EXHIBIT "C"

ORIGINAL

1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

ASSEMBLY POINT AVIATION, INC.,
Plaintiff,

- against -

Index No: 1:13-CV-0298

RICHMOR AVIATION, INC.,
Defendant.

---

The following **EXAMINATION BEFORE TRIAL** of **PHILLIP MORSE** in the above-entitled matter was held pursuant to Notice at **WHITEMAN, OSTERMAN & HANNA**, One Commerce Plaza, Albany, New York, on Tuesday, March 111, 2014, commencing at 12:38 p.m. before Laurel Stephenson, Court Reporter and Notary Public.

**A-P-P-E-A-R-A-N-C-E-S:**

**JOHN J. HENRY, ESQ.**
**WHITEMAN, OSTERMAN & HANNA, LLP.**
One Commerce Plaza
Albany, New York 12260
Attorneys for Plaintiff

**BRIAN M. QUINN, ESQ.**
**TABNER, RYAN & KENIRY, LLP.**
18 Corporate Woods Boulevard
Suite 8
Albany, New York 12211
Attorneys for Defendant

---

**ALSO PRESENT:**

Mahlon Richards

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

2

**I-N-D-E-X**

**DEPOSITION EXHIBITS**

| Number | Description | For Ident. |
|---|---|---|
| 29 | Defendant 6902 - 6903 Invoice date October 5, 2001 | 4 |
| 30 | Defendant 501, 504, November 15, 2002 | 4 |
| 31 | New York State Department of State Division of Corporations | 8 |
| 32 | August 16, 2006, invoices | 45 |
| 33 | State of New York Supreme Court Memorandum and Order | 74 |
| 34 | DynCorp, August 20, 2003 | 80 |
| 35 | Invoice | 81 |

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

3

**S-T-I-P-U-L-A-T-I-O-N-S**

**F-E-D-E-R-A-L**

**IT IS HEREBY STIPULATED AND AGREED**, by and between the attorneys for the respective parties, as follows:

All objections, except as to the form of the questions, shall be reserved to the time of the trial.

The within examination may be signed and sworn to before any Notary Public with the same force and effect as if signed and sworn to before the court.

Filing of the original transcript of the examination is waived.

* * *

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

4

PHILLIP MORSE -- Atty. Quinn

**PHILLIP MORSE,**

called as a witness, having been duly sworn, was examined and testified as follows:

(Deposition Exhibits Numbers 29 and 30 were marked for identification, this date.)

**BY MR. QUINN:**

Q My name is Brian Quinn. I'm with Tabner, Ryan and Keniry. I'm an attorney for Richmor --
A Speak up, because my hearing is bad.
Q Sorry about that. Could you state your name for the record, please.
A Phillip H. Morse.
Q Where do you reside?
A
Q What year were you born?
A June of 1941.
Q Did you attend college?
A Yes.
Q Where did you attend?
A University of Maine.
Q Did you graduate?
A Yes.
Q Did you receive a degree?
A Yes.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832



5

PHILLIP MORSE -- Atty. Quinn

Q What degree did you receive?
A Sociology.
Q Did you receive any other degrees besides --
A No.
Q -- sociology? Did you attend any other higher education after graduating?
A Real estate, Boston.
Q Did you receive a degree for that?
A No.
Q Did you receive a certificate?
A I'm sorry?
Q Did you receive a certificate?
A Yes.
Q What kind of certificate did you receive?
A To sell real estate.
Q All right. After graduating, what did you do?
A Went in the Army.
Q How long were you in the Army?
A Six -- six months active, five and a half years reserve.
Q After that, did you leave the Army at any time?
A Yes.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

6

PHILLIP MORSE -- Atty. Quinn

Q What did you do after the Army?
A I went to work for Liberty Mutual Insurance Company of Boston.
Q What did you do for Liberty Mutual?
A Claims adjustor.
Q How long did you do that for?
A Year and a half.
Q What did you do after that?
A Went to work for a small medical company in upstate New York.
Q What did you do for them?
A Salesman.
Q How long did you do that for?
A About three years.
Q Then after that, did you work anywhere else after that?
A Started my own company.
Q What company was that?
A North American Instrument Corporation.
Q Do you recall when?
A 1969.
Q How long were you associated with that company for?
A Until '94, '95.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

7

PHILLIP MORSE -- Atty. Quinn

Q Did you have a position at that company?
A I was founder and chairman of the board.
Q Were you an officer of the company?
A Yes.
Q What was your position as an officer?
A Chairman of the board.
Q After that, did you retire from that position at all?
A Yeah.
Q What did you do?
A Retire.
Q Then did you work at Heritage Creations, Incorporated?
A Yeah. Didn't really work at it.
Q Were you associated with Heritage Creations?
A Yes, I funded it.
Q Were you a director of the corporation?
A Partly the owner.
Q Were you an officer of the corporation?
A I don't recall.
Q Did there come a time when you founded Assembly Point Aviation?
MR. HENRY: I'm going to object to the form to the extent that you said founded, because I'm

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

8

PHILLIP MORSE -- Atty. Quinn

not sure what that means, but you can answer if you know what he's asking.
A What is the question again?
Q Did there come a time when you created Assembly Point Aviation?
A Yes.
Q When was that?
A I don't recall.
Q From 2001 to 2005, were you a director of Assembly Point Aviation?
A 2001-2005?
Q Yes.
A Don't know.
Q Were you an officer of Assembly Point Corporation?
A I was the owner of it.
Q Do you know if you were the chief executive officer?
A Don't even know if it had had one.
Q All right.
(Deposition Exhibit Number 31 was marked for identification, this date.)
(The document was handed to the witness, and the witness examined the document.)

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

9

PHILLIP MORSE -- Atty. Quinn

BY MR. QUINN:

Q This is a printout from the New York Department of State Division of Corporations.

A Okay. Chief executive officer.

Q Would you agree with this designation of you on this sheet?

A Yes.

Q What were your duties?

A I flew in it. I had no duties.

Q So, as the chief executive officer, you had no duties for Assembly Point Aviation?

A No.

Q Were you also the chairman of Assembly Point Aviation?

A I don't recall.

Q Take a look at Exhibit 14.

(The document was handed to the witness, and the witness examined the document.)

Q All right. On the second page there's a signature line for Assembly Point Aviation. Is that your signature?

A Yep.

Q Below it says chairman.

A Yep.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

10

PHILLIP MORSE -- Atty. Quinn

Q Were you the chairman at that time?

A I guess so.

Q Do you recall when you became the chairman?

A No.

Q What did Assembly Point Aviation do?

A As far as I -- it was just a company set up to -- to manage the plane.

Q Do you know if it conducted any other business besides managing the plane?

A Not that I'm aware of.

Q Do you know who assisted Assembly Point Aviation in terms of its finances?

MR. HENRY: Object to the form. You can answer if you know what he's asking.

A I don't know.

Q Do you know who assisted Assembly Point Aviation in 2001 to 2005 with its taxes?

A Who did what?

Q Who did the taxes for Assembly Point Aviation?

A I assume it was Dave Gilmour, I assume.

Q Do you know if anybody from Assembly Point Aviation reviewed any invoices or expense reports that Richmor provided?

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

11

PHILLIP MORSE -- Atty. Quinn

A I have no idea.

Q Do you know who communicated with Richmor Aviation from 2001 to 2005 about the airplane?

A I would assume it would have been Dave Gilmour.

Q Would there be anyone else besides Dave Gilmour?

A Sarah Rose Homkey, probably.

Q Anyone else besides those two?

A I don't know.

Q Did you ever communicate with anybody from Richmor Aviation about the airplane from 2001 to 2005?

A Did I?

Q Yes.

A I don't recall.

Q Do you know what this lawsuit is about?

A What's that?

Q Do you know what this lawsuit is about?

A Yes.

Q What is it about?

MR. HENRY: Objection, the pleadings speak for themselves. You can answer if you know what he's asking.

A Let the pleadings speak for themselves.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

12

PHILLIP MORSE -- Atty. Quinn

Q What is your understanding of the pleadings?

A The pleadings: Richmor Aviation filed a lawsuit with the company to settle a claim that was rightly owed to them -- owed to us, and the split was supposed to be 85/15.

Q When you say "the split was supposed to be 85/15," what do --

A Whatever was recovered in the settlement.

Q What is the basis for saying that?

A Discussions that were had with Mahlon Richards.

Q Is it your understanding that the agreement to have an 85/15 split was oral?

A Well, it was a discussion that I had, if I recall, in my office in Glens Falls, yeah.

Q Can you describe that discussion in Glens Falls?

A I think Mahlon said he had an opportunity to have a contract with the government for 300 hours for a certain length of time, and I said fine.

Q And do you recall that discussion?

A I just relayed it to you.

Q I'm asking you, is that an assumption you're making?

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

13

PHILLIP MORSE -- Atty. Quinn

A That's it.
Q Is that a vivid recollection?
A Pardon?
MR. HENRY: Object to the form.
Q Is that a recollection?
MR. HENRY: He just testified as to his recollection of the conversation.
Q Okay. Do you know when that conversation took place?
A No.
Q Do you know if it was in 2002?
A I don't recall.
Q All right. Do you know if it was before Richmor entered into the SportsFlight Air contract?
A I have no idea.
Q Okay. I'll show you what's been marked as Exhibit 2, which is three parts. There's an aircraft lease agreement, an aircraft pilot and management service agreement, and master cross leasing agreement.
(The document was handed to the witness, and the witness examined the document.)
Q Have you ever seen this document before?
A No.
Q All right. Do you know who participated in

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

14

PHILLIP MORSE -- Atty. Quinn

the drafting or negotiation of this document?
MR. HENRY: Object to the form that to the extent it assumes there was a negotiation over the contract. Go ahead. You can answer if you know.
A I have no idea.
Q Do you know if any attorneys were involved in preparing this?
A I have no idea.
Q Do you know if Assembly Point Aviation requested any changes to --
A I have no idea.
Q If you can turn to page 2 on that document, 2.2(b), and it says, "use priority," and in that first sentence it mentions lessees. Do you have any idea --
A The what?
Q It mentions lessees in the first sentence, the last word.
MR. HENRY: Are you looking at 2.2(b)?
MR. QUINN: Yes.
MR. HENRY: He's just asking if you see that section.
THE WITNESS: Do I see it?
MR. HENRY: Yes.
THE WITNESS: Now?

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

15

PHILLIP MORSE -- Atty. Quinn

A Yeah.
Q Do you have any idea what lessees refers to?
A No.
Q And in the next sentence it says, "Air Services Provider shall present flight scheduling requirements for the prospective charter flights to owner for prior approval," and then continues.
Did Richmor ever present flight scheduling requirements for prospective charter customers to you for --
A I have no idea.
Q On 2.2(c), it says, "Nothing contained herein shall obligate Air Services Provider to any minimum use of the aircraft," and then it continues.
Did you have any discussion with anybody at Assembly Point at any time about that provision?
A No.
Q What about anybody from Richmor?
A I have no idea.
Q And then if you go to Section 5.1 on page 4, the last sentence, "Except as provided in Section 2.4, Air Services Provider shall assume the risk of non-payment, non-collection or refunds of charter flight revenues from any charter customer."

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

16

PHILLIP MORSE -- Atty. Quinn

Have you ever had any discussions with anybody from Assembly Point about that provision?
A I've never seen it before.
Q Have you ever heard about it before?
A No.
Q On the next page, 5.3, it provides, "Air Service --
A What is it?
Q 5.3.
It provides, "Air Services Provider shall remit 85 percent of the charter rate per hour flown on owner's aircraft," then it continues.
Have you had any discussion with anybody from Assembly Point or Richmor about the use of the word flown in that provision?
A No.
Q What about for the use of the phrase charter rate in that provision?
A I'm sorry?
Q Have you had any discussions with anybody from Assembly Point or Richmor about the use of the phrase charter rate in that provision?
A The only thing I recall is Mahlon was going to give the government a better lease price than

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

17

PHILLIP MORSE -- Atty. Quinn

retail.

Q Do you recall the definition of flight hour that is --

A No.

Q If you turn to the management agreement on page 2, the definition of flight hour there, it provides, "Shall mean the time from take-off to landing, wheels-up to wheels-down, as recorded time on the Aircraft hour meter, or, if non-functional for any reason, as indicated in the journey log entries."

Did you have any discussions with anybody --

A No.

Q Let me just finish the question.

**MR. HENRY:** For the record, let him finish the question.

A I thought you answered [sic] the question.

Q I know what you're saying, but I just need to have it for the record.

Did you have any discussions with anybody from Assembly Point or Richmor at any time about that definition of flight hour?

A No.

Q And on that third part of that exhibit, the master cross leasing agreement, do you know what that

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

18

PHILLIP MORSE -- Atty. Quinn

is?

A No.

Q Are you aware of any prior drafts in the possession of Assembly Point regarding this lease?

A No.

Q Prior to this lease date, are you aware of any instances where Richmor obtained a customer with a minimum guarantee with any charter contract in relation to Assembly Point Aviation's aircraft?

A I have no idea.

Q After the date of the lease, are you aware of any instance where Richmor obtained a charter customer with a minimum guarantee in connection with Assembly Point's aircraft?

A I have no idea.

Q If you could take a look at Exhibit 1, this one here.

(The document was handed to the witness, and the witness examined the document.)

Q Have you ever seen this document before --

A No.

Q -- which is Exhibit 1 of defendant's production, the complaint and demand for jury trial?

A No.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

19

PHILLIP MORSE -- Atty. Quinn

Q I'm sorry. I meant Defendant's Deposition Exhibit 1.

On paragraph 21 of this complaint it references an opportunity that Richmor brought to plaintiff in early 2002. Do you recall in 2002 any opportunities that plaintiff brought to Richmor -- or that Richmor brought to plaintiff, sorry?

A I have no idea.

Q You testified earlier about a discussion that occurred at some time about the use of the aircraft for the government, correct?

A Yes.

Q All right. And where was that conversation again?

A To the best my knowledge, it was Glens Falls.

Q Do you know if it was over the telephone or in person?

A In person.

Q Where in Glens Falls was it?

A At company headquarters on Pruyn's Island.

Q At Assembly Point Company headquarters?

A No, at North American Instrument Corporation headquarters.

Q Who was involved in that discussion?

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

20

PHILLIP MORSE -- Atty. Quinn

A I think it was Mahlon, myself, and Dave Gilmour.

Q Do you recall anybody else involved?

A Not that I am aware of.

Q Do you recall how long this discussion occurred?

A No.

Q Do you recall what was said at the discussion?

A I've already indicated that Mahlon said he had an opportunity to charter the plane to the government for 300 hours.

Q Did he say when the opportunity was going to begin?

A I don't recall.

Q Did he say how much the rate was going to be?

A He said he had to give them -- he was giving them less than market rate.

Q Did he say anything about a guarantee involved with the opportunity?

A Three hundred hours.

Q Did he say if it was guaranteed for the plane or guaranteed for Richmor?

A I don't know the difference.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

21

PHILLIP MORSE -- Atty. Quinn

Q Did you ask whether or not Assembly Point was going to be a party to that agreement with the government and Richmor?

A I don't recall.

Q Do you recall who Richmor was going to contract with?

A No -- government, that's all.

Q At that time, did you know the entity known as SportsFlight Air?

A No.

Q Did anybody discuss what would happen if those hours were not flown on the aircraft?

A No.

Q Did anybody discuss an option to renew that opportunity with the government after it expired?

A What's the question again?

Q Did anybody discuss the term of the opportunity, the duration of the opportunity?

MR. HENRY: I think the original question was, was there an option to renew.

MR. QUINN: Yes, I'm getting there.

MR. HENRY: All right. Do you know what he's asking?

THE WITNESS: Yeah.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

22

PHILLIP MORSE -- Atty. Quinn

A I thought it was -- first I thought it was two years or something like that.

Q Did Mahlon say it was going to be two years at that time?

A I can't recall.

Q Do you recall if anybody discussed whether or not there was an option to renew that opportunity at the end of the expiration of the two-year term?

A All I know is when the initial time was over, it was relayed to me by Dave Gilmour that it was going to be a month-to-month situation.

Q But did Richmor say anything at that time --

A I have no idea.

Q -- about a month-to-month discussion?

A Yeah.

Q What did they say?

A I got it thirdhand. I have no idea what -- you have to talk with Dave Gilmour about that.

Q What I'm asking you is do you recall what was Mahlon's --

A I approved it.

Q At the meeting, did you talk with Mahlon directly?

A I did not meet him.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

23

PHILLIP MORSE -- Atty. Quinn

Q Who met Mahlon?

A I don't know.

Q But at the meeting where the opportunity was first raised, were you present?

A There was no meeting about an extension.

Q I'm referring to the meeting about the initial opportunity.

A Right.

Q All right. Were you present at that meeting?

A Yeah.

Q David Gilmour was also present there?

A Yeah.

Q What did Mahlon say at the meeting, if anything, about a renewal of this opportunity?

A Renewal was never mentioned.

Q Did he mention if there was an opportunity to renew?

A No.

Q At that meeting, did Mahlon inform Assembly Point that it was guaranteeing the use of the plane for fifty hours per month?

A I don't recall the details of it.

Q All right. Do you recall at the meeting if Richmor promised Assembly Point Aviation 85 percent of

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

24

PHILLIP MORSE -- Atty. Quinn

$4,900 times fifty hours per month?

A I don't recall the details other than the 85/15 split.

Q Do you recall Mahlon saying that there would be an 85/15 split at the meeting?

A Yes.

Q What did he say?

A He said it would be his customary 85/15 split.

Q Is that for hours that were flown on the plane?

A I have no data.

Q Was that for hours that were not flown?

A I have no idea.

Q Did you inquire about how the 85/15 split would work at the meeting?

A No.

Q Did anybody discuss the maintenance of the aircraft at the meeting?

A No.

Q Did anybody discuss Assembly Point's use of the airplane at the meeting?

A Not that I recall.

Q Did anybody discuss whether or not

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

non-government charter customers could use the aircraft in connection with the opportunity?

A Not that I recall.

Q Was there any discussion at that meeting about how Assembly Point would keep track of any unused hours?

A I have no idea.

Q Did you take any notes at that meeting?

A No.

Q Did Dave take any notes at that meeting?

A I have no idea.

Q I want to show you what's marked as Exhibit 3.

(The document was handed to the witness, and the witness examined the document.)

Q Have you ever seen this document before --

A No.

Q -- this is Defendant's Exhibit 3 for depositions.

A No.

Q Have you ever seen any drafts of this document before?

A No.

Q Do you know what time period the SportsFlight

Air contract, the initial written contract provided for?

A No.

Q Are you aware of the terms of the original SportsFlight Air --

A I'm sorry?

Q Are you aware of any of the terms of the original SportsFlight written contract?

A No.

**MR. HENRY:** Objection. He just testified he's never seen it before.

Q Has anybody from Assembly Point ever informed you of any terms of the SportsFlight Air original written contract?

A No.

Q Did you become aware at some point that Richmor had begun using the plane for the government flights?

A I suspect, yes.

Q Do you know when that was?

A No.

Q Do you know if it was before May 2002?

A No.

Q Do you know if it was after November 2002?

A No.

Q Do you recall how you became informed?

A No, I don't.

Q Did anybody from Assembly Point inquire from Richmor whether or not the SportsFlight Air contract had ended?

A I have no idea.

Q Do you know if anybody was assigned at Assembly Point to monitor the number of hours being flown on the aircraft?

A I have no idea.

Q Do you know if anybody monitored the number of hours being flown on the aircraft?

A I don't -- I have no idea.

Q Did anybody from Assembly Point conduct any internal meetings about the opportunity?

A I have no idea.

Q Did anybody at Assembly Point discuss with Richmor the number of hours being flown on the aircraft?

A I have no idea.

Q Did anybody from Assembly Point discuss with Richmor how Richmor intended to bill SportsFlight Air at the end?

A I have no idea.

Q Did anybody from Richmor and Assembly Point discuss how much was going to be paid to Assembly Point at the end of the SportsFlight Air agreement?

A I have no idea.

Q You mentioned earlier you had a discussion or thirdhand knowledge from Dave Gilmour about the extension of the SportsFlight Air contract; is that correct?

A That I recall, yes.

Q Do you recall what Dave told you?

A Just that he'd had a discussion with Mahlon and there was an extension of month-to-month, and I said fine.

Q At the time, did you have an expectation that Assembly Point was going to receive fifty hours per month?

A There was no details.

Q All right. So, is it fair to say that Dave didn't inform you how they were going to calculate how much was owed to Assembly Point by Richmor at the end of the SportsFlight Air agreement?

A I don't recall --

**MR. HENRY:** Objection to the form.

29

PHILLIP MORSE -- Atty. Quinn

A -- any of the discussion, actually.

MR. HENRY: And object to the form.

Q I'm going to show you what's been marked as Exhibit 29.

(The document was handed to the witness, and the witness examined the document.)

Q Have you ever seen these invoices before?

A No.

Q Did anybody from Assembly Point receive any invoices that were sent from Richmor to SportsFlight Air after the SportsFlight Air contract expired?

A I have no idea.

Q If you can turn back to that complaint, which is Exhibit 1, and if you could read paragraph 28 to yourself.

(The witness examined the document.)

Q Are you aware of any cases or instances where Richmor or plaintiff -- plaintiff being Assembly Point Aviation, obtained permission from the government or its intermediary to use the airplane for any purpose other than charters through SportsFlight Air?

A I have no idea.

Q After that discussion with Dave about the renewal of the SportsFlight Air contract, did you have

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

30

PHILLIP MORSE -- Atty. Quinn

any other discussions with Dave about the SportsFlight Air contract?

A Not that I recall.

Q Do you know when anybody from Assembly Point first informed Richmor about how much Richmor owed Assembly Point for the unused flight time?

A I have no idea.

Q Do you know how much Assembly Point is claiming that it's owed from Richmor for the unused flight time?

A No.

Q Did there come a time when you first learned of Richmor's lawsuit against SportsFlight Air?

A Yes.

Q Do you recall when that was?

A Not exactly, no.

Q Do you know if it was before the lawsuit was commenced or after?

A I have no idea.

Q How did you become aware of the lawsuit?

A Oh, I think Mahlon said he was going to sue them, sue the government.

Q At that time, did he say he was suing on behalf of Assembly Point Aviation?

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

31

PHILLIP MORSE -- Atty. Quinn

A I don't recall.

Q Do you recall, at that time, if he discussed sharing proceeds from the lawsuit with you?

A I don't recall.

Q Do you recall him mentioning anything about negative publicity?

A No.

Q If you can turn on Exhibit Number 1, defendant's deposition exhibit, to paragraph 44. That last sentence of paragraph 44 says, "The sole aircraft that was the subject of the litigation and basis upon which Richmor obtained its judgment was Plaintiff's aircraft N85VM."

Is that a true and accurate statement, to the best of your knowledge?

A Yes.

Q What's the basis of saying that?

MR. HENRY: Objection. If you know. He's already testified he never saw the complaint before.

MR. QUINN: I'm asking if this sentence is true and accurate to his knowledge. He just saw it.

MR. HENRY: It's right out of the

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

32

PHILLIP MORSE -- Atty. Quinn

Appellate Division decision, but you can ask him.

A What was the question?

Q What's the basis for saying that this statement is true and accurate that "The sole aircraft that was the subject of the litigation and the basis upon which Richmor obtained its judgment" --

A I have no idea.

Q -- "was Plaintiff's aircraft"?

I'll show you what's been marked as Exhibit 30.

(The document was handed to the witness, and the witness examined the document.)

Q This is a document that Richmor Aviation prepared. It's two pages of the document. Have you ever seen this document before?

A No.

Q All right. Did you ever discuss with Richmor the use of other aircraft --

A No.

Q -- for the SportsFlight Air contract?

A No.

Q Do you know if anybody from SportsFlight Air ever discussed with Richmor the use of other aircraft?

A I'm not aware if they did.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

33

PHILLIP MORSE -- Atty. Quinn

Q I'll show you what's been marked as Exhibit 6 and 5 from defendant's deposition exhibits.

(The documents were handed to the witness, and the witness examined the documents.)

Q For Defendant's Deposition Exhibit 6, have you ever seen this document before?

A No.

Q Has anybody from Assembly Point ever --

A I have no idea.

**MR. HENRY:** You got to let him finish the question.

Q Has anybody from Assembly Point ever discussed with you an invoice that Richmor sent to SportsFlight Air outlining different flights and hours?

A Not that I recall.

Q Okay. On Exhibit 5, Defendant's Deposition Exhibit 5, have you ever seen this document before?

A No.

Q All right. So have you ever heard from anybody from Assembly Point of what this document is?

A I have never seen this.

Q Okay. I'll show you what's been marked as Plaintiff's Exhibit 8 from the depositions.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

34

PHILLIP MORSE -- Atty. Quinn

(The document was handed to the witness, and the witness examined the document.)

Q Paragraph 8 provides, "During this time, Plaintiff's crew and aircraft were available to defendant on twenty-four (24) hour notice, should Defendant have required flight services."

And this is the complaint from the State Court action between Richmor and SportsFlight, and then on paragraph 23 --

A Run 8 by me again?

Q Do you see paragraph 8 where it says, "During this time --

A I understand.

Q All right. And then do you see paragraph 23 where it says, "The agreement with Defendant limited Plaintiff from fully utilizing its aircraft fleet and flight crews, because Plaintiff needed to have a flight crew and aircraft available on short notice for Defendant."?

And then do you see paragraph 24 where it says, "Having a flight crew on notice and an aircraft available to Defendant at all times was a benefit to Defendant, at Plaintiff's expense." Do you see those paragraphs?

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

35

PHILLIP MORSE -- Atty. Quinn

A Um-hmm.

Q Were you aware that Richmor Aviation was alleging that it needed to be on call 24/7 in connection with the SportsFlight Air agreement?

A Run that by me again?

Q Were you aware of the obligations of Richmor Aviation to SportsFlight Air?

A No.

Q Were you aware -- withdrawn on the last phrase.

In connection with Assembly Point's claim for the unused flight time, did Assembly Point promise Richmor Aviation that it would be available 24/7 for these flights?

**MR. HENRY:** I'm sorry. What was the question?

Q In connection with Richmor's promise to Assembly Point to use the plane for fifty hours per month, was that your understanding of what the promise was from Richmor to Assembly Point?

A I think you got that wrong.

Q All right. What was the promise that Rich --

A What fifty hours are you talking about?

Q Did Richmor promise Assembly Point to use the

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

36

PHILLIP MORSE -- Atty. Quinn

aircraft for fifty hours per month?

**MR. HENRY:** I don't think there's any allegation that Richmor was going to use the plane for fifty hours a month.

Q Did Mahlon ever inform anybody from Assembly Point that Richmor was going to use the plane for fifty hours per month?

A That's the discussion I think he had with Dave Gilmour.

Q All right. And are you aware of any reciprocal promise from Assembly Point to Richmor to have the plane available 24/7 for the SportsFlight Air charters?

A I have no idea.

Q Do you know if the plane was available 24/7 for these charter flights with SportsFlight Air?

A I have no idea.

Q If I could show you Exhibit 21 from defendant's exhibit documents.

(The document was handed to the witness, and the witness examined the document.)

Q This is a draft summary sheet prepared by Richmor Aviation for maintenance days for the aircraft. It has the maintenance dates and the number

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

of days for the aircraft.

Would you agree that these number of days are correct on this draft summary?

MR. HENRY: I'm going to object to the form.

A I have no idea, no idea.

Q Do you have any documents that would dispute these figures on this draft summary sheet?

A I don't know. I've never seen these before.

Q But would you have any independent documents yourself that would dispute --

A Absolutely not.

Q During the term of the Richmor Aviation and Assembly Point lease, did Richmor provide Assembly Point with any maintenance records?

A I have no idea.

Q For Exhibit 20, if you could just turn to that.

(The document was handed to the witness, and the witness examined the document.)

Q This is a draft summary sheet that Richmor prepared identifying the Assembly Point trips, personal use of airplane, and the charter trips, non-SportsFlight charter trips, between 2002 and

January of 2005.

MR. HENRY: I'm going to object to the form. That's your characterization of this document. Go ahead you can answer.

Q Let's assume that to be true. Now, that first Assembly Point trip lists September 28th of 2002 a trip to Scotland for one day. Do you recall going to Scotland for one day in September of 2002?

A What date?

Q September 28th of 2002.

A Yeah.

Q And was that trip on Assembly Point's aircraft that's at issue in this case?

A I don't recall.

Q Do you recall going to Scotland October 5th of 2002?

A I don't recall.

Q What about Florida on --

A Sure.

Q -- October 31st through November 1st of 2002, do you recall if that was using the Assembly Point aircraft?

A I have -- no, no idea.

Q Did you use the Assembly Point aircraft at

all between 2002 to 2005?

A Did I what?

Q Use the Assembly Point aircraft at all from 2002 to 2005 for personal --

A Certainly.

Q -- use? Do you recall how many days you used it?

A No.

Q Do you recall if you used it some months more than once?

A More than once?

Q Yes.

A Yes.

Q Did you have any discussions with anybody from Richmor about what effect the usage of the plane by Assembly Point and for non-government purposes would have on the agreement between Richmor and Assembly Point in connection with the unused flight time on the SportsFlight Air contract?

MR. HENRY: Object to the form. You can answer if you know what he's asking.

A Well, the only thing that I recall is that if I was going on a trip and the government had the plane, then I had to go on another plane.

Q After the SportsFlight Air contract, if some other non-government charter was using the plane, would you use other aircraft also?

A I have no idea.

Q Do you recall using any other aircraft after 2006?

A I have no idea.

Q Do you recall if those other aircraft were more expensive or less expensive than your aircraft?

A I have no idea.

Q Do you recall if you paid anything to use your aircraft?

A I have no idea.

Q Do you recall how many charter customers, other than SportsFlight Air, used the aircraft in 2002 --

A I have no idea.

Q The last part was: 2002 to 2005?

Do you have any records or does Assembly Point have any records to evidence how many times or days Assembly Point used the aircraft from 2002 to 2005?

A I have no idea.

Q Do you know if it has any records to reflect

what charter customers used the aircraft from 2002 to 2005?

A I have no idea.

Q I want to show you what's been marked as Exhibit 18.

(The document was handed to the witness, and the witness examined the document.)

Q These are various invoices for the plane. Do you recall receiving any invoices from Richmor Aviation in connection with the plane?

A I never saw invoices.

Q Did you ever receive any invoices in the mail from Richmor Aviation?

A I have no idea.

Q Would you agree with me that these invoices are addressed to you?

A Yes.

Q Was that your address at the time?

A Yes.

Q And do you recall if Richmor sent any invoices to anybody at Assembly Point between 2002 to 2005?

A I have no idea.

Q If invoices had been sent, who would review

them, if you know, from Assembly Point Aviation?

MR. HENRY: Object to the form. You can answer if you know.

A Between 2000-2004?

Q 2002 to 2005.

A Probably Dave Gilmour.

Q Is it possible that nobody reviewed the invoices?

MR. HENRY: Objection to the form, calls for speculation.

A I have no idea.

Q Do you recall if anybody from Assembly Point paid anybody at Richmor Aviation anything in connection with the lease of the plane from 2002 to 2005?

A Paid the bills.

Q So is it fair to say that somebody reviewed the invoices?

A Yes.

Q To the best of your recollection, that would have been Dave Gilmour?

A Yes.

Q Did you have an assistant between 2002 to 2005?

A Sarah Rose Homkey.

Q Do you know if she received any of the invoices?

A Well, they probably ended up going to her.

Q Do you know if she forwarded them to Dave Gilmour?

A Well, they were in the same building, so.

Q Do you know if she reviewed any of the invoices?

A Who?

Q Sarah.

A I have no idea.

Q Do you recall informing any news media in March of 2005 that Richmor would send monthly invoices to Assembly Point Aviation?

A I have no idea.

Q Do you recall reporting to any news media that the monthly reports from Richmor would have information about who was leasing the aircraft?

A No.

Q Do you recall making any comments in March of 2005 to any news media that the monthly reports would report where the plane had gone?

A Yes.

Q All right. What do you recall in that regard?

A I got a call from somebody saying there was going to be an article in the Chicago Tribune the following morning, and then a couple days later some -- someone called. I can't recall who. And the article was about rendition.

Q Did you make any comments about Guantanamo Bay that you recall?

A I'm sorry?

Q Did you make any comments about Guantanamo Bay?

A Not that I am aware of.

Q Do you recall saying to the person that you knew that the plane had been used to go to Guantanamo Bay?

A I don't recall exactly.

Q All right. At that time, what locations or destinations were you aware of about where the plane had gone?

A In all the years that they had the arrangement with the government, I only knew of one location.

Q All right. Were you aware of how many hours

the plane had been used?

A No.

Q Are you aware of whether or not the invoices listed how many hours the plane had been used?

A No.

Q Are you aware of whether or not the invoices listed the destinations of where the plane had been used?

A No.

Q Are you aware of whether or not any of the invoices contained additional materials with them, like receipts?

A No.

Q All right.

(Deposition Exhibit Number 32 was marked for identification, this date.)

BY MR. QUINN:

Q This is what appears to be one of the invoice packets from Richmor to Assembly Point. Have you ever seen anything like this?

A Have I ever seen anything like this?

Q Yes.

A Yeah.

Q Would Richmor send these invoice packets to

Assembly Point?

A As far as I know.

Q As far as you know, is this the type of information that would be included in the packets?

A As far as I know.

Q At the top, on the first page, it lists owner hours. Do you know what that refers to?

A Probably hours that I flew.

Q All right. And do you know what maintenance hours refers to?

A Yes.

Q What does that refer to?

A Maintenance hours.

Q Does that reflect hours in the air to get to maintenance?

A I have no idea.

Q Richmor hours, do you know what that refers to?

A No.

Q If you turn to the fourth page in, this lists the aircraft number, the trip start date, the end date, and the hours and the miles and the fuel, and it lists the destination, departure cities, airports, arrival cities, hours and miles. Do you recall

Richmor sending any other documents like this to Assembly Point Aviation?

A No.

Q All right. Do you recall -- I'm asking do you recall one way or the other?

A I don't remember ever seeing this.

Q But do you ever recall seeing anything similar to this?

A No.

Q All right. And if you turn two more pages in, there's a similar document with the trip start date, end date, departure city, arrival city, hours, miles --

A Um-hmm.

Q -- do you recall --

A Do I recall what?

Q Do you recall receiving anything like this?

MR. HENRY: Objection, asked and answered. You just asked him about the same.

A This is my first time seeing this.

Q To your knowledge, you haven't seen any of these types of documents in connection with any invoice packets that were sent to Assembly Point Aviation?

MR. HENRY: Objection, asked and answered. You can answer it again.

A I have not.

Q Okay.

A My wife going to Wimbledon.

Q Do you know if anybody from Assembly Point kept track of the numbers of hours used on the plane?

A I have no idea.

Q I'll show you what's been marked as Exhibit 17.

(The document was handed to the witness, and the witness examined the document.)

Q Have you ever seen any document like this before?

A No.

Q So I assume you don't know who created it?

A No.

Q All right. I assume you don't know -- sorry. This is for 2008 to 2009. For any of the other years, from 2002 to 2005, had you seen any document like this before?

A No.

Q I'll show you what's been marked as Exhibit 4.

49

PHILLIP MORSE -- Atty. Quinn

(The document was handed to the witness, and the witness examined the document.)

Q This is an e-mail from Cynthia purportedly to you with an attachment, govtcont.pdf. Do you recall receiving any documents from Cynthia in December of 2008?

A Do I recall?

Q Yes.

A Sure.

Q All right. If you look through this e-mail on the bottom of the page P-001209, do you recall ever reading this document that was in the e-mail attachment?

A No.

Q Do you recall ever discussing this document with Cynthia?

A Not that I recall.

Q If you look through on P-001219, this lists various planes that were being used in connection with this contract number.

MR. HENRY: Object to the form.

Q All right. This lists various planes on the top, says, DynCorp GIV, contract number LT050602. Do you see that?

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

50

PHILLIP MORSE -- Atty. Quinn

A Yep.

Q All right. Do you recall discussing this document with Cynthia?

A No.

Q Do you recall --

A Never seen this before.

Q Have you seen this before?

A No, I have not.

Q If you look through to P-001223, in that second to last paragraph, the middle paragraph there, the second to last sentence where it says, "Mr. Morse can use his airplane as is his prerogative." This is the e-mail dated July 2003, do you see that?

A No.

Q Have you ever seen this document before?

A No.

Q Did you discuss with Cynthia anything about an e-mail from DynCorp?

A I couldn't recall.

Q After that, P-001224, is a document from Richmor to Don Moss, and it goes on, there's various flights, hours, and dates of flights.

A I don't recall seeing this.

Q Have you ever seen this document before?

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

51

PHILLIP MORSE -- Atty. Quinn

A Nope.

Q You testified earlier, I believe, that you remember Cynthia sending you documents, though?

A Yeah.

Q Do you recall what --

A Not related to Richmor, though.

Q What did she send you?

A I don't recall.

Q All right. Do you recall if she sent you anything about the Richmor lawsuit?

A Not that I recall.

Q But this e-mail is from Cynthia to you, correct?

A Yep.

Q All right. Looking through these documents, does that refresh your memory in any way about what Cynthia sent you --

A No.

Q -- in connection with Richmor?

A It was six years ago.

Q But you recall the conversations of 2002, correct?

MR. HENRY: Objection. He's already testified as to that.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

52

PHILLIP MORSE -- Atty. Quinn

Q But you said that this was six years ago, this document you don't recall because it's six years ago?

MR. HENRY: That's correct. He already answered that.

A I answered the question.

Q All right. If I can show you Exhibits 7, 8, and 9 of Defendant's Deposition Exhibits.

(The documents were handed to the witness, and the witness examined the documents.)

Q On that first page, it purports to be an e-mail from Cynthia to Mahlon cc'd to David Gilmour. The second to last paragraph, the second sentence in the last it says, "I assume that part of what you're trying to recover is for Richmor and the other part is for Assembly Point Aviation."

Do you see that?

A Yep.

Q Do you know if Richmor and Assembly Point had any agreement prior to that about how they would share lawsuit proceeds in connection with the State Court litigation?

MR. HENRY: Other than what he's testified to previously?

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

53

PHILLIP MORSE -- Atty. Quinn

Q Other than what you testified to.

A All I recall is what Mahlon said at the original meeting at Pruyn's Island.

Q After that, did there come a time when Cynthia had any discussions with Mahlon about sharing proceeds for the lawsuit?

MR. HENRY: Objection. That's outside his knowledge.

Q Did Cynthia inform you at any time that she had discussions with Mahlon about sharing proceeds from the State Court litigation?

A Yeah.

Q What did she say?

A She just expected that it would be an 85/15 split.

Q Did she say why she expected that?

A You'd have to talk with her about it. I don't know.

Q But did she tell you why she expected that?

A That was the agreement that Dave Gilmour and Cynthia and I had -- the understanding that the agreement that we -- we struck with Mahlon.

Q Do you know if at that time whether or not Cynthia had reviewed the lease at all when she made

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

54

PHILLIP MORSE -- Atty. Quinn

that statement?

MR. HENRY: Objection. Outside of his knowledge.

A I have no idea.

Q Did you provide her with a copy of the lease?

A I have no idea.

Q Do you know if David provided her a copy --

A I have no idea.

Q Was Cynthia assigned the task of talking with Mahlon because she had the law school education?

MR. HENRY: Object to the form. You can answer if you know what he's asking.

A No.

Q Do you know why Cynthia was talking to Mahlon?

A Because she was in charge of the facility.

Q When you say "facility," what do you mean by that?

A The building on Pruyn's Island and the aircraft.

Q But David Gilmour, was he the one that signed the lease for the aircraft, if you know?

A I have no idea.

Q When you say Cynthia was in charge, what was

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

55

PHILLIP MORSE -- Atty. Quinn

her position in Assembly Point Aviation, if any?

A She worked for me.

Q Was she an officer?

A No, not that I'm aware of.

Q Did she discuss contracts with any of the customers?

MR. HENRY: Objection. That's all been the subject of her own deposition. You're asking stuff outside of his knowledge as to what --

A I have no idea.

MR. HENRY: -- her contact was.

Q You were the CEO at the time, correct?

A I'm sorry?

Q You were the CEO at the time, correct?

MR. HENRY: Object to the form.

A Yeah.

Q As the CEO, do you know what Cynthia was doing in terms of her duties at that time?

A No.

Q If you could turn to Exhibit 7 of defendant's deposition exhibit, P-000711.

A What number?

Q P-000711. In that top portion of the e-mail, third to last sentence, it says, "Your lawyers sound

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

56

PHILLIP MORSE -- Atty. Quinn

like our lawyers."

Do you know if Assembly Point hired any attorneys in connection with the Richmor State Court litigation?

A No, I have no idea.

Q Do you know who Assembly Point had as lawyers at that time?

A No.

Q Do you know if they had lawyers at that time?

A No.

Q On the next page, P-000690, in the third paragraph down, it's from Cynthia to Mahlon, and it says, "I'm also happy to be a sounding board on your litigation," and it's dated January 2009.

Do you recall if Cynthia ever informed you that she was a sounding board on the litigation?

A She was what?

Q A sounding board on the litigation?

A No.

Q On the next page, P-000699, the second sentence of that e-mail provides, "You have the paperwork regarding how much we would be owed, correct?"

Do you know what paperwork is referred to

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

there?

A I have no idea.

Q Do you know if Assembly Point had any paperwork --

A I have no idea.

Q -- regarding how much they would be owed? On the next page, P-000691, this purports to be from David Gilmour to yourself, and it provides, "My dream for the next three months," and if you go down three lines from there, "Richmor is able to collect blood from a stone in their lawsuit and pass it along to us."

Did you have any discussions with Dave about his dream?

A About what?

Q His dream?

A Not that I recall.

Q Do you know why Dave used the word dream in this e-mail?

**MR. HENRY:** Objection.

A I have no idea.

Q Did you have any discussions with him about this e-mail?

A No.

Q And on the next page, P-004084, it purports to be an e-mail from Cynthia to Rebecca, and if you go down a little ways, it says, "What I've been telling Phil and Dave," and then it has, "Dear Phil and Dave," and it continues on, "Hey, Phil, you seem to be surprised at the news of Richmor's lawsuit against SportsFlight Air on the subject of those CIA flights."

A Where are you?

Q Oh, page P-004084, "Hey Phil, you seem to be surprised at the news of Richmor's lawsuit against SportsFlight Air on the subject of those CIA flights and said you didn't know about it."

Do you recall ever being surprised at the news of Richmor's lawsuit?

A No, I knew they were going to sue them.

Q Do you recall receiving e-mail correspondence with Cynthia keeping you up to date on the lawsuit starting in 2008?

A I don't remember any specific details, no.

Q Then this e-mail goes on to say, "Below is one e-mail I sent that describes how Mahlon and I agreed that the proceeds would be distributed."

A Yeah, I don't recall.

Q Do you recall ever receiving an e-mail

describing how the proceeds would be distributed?

A I don't recall.

Q Do you recall Cynthia ever informing you in an e-mail about how Mahlon and her agreed on the proceeds?

A I'm sure she did.

Q Do you recall what else was in that e-mail?

A No.

Q Do you recall what the e-mail said?

A No.

Q Do you recall when the e-mail was sent?

A No.

Q If you could look at Exhibit 8, Defendant's Exhibit 8 document, on the second page, which purports to be an e-mail from Cynthia to Mahlon dated January 20, 2013, in the second paragraph, fourth sentence, it provides, "You said you were doing this on his behalf."

A I'm sorry?

Q Where it says, "You said you were doing this on his behalf and that you'd just take your usual commission (15%) out of anything received. That's what you said on the phone last week: that you knew you owed Phil the money but you wanted me to ask him

to let you pay it over some period of time."

A What's the question?

Q Do you recall ever hearing from Cynthia that Richmor said to it in January 2013 that Richmor knew it owed you the money?

A I have no idea.

Q Do you recall Cynthia telling you, at any time, that Richmor had sued SportsFlight Air in the State Court on behalf of Assembly Point Aviation?

A I knew that Richmor was -- had taken an action.

Q Do you recall if Cynthia ever informed you that the action had been on behalf of Assembly Point Aviation?

A It was my understanding that this was a joint venture.

Q Between Assembly Point Aviation and Richmor?

A Yes.

Q Did Assembly Point pay any of the attorney's fees involved in that State Court litigation?

A No.

Q What's the basis of saying that it was a joint venture?

A It's what Mahlon said it was going to be.

Q When did he say that?

A At our first -- the meeting he had when he said he was going to sue them.

Q Do you know if there's anything in the lease that would prohibit a joint venture like that?

A I'm sorry?

Q Do you know if there's anything in the lease that would prohibit such a joint venture? Are you aware of any terms that --

A I have no idea.

Q Did you discuss anything at that meeting about contributing to attorney's fees if --

A What meeting?

Q That you just referenced. Do you recall if you discussed anything about sharing attorney's fees at that meeting?

A It's my understanding the split was going to be 85/15.

Q Is that for attorney's fees?

A Interpret it any way you want.

Q Well, I'm asking your understanding.

A I figured it was an 85/15 split.

Q For attorney's fees?

A Everything.

Q What about for interest that Richmor recovered from SportsFlight Air?

A 85/15.

Q Has Richmor ever shared interest with Assembly Point Aviation 85/15?

A I have no idea.

Q Did Richmor inform Assembly Point, at any time, that it was going to share interest 85/15 from any lawsuit it had against SportsFlight Air?

A First meeting we had.

Q Did Mahlon say at that first meeting that if it had to sue SportsFlight Air, that Assembly Point would get 85 percent of the interest recovered from the lawsuit?

A That was the understanding, yes.

Q Where did that understanding come from, what was the basis of the understanding?

A Mahlon.

Q How did he convey that understanding?

A Verbally.

Q What did he say to verbally convey that understanding?

**MR. HENRY:** I think we've hashed this to death. He's already --

Q Well, I'm asking: Did he explicitly say that he was going to give 85 percent of any interest recovered from any lawsuits --

A Yes.

Q -- to Assembly Point? And that's what he expressly said?

A Yes.

Q That was discussed at the meeting?

A I'm sorry?

Q That was discussed at the meeting?

A Any recovery would be split 85/15.

Q At that time, was there a lawsuit going on?

A I don't -- I have no idea.

Q Did he use the word recovery?

A He was talking about suing them.

Q At the meeting?

A Yeah.

Q Why would he be talking about suing them at the meeting?

A Because he hadn't sued them yet, I assume. He might have. I don't know.

Q Was this meeting in 2002?

A No, this was 2008 or 2009.

Q What was discussed at this 2008 or 2009

meeting?

A I just told you.

Q Can you tell me anything else?

A No.

Q Where was this meeting in 2008 or 2009?

A Pruyn's Island, Glens Falls, New York.

Q This was before the SportsFlight Air transaction contract was entered into?

A What?

Q Was this before the government started using the airplane?

A No, it was seven years after.

Q So there was this meeting seven years after. Was there a meeting before the SportsFlight Air contract occurred?

**MR. HENRY:** Objection, asked and answered. You are already asked him about the 2002 meeting. I'm not sure that you've established that he was even at the meeting that you're asking him about, about the division of the proceeds of the lawsuit.

Q Were you at this 2008 meeting?

A I can't recall.

Q But you just said that Mahlon expressly said at that meeting that he was going to share interest.

A Well --

Q Were you present during that statement?

A I think I was there. I'm not positive.

Q Do you recall if anybody else was present at that meeting?

A Maybe Dave and Cynthia.

Q Would you have any travel records to show when this meeting occurred?

A No.

Q Would you have any e-mails?

A No.

Q How did Mahlon know to go to that meeting in 2008?

MR. HENRY: Objection. That's for Mahlon's knowledge.

Q Did anybody from Assembly Point inform Mahlon about where the meeting was going to be held?

A I have no idea.

Q Was Cynthia present at that meeting in 2008?

A I have no idea.

Q On P-000624 of Exhibit 8 of defendant's deposition exhibits, if you look at that e-mail, it purports to be from Cynthia to yourself, and down towards the bottom in the last paragraph it says, "You

can call him and talk to him or you could say you'll talk to him when he answers the two questions I've recently asked." Then it continues on and it goes to number two, "What is the actual amount that you are due (after legal fees and his commission). We'll skip the interest we're due."

Do you know what that refers to: We'll skip the interest we're due?

A I'm sure she was referring to the settlement that Richmor got.

Q And what do you mean by "we'll skip the interest we're due" -- or, what did she mean, based on your understanding?

A I don't know. You'll have to ask her that.

Q How did you interpret that?

A Well --

MR. HENRY: Objection. It speaks for itself.

A Yeah.

Q Did you have any discussions with her afterwards about what that meant?

A I don't recall.

Q Now, if you go to P-000625, an e-mail from Cynthia to yourself and subject line, "Mahlon and I

spoke on the phone," and below that it says, "Call for details." Do you recall speaking on the phone or calling Cynthia in response to this e-mail?

A No.

Q Do you recall Cynthia ever informing you about what she spoke on the phone with Mahlon about?

A I probably did, but I don't recall anything.

Q The next one, P-000085, purports to be an e-mail from Mahlon to Cynthia dated January 24th, 2013, and it provides, "Here is how I would have figured out what I wanted to give Phil from the proceeds from my lawsuit with SportsFlight Air," and then it goes down and it says, "To come up with a BALLPARK figure, I would have started with the rate of $4,600 times 85% minus the operating cost of $2,500 times the 167 hours would equal $235,470," and then it continues, "...I'm not saying I owe Phil this money. It would be a gift," and it continues on.

Have you ever seen this e-mail before?

A No.

Q All right. Did you have any discussions with Cynthia or David about Mahlon sending an e-mail about this gift?

A All I heard was from either Dave or Cynthia

or both that all of a sudden it's turned into a gift.

Q Did they say how much the gift was?

A No, not that I recall.

Q Then if you go on to P-000086, towards the bottom, the fourth paragraph.

A Let me get to that one.

Q It purports to be an e-mail from Cynthia to Mahlon cc'd to Dave and yourself, and then if you go down to the fourth paragraph down, it starts out, "Mahlon, we have a real difference in perspective and expectations on the distribution of proceeds of the SportsFlight settlement."

Do you see that?

A Yep.

Q Do you recall having any discussions with Cynthia or David about the difference in perspective and expectations on the distribution of the proceeds of the SportsFlight settlement?

A Sure.

Q What was discussed?

A That we were supposed to get 85 percent of whatever was recovered from the lawsuit.

Q Was it your understanding that Richmor disagreed with that expectation?

A I have no idea.

Q Did you talk to anybody at Richmor about what Richmor's perspective and expectations were on the distribution of any proceeds of the SportsFlight settlement?

A I did not.

Q Have you ever talked to anybody at Richmor at any time about their perspective and expectation on the distribution of any proceeds?

MR. HENRY: Objection, asked and answered. You can answer it again.

Q Not for the settlement. I'm talking about the SportsFlight lawsuit now.

A What's the question again?

Q Have you ever had any discussions with anybody at Richmor about their perspective and expectations on any distribution of any proceeds from the SportsFlight lawsuit?

A Yeah, with Mahlon in the original meeting.

Q At the original meeting. And when was the original meeting?

A I don't know, 2008 or 2009.

Q Was there a meeting before that?

A What kind of meeting?

Q You said the original meeting. Was there --

A There was a meeting in 2002 and then there was another one in 2008 or 2009. That's all I recall.

Q Why would you refer to the 2008 meeting as the original meeting?

A I didn't.

Q All right. Was the 2002 meeting an original meeting?

A Yes.

Q At that time, did Mahlon expressly say anything about giving Assembly Point Aviation 85 percent of unused flight time in connection with the SportsFlight Air contract?

A We never talked about flight time that I'm aware of.

Q Did you ever talk about hours that were not flown on the SportsFlight Air contract?

A I'm sorry?

Q Did you ever talk about Richmor giving 85 percent of any hours that were not flown in connection with the government contract?

A Not that I am aware.

Q Based on your discussions that you had with Richmor, what was your expectation in terms of how

much Assembly Point was going to be paid?

A Eighty-five percent of whatever was recovered.

Q What if nothing was recovered?

MR. HENRY: Objection, calls for speculation.

Q Did you have an understanding if nothing was recovered what Assembly Point would receive, if anything?

MR. HENRY: Objection, calls for speculation. You can answer if you know what he's asking.

A Never thought about it.

Q All right. In this case, is Assembly Point Aviation suing Richmor Aviation for more than the amount recovered?

MR. HENRY: Objection, the pleadings speak for themselves. He's already testified he hasn't read the complaint, but go ahead. You can answer if you know.

A (There was no response.)

Q Are you aware of how much Assembly Point is suing --

A No.

Q -- Richmor for?

A No.

Q Are you aware of how much was recovered by Richmor?

A No.

Q What is your understanding about how much you believe Assembly Point is due from Richmor?

A I have no idea.

Q At those meetings that you had and the discussions you had with Richmor, did you discuss what would happen if Richmor couldn't collect --

A No.

Q -- from SportsFlight Air?

A No.

Q So, when you say there's an 85/15 split, I assume there was no discussions based on that split occurring if Richmor could not recover from SportsFlight Air?

MR. HENRY: Objection, asked and answered. You can answer it again.

A I answered it before.

Q But what was the answer?

A What's the question again?

Q All right. At the meeting, were there any

73

PHILLIP MORSE -- Atty. Quinn

discussions about how much the split would be if Richmor did not recover the full amount of the judgment from SportsFlight Air?

**MR. HENRY:** Objection. I think he's already testified he doesn't recall any discussions about what would happen if there was no recovery. You can answer it again if you know.

A I don't recall.

Q Did you discuss anything at the meetings about what would happen if Richmor used other aircraft in connection with the SportsFlight Air contract?

A I don't recall.

Q Do you recall at any time whether or not you became aware that other aircraft were being used in connection with the SportsFlight Air contract?

A I don't recall.

Q Do you recall being aware of any news media stories discussing other aircraft being used in rendition flights?

A Generally, yeah.

Q When did you first become aware of that?

A I don't recall the year.

Q Was it around the time that you had to change the tail number on the aircraft?

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

74

PHILLIP MORSE -- Atty. Quinn

A Possibly.

Q And that was 2004: Would that refresh your recollection?

A 2004.

Q I show you what's been marked as Exhibit 15.

(The document was handed to the witness, and the witness examined the document.)

Q And I'll get this marked.

(Deposition Exhibit Number 33 was marked for identification, this date.)

**BY MR. QUINN:**

Q On Exhibit 33, the second to last page, this document purports to be the memorandum and order from the Third Department in the Richmor versus SportsFlight case. On the second to last page, after "we agree" on that second full paragraph down, it provides, "We agree, however, that the Supreme Court erroneously accepted the Plaintiff's calculation of damages based on a 50-hour obligation for each of the 32 months between May 2002 and January 2005 for a total of 1,600 hours," and it continues on. "The evidence supports an obligation by defendant to pay for only 1,550 hours."

Do you see that?

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

75

PHILLIP MORSE -- Atty. Quinn

A Um-hmm.

Q Have you ever seen this document before?

A No.

Q Have you ever read it?

A No.

Q Did anybody ever inform you about --

A No.

Q -- what the obligation of SportsFlight Air to Richmor was?

A No.

Q In Exhibit 15, the bottom of the page on the first page, it says, "Number 1, total charter hours for which SportsFlight Air contracted," and it lists 1,800 hours. Do you see that?

A Yes.

Q And it lists the contract to be between the time period between May 2002 and May 2005. Do you see that?

A Yes.

Q Do you know who prepared those calculations?

A No.

Q Did somebody at Assembly Point prepare those calculations?

A I have no idea.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

76

PHILLIP MORSE -- Atty. Quinn

**MR. HENRY:** Objection, asked and answered.

Q Did you have any discussions with anybody at Assembly Point about using a higher obligation than the Appellate Division determined that SportsFlight Air had to Richmor?

A I don't understand your question.

Q Did you discuss anything about what the total obligation of SportsFlight Air was --

A No.

Q -- with anybody from Assembly Point Aviation? All right. Do you know how Assembly Point Aviation came up with this 1,800 hours?

A No.

Q On the next page, number 3 lists less actual hours flown and paid for by SportsFlight Air. Are you aware of how many hours were flown by SportsFlight Air?

A No.

Q Do you know if anybody at Assembly Point is aware of how many hours were flown by SportsFlight Air?

A I have no idea.

Q It also says below that, "1,258.4 hours flown

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

and paid for by SportsFlight Air, Incorporated at the contract rate of $4,900 per hour."

Do you see that?

A Yes.

Q Do you know if each one of those 1,258.4 hours were paid by SportsFlight Air --

A I have no idea.

MR. HENRY: Objection.

Q -- at a contract rate of $4,900 per hour?

A I have no idea.

Q Do you know if anybody from Assembly Point would know that?

A No.

MR. HENRY: Objection, calls for speculation. Answer if you know.

A I have no idea.

Q Have you discussed this assertion with anybody from Assembly Point?

MR. HENRY: Objection, asked and answered. You can answer it again.

A (There was no response.)

Q I'll take that as a no?

A No.

Q Below that it says, number 4, "Less

Defendant's commission under the lease," and then it says, "Fifteen percent of total owed under the SportsFlight Air Incorporated contract," and then it gives the number of $361,326 for Richmor's commission from the unused flight hours, is that correct, if you know?

A I don't know.

Q All right. Assuming that Assembly Point is claiming that Richmor is entitled to only $361,326 for the unused flight time and that Assembly Point is entitled to $2,047,514, all right, do you know if that would require Richmor to pay money to Assembly Point that they didn't recover from SportsFlight Air?

A I have no idea. It's the first time I've seen the document.

Q If you turn back to the lease, Exhibit 2 of defendant's deposition exhibit documents, and go to page 5, was it Assembly Point's understanding that Richmor would receive fifteen percent of the unused flight time based on the provisions of the lease?

A I have no idea.

Q All right. Do you know what that comes from, what is the basis --

A I have no idea.

Q What's the basis of Assembly Point saying that Richmor is only entitled to fifteen percent of the unused flight time?

MR. HENRY: You mean --

A I have no idea.

MR. HENRY: -- its commission?

Q Yes.

A It's a fee.

Q Fee for what?

A As far as I remember or recall, the original agreement that we've had for 25 years was a split of fifteen percent for agency fee.

Q Have you ever split money for unused flight time?

A I have no idea.

Q In connection with any other charter customers besides the government opportunity, besides SportsFlight Air, did you ever share revenue based on Richmor having to be on call 24/7 for --

A I have no idea.

Q All right. Did you ever share revenue 85/15 when Richmor used more than three pilots for the plane?

A I have no idea.

Q Did you ever share revenue when Richmor had to arrange for other aircraft for the use by the government?

A I have no idea.

(Deposition Exhibit Number 34 was marked for identification, this date.)

(The document was handed to the witness, and the witness examined the document.)

BY MR. QUINN:

Q This purports to be a letter from DynCorp to Mahlon, and the second sentence reads, "Your employees have been single-handedly responsible for the success of our project." Do you see that?

A Um-hmm.

Q Have you ever seen this letter before?

A No.

Q Has anybody from Richmor ever informed you that their employees were single-handedly responsible for the success of the project?

A I don't remember seeing it before.

Q Did anybody from the government or SportsFlight Air ever provide Assembly Point with any similar letter?

A I have no idea.

Q Do you know if anybody from the government ever thanked Assembly Point for the use of their aircraft?

A I have no idea.

(Deposition Exhibit Number 35 was marked for identification, this date.)

(A brief recess occurred.)

BY MR. QUINN:

Q I'll show you what's been marked as Exhibit 35. If you could just skim to the fourth page, Defendant's 18630, the page number at the bottom.

(The document was handed to the witness, and the witness examined the document.)

Q On the right-hand column under the category "less Assembly Point's use of other A/C," do you see that? Does this refresh your recollection if you used other planes after the SportsFlight Air contract expired?

A Oh, I know I used other planes.

Q What was the purpose of using other planes?

A Our plane wasn't available.

Q Now, was the plane not available at times when it was chartered to other third parties besides

SportsFlight Air?

A Possibly, yeah.

Q Was it not available at those times after 2006?

A I have no idea.

Q And this invoice here, the invoice date is for the billing period April 30, 2005, and if you go back to Defendant's 18634, there's an invoice for billing period of August 31st, 2005, and on the right-hand column under use of other A/C it references a Gulfstream II. Do you see that?

Under trip date, trip number, A/C number and the description it says, "Trade hour 1.6 Gulf two hours?

A Um-hmm.

Q Do you recall using other aircraft on August 31st, 2005?

A I'm sorry?

Q Do you recall using any other aircraft on August 31st, 2005? Does that refresh your memory?

A I have no idea.

Q Do you know what the reference to trade hour means?

A No.

Q If you go to the next page for the September 30th, 2005, billing period, there's a similar entry there for trip date on September 30th, 2005, and it's for a Falcon. Do you recall using a Falcon airplane in September of 2005?

A No.

Q If you did use any other aircraft after 2005, what would be some of the reasons for it, if you remember?

A I have no recall. Ours wouldn't have been able.

Q Would it not have been available because other charter customers were using it?

A I have no idea.

Q You testified earlier that Assembly Point Aviation had a meeting with Richmor Aviation in connection with the government opportunity. Do you recall if anything was mentioned about the discount that was being offered, other than what you testified to today?

A No.

Q Do you recall if anybody from Assembly Point made the discount of the charter rate contingent on Richmor using the aircraft for fifty hours a month?

A I have no idea.

Q If you look on Exhibit 14, this purports to be a loan agreement. Do you recall signing this agreement?

A No.

Q Do you recall any prior loan agreements that had a provision similar to number 6 below where it says no long-term charter?

A I'm sorry.

Q Do you recall any other loans that Assembly Point might have taken that had loan agreements with provisions similar to number 6, paragraph 6?

A No.

Q Do you know if Assembly Point provided any documents to the lender about --

A I have no idea.

MR. HENRY: Just let him finish.

Q Do you know if anybody from Assembly Point provided any loan documents to the lender and represented that Richmor owed it millions of dollars in connection with the unused flight time?

A I'm sorry. Say that again?

Q Do you know if anybody from Assembly Point represented to the lender in 2007 that Richmor owed it

85

PHILLIP MORSE -- Atty. Quinn

millions of dollars in connection with unused flight time?

A I have no idea.

Q Have you seen any documents regarding the plane from Capital Aviation or DynCorp?

A No.

Q Have you ever seen any invoices that Capital Aviation sent to DynCorp?

A No.

Q Have you read Mahlon's testimony from the State Court action?

A No.

Q Have you heard about what Mahlon said from anybody at Assembly Point?

A No.

Q Have you read any of the decisions from the State Court?

A No.

Q Have you read any of the pleadings from the State Court action seeking to enforce the judgment?

A No.

Q Do you know how many attorneys were involved in the State Court action?

A No.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

86

PHILLIP MORSE -- Atty. Quinn

Q Do you know how many parties were involved in the State Court action?

A No.

Q Do you know how many subpoenas were served in connection with the State Court action?

A No.

Q Did you ever discuss any of those topics with Richmor at any time?

A No.

Q Who is Cathy Gilmour?

A Huh?

Q Who is Cathy Gilmour?

A Dave's wife.

Q What does she do for Assembly Point?

A She's an accountant.

Q What does she do as an accountant?

A Books.

Q Does she sign any documents on behalf of Assembly Point?

A I don't believe so.

Q I'm going to show you what's been marked as Exhibit 19.

(The document was handed to the witness, and the witness examined the document.)

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

87

PHILLIP MORSE -- Atty. Quinn

Q This purports to be a document from Richmor to Assembly Point Aviation, CO Cathy Gilmour, and at the bottom it has a signature from Cathy Gilmour, accountant. Do you see that?

A Um-hmm.

Q Do you know if anybody from Assembly Point authorized Cathy Gilmour to sign this document?

A Probably Dave.

Q Do you know what this document is?

A I have no idea.

Q Have you ever seen it before?

A No.

Q If I can show you what's been marked as Exhibit 11.

(The document was handed to the witness, and the witness examined the document.)

Q This purports to be an e-mail from Cynthia to yourself, Rebecca Smith, and Dave Gilmour. Who is Rebecca Smith?

A She's my assistant.

Q Does she do anything on behalf of Assembly Point Aviation?

**MR. HENRY:** Object to the form. You can answer.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

88

PHILLIP MORSE -- Atty. Quinn

A Used to arrange flights, I think.

Q And in the second paragraph in this e-mail it says, "According to IATA data, a GIV is supposed to burn 5,000 tons of fuel in the first hour of flight to get to altitude and then 3,000 pounds of fuel per hour thereafter."

Do you know what IATA data is?

A No.

Q Do you have any knowledge about how many pounds of fuel --

A No.

Q -- the aircraft is supposed to burn?

A No.

Q If I can direct your attention back to Exhibit 18, Defendant's Deposition Exhibit 18.

(The document was handed to the witness, and the witness examined the document.)

Q Exhibit 18 purports to list various expenses such as aircraft wash and clean, crew costs, current month's trip expense. I might have asked this before, and I apologize if I did, but did Assembly Point have any method of maintaining records for the expenses of the aircraft?

A I have no idea.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

Q Would that be something Dave would know?

MR. HENRY: Objection, calls for speculation. You can answer if you know.

A I don't --

Q Would anybody else at Assembly Point, based on your knowledge, know about how Assembly Point went about retaining documents regarding expenses for the aircraft?

A That would be Dave.

Q Were you involved in any drafting or negotiating or executing of any subsequent leases after 2001, leases between Richmor and Assembly Point Aviation?

A No.

Q Do you know what the terms of any subsequent leases are regarding Richmor and Assembly Point Aviation?

A No.

Q If I can direct your attention to Exhibit 9 of defendant's exhibit documents.

(The document was handed to the witness, and the witness examined the document.)

Q On Exhibit 9, P-000653, this purports to be an e-mail from Cynthia to David and yourself, and it

purports to calculate what Richmor should have sent on the invoice to SportsFlight Air in October of 2005. Do you see that?

A Um-hmm.

Q Do you recall receiving this e-mail?

A I'm sure I got it.

Q Did you have any discussions with Cynthia at that time about how much was owed to Assembly Point Aviation?

A What was the question?

Q Did you have any discussions with Cynthia or David about what was owed to Assembly Point Aviation?

A No.

Q Do you recall seeing any other writings prior to March 14, 2013 --

A No.

Q -- about what was owed to Assembly Point Aviation?

A No.

Q If I can have you turn to P-000582.

At the top it says, "Partial recap of meeting held February 4th, 2013."

Do you recall receiving this document?

A No.

Q All right. Do you recall if Cynthia typed something up about a February 2013 meeting with Mahlon?

A I don't know.

Q Do you know whether or not Assembly Point is seeking to remove a 305-hour credit that Richmor provided to SportsFlight Air in connection with the unused flight time?

A I'm not aware of any of the details.

Q So I assume you're not aware of the basis that Assembly Point is asserting for the removal of that credit?

A I'm not aware.

Q All right. In connection with the SportsFlight Air transaction or -- if I can rephrase it -- Richmor's use of the plane for SportsFlight Air, the government, were there any times when you weren't able to use your airplane?

A I think so.

Q Can you give me specific dates?

A No.

Q Can you gave me months?

A Pardon?

Q Any months?

A Months?

Q Yes.

A What do you mean?

Q Like any months and years?

A No.

Q Can you give me any trips that you wanted to take that you couldn't take in terms of where you wanted to go?

A No.

Q Was there something special about your airplane that you would rather use your airplane?

A Yeah, it was mine.

Q But was it a big airplane?

A What's big?

Q Was it a ten-passenger?

A Yeah.

Q All right. If it was just you, would you take a ten-passenger plane somewhere?

A Depends where I was going.

Q All right. Were there instances where you took smaller aircraft?

A Yes.

Q If somebody wanted to charter the airplane, would you agree that Richmor could charter it out to

somebody to use that aircraft and you would take a different aircraft?

A Yes.

Q Smaller airplane?

A Yes.

MR. QUINN: I just need like three minutes or so.

(A brief recess occurred.)

BY MR. QUINN:

Q Prior to coming here today, did you discuss David's or Cynthia's deposition testimony with them?

A No.

Q Other than what you've testified to today, do you recall any other discussions or conversations or communications you had with Richmor Aviation from 2001 to the present about their lawsuit, the minimum guarantee, or the unused flight time?

A No.

Q All right. And other than what you've testified to here today, do you recall any other conversations or communications you had with David or Cynthia about the unused flight time, the minimum guarantee, or the lawsuit, that is the State Court lawsuit?

A No.

MR. QUINN: That's it.

MR. HENRY: I have no questions.

MR. QUINN: Nice meeting you.

(Whereupon, at 1:34 p.m. the examination of Phillip Morse in the above-entitled matter was concluded.)

**STATE OF NEW YORK**

**SS:**

**COUNTY OF**

I, **PHILLIP MORSE**, having been duly sworn, do hereby certify that the foregoing typewritten transcript of my testimony, with corrections, if any, constitutes a true, full and accurate transcript of the testimony given by me in the above-entitled action.

PHILLIP MORSE

Sworn to before me this 10 day of April, 2014.

NOTARY PUBLIC

My Commission Expires:
2/10/17

C E R T I F I C A T I O N

I, LAUREL STEPHENSON, a Court Reporter and Notary Public in and for the State of New York, do hereby certify that the foregoing record taken by me at the time and place as noted in the heading hereof is a true and accurate transcript of same, to the best of my ability and belief.

Laurel Stephenson

Date: MAR 25 2014

** PLEASE NOTE: This transcript is not to be distributed to any third-party. You may copy it or send it internally within your own offices and branches. Notify this office first if you need to distribute or copy any portion of it for any other purposes.

Martin Deposition Services, Inc.
Malta Commons Business Park
100 Saratoga Village Boulevard
Building 37, Suite 37C
Malta, New York 12020
Phone: (518) 587-6832
Toll free: (800) 587-6832
Fax: (518) 587-1539
Website: Www.martindepo.com

$

$2,047,514 [1] - 78:12
$2,500 [1] - 67:16
$235,470 [1] - 67:17
$361,326 [2] - 78:5, 78:10
$4,600 [1] - 67:16
$4,900 [3] - 24:2, 77:3, 77:10

'

'94 [1] - 6:25
'95 [1] - 6:25

1

1 [6] - 18:17, 18:23, 19:3, 29:15, 31:9, 75:13
1,258.4 [2] - 76:25, 77:6
1,550 [1] - 74:24
1,600 [1] - 74:22
1,800 [2] - 75:15, 76:14
1.6 [1] - 82:14
11 [1] - 87:15
14 [3] - 9:17, 84:3, 90:16
15 [2] - 74:6, 75:12
15% [1] - 59:23
167 [1] - 67:17
17 [1] - 48:11
18 [4] - 41:6, 88:16, 88:19
18630 [1] - 81:12
18634 [1] - 82:9
19 [1] - 86:23
1941 [1] - 4:17
1969 [1] - 6:22
1:34 [1] - 94:6
1st [1] - 38:21

2

2 [4] - 13:18, 14:13, 17:7, 78:17
2.2(b [2] - 14:14, 14:19
2.2(c [1] - 15:13
2.4 [1] - 15:22
20 [2] - 37:18, 59:17
2000-2004 [1] - 42:5
2001 [6] - 8:10, 10:18, 11:4, 11:13, 89:13, 93:16
2001-2005 [1] - 8:12
2002 [29] - 13:12, 19:6, 26:23, 26:25, 37:25, 38:7, 38:9, 38:11, 38:17, 38:21, 39:2, 39:5, 40:17, 40:19, 40:22, 41:2, 41:22, 42:6, 42:15, 42:24, 48:21, 51:22, 63:23, 64:18, 70:3, 70:8, 74:21, 75:18
2003 [1] - 50:14
2004 [2] - 74:3, 74:5
2005 [28] - 8:10, 10:18, 11:4, 11:13, 38:2, 39:2, 39:5, 40:19, 40:23, 41:3, 41:23, 42:6, 42:16, 42:25, 43:15, 43:23, 48:21, 74:21, 75:18, 82:8, 82:10, 82:18, 82:21, 83:3, 83:5, 83:6, 83:8, 90:3
2006 [2] - 40:7, 82:5
2007 [1] - 84:25
2008 [12] - 48:20, 49:7, 58:19, 63:24, 63:25, 64:6, 64:22, 65:14, 65:20, 69:23, 70:4, 70:5
2009 [7] - 48:20, 56:15, 63:24, 63:25, 64:6, 69:23, 70:4
2013 [6] - 59:17, 60:5, 67:11, 90:16, 90:23, 91:3
21 [2] - 19:4, 36:19
23 [2] - 34:10, 34:15
24 [2] - 34:6, 34:21
24/7 [5] - 35:4, 35:14, 36:13, 36:16, 79:20
24th [1] - 67:10
25 [1] - 79:12
28 [1] - 29:15
28th [2] - 38:7, 38:11
29 [2] - 4:5, 29:5
290 [1] - 4:15

3

3 [3] - 25:14, 25:19, 76:16
3,000 [1] - 88:6
30 [3] - 4:5, 32:11, 82:8
300 [2] - 12:20, 20:13
305-hour [1] - 91:7
30th [2] - 83:3, 83:4
31 [1] - 8:22
31st [4] - 38:21, 82:10, 82:18, 82:21
32 [2] - 45:16, 74:21
33 [2] - 74:10, 74:13
34 [1] - 80:6
35 [2] - 81:6, 81:11

4

4 [3] - 15:21, 48:25, 77:25
44 [2] - 31:10, 31:11
4th [1] - 90:23

5

5 [4] - 33:3, 33:18, 33:19, 78:19
5,000 [1] - 88:5
5.1 [1] - 15:21
5.3 [2] - 16:7, 16:10
50-hour [1] - 74:20
5th [1] - 38:16

6

6 [5] - 33:2, 33:6, 84:8, 84:13

7

7 [2] - 52:8, 55:21

8

8 [8] - 33:25, 34:4, 34:11, 34:12, 52:8, 59:14, 59:15, 65:22
85 [7] - 16:12, 23:25, 62:14, 63:3, 68:22, 70:13, 70:21
85% [1] - 67:16
85/15 [16] - 12:6, 12:8, 12:14, 24:4, 24:6, 24:9, 24:16, 53:15, 61:19, 61:23, 62:4, 62:6, 62:9, 63:12, 72:16, 79:22

9

9 [3] - 52:9, 89:20, 89:24

A

A/C [3] - 81:17, 82:11, 82:13
able [3] - 57:11, 83:12, 91:19
above-entitled [1] - 94:7
absolutely [1] - 37:13
accepted [1] - 74:19
According [1] - 88:4
accountant [3] - 86:16, 86:17, 87:5
accurate [3] - 31:15, 31:23, 32:5
action [6] - 34:9, 60:12, 60:14, 85:12, 85:21, 85:24, 86:3, 86:6
active [1] - 5:21
actual [2] - 66:5, 76:16
additional [1] - 45:12
address [1] - 41:19
addressed [1] - 41:17
adjustor [1] - 6:6
afterwards [1] - 66:22
agency [1] - 79:13
ago [3] - 51:21, 52:2, 52:4
agree [6] - 9:6, 37:3, 41:16, 74:17, 74:18, 92:25
agreed [2] - 58:23, 59:5
agreement [16] - 12:13, 13:19, 13:20, 17:6, 17:25, 21:3, 28:5, 28:23, 34:16, 35:5, 39:18, 52:21, 53:21, 53:23, 79:12, 84:4, 84:5
agreements [2] - 84:7, 84:12

ahead [3] - 14:5, 38:5, 71:20
air [1] - 46:15
Air [96] - 13:15, 15:5, 15:14, 15:23, 16:7, 16:11, 21:10, 26:2, 26:6, 26:14, 27:6, 27:24, 28:5, 28:9, 28:23, 29:12, 29:22, 29:25, 30:3, 30:14, 32:21, 32:23, 33:15, 35:5, 35:8, 36:13, 36:17, 39:20, 40:2, 40:16, 58:8, 58:12, 60:9, 62:3, 62:10, 62:13, 64:8, 64:15, 67:13, 70:14, 70:18, 72:14, 72:19, 73:4, 73:12, 73:16, 75:9, 75:14, 76:7, 76:10, 76:17, 76:19, 76:23, 77:2, 77:7, 78:4, 78:14, 79:19, 80:23, 81:19, 82:2, 90:3, 91:8, 91:16, 91:17
Aircraft [1] - 17:10
aircraft [50] - 13:18, 13:19, 15:15, 16:13, 18:10, 18:15, 19:11, 21:13, 24:20, 25:3, 27:11, 27:14, 27:21, 31:11, 31:14, 32:5, 32:9, 32:19, 32:24, 34:5, 34:17, 34:19, 34:22, 36:2, 36:25, 37:2, 38:14, 38:23, 38:25, 39:4, 40:4, 40:6, 40:9, 40:10, 40:13, 40:16, 40:22, 41:2, 43:20, 46:22, 54:21, 54:23, 73:11, 73:15, 73:19, 73:25, 80:3, 81:4, 82:17, 82:20, 83:8, 83:25, 88:13, 88:20, 88:24, 89:9, 92:22, 93:2, 93:3
airplane [14] - 11:4, 11:13, 24:23, 29:21, 37:24, 50:13, 64:12, 83:6, 91:19, 92:12, 92:14, 92:24, 93:5
airports [1] - 46:24
allegation [1] - 36:4
alleging [1] - 35:4
altitude [1] - 88:6
American [2] - 6:20, 19:23
amount [3] - 66:5, 71:17, 73:3
Answer [1] - 77:16
answer [10] - 8:2, 10:15, 11:23, 14:5, 38:5, 39:22, 42:4, 48:3, 54:13, 69:12, 71:12, 71:21, 72:21, 72:23, 73:8, 77:21, 87:25, 89:4
answered [11] - 17:17, 47:20, 48:3, 52:6, 52:7, 64:18, 69:12, 72:21, 72:22, 76:3, 77:21
answers [1] - 66:3
apologize [1] - 88:22
Appellate [2] - 32:2, 76:6
approval [1] - 15:8
approved [1] - 22:22
April [1] - 82:8
Army [4] - 5:19, 5:20, 5:23, 6:2
arrange [2] - 80:3, 88:2
arrangement [1] - 44:23
arrival [2] - 46:25, 47:13
article [2] - 44:5, 44:8
Assembly [132] - 7:23, 8:6, 8:11, 8:15, 9:12, 9:14, 9:21, 10:6, 10:12, 10:17, 10:20, 10:23, 14:10, 15:17, 16:3, 16:15, 16:22, 17:21, 18:5, 18:10, 18:14, 19:22, 21:2, 23:20, 23:25, 24:22, 25:6, 26:13, 27:5, 27:10, 27:16, 27:19, 27:23, 28:3, 28:4, 28:17, 28:22, 29:10, 29:19, 30:5, 30:7, 30:9, 30:25, 33:9, 33:13, 33:22, 35:12, 35:13, 35:19, 35:21, 35:25, 36:6, 36:12, 37:15, 37:23, 38:7, 38:13, 38:22, 38:25, 39:4, 39:17, 39:19, 40:20, 40:22, 41:22, 42:2, 42:13, 43:16, 45:20, 46:2, 47:3, 47:24, 48:7, 52:17, 52:20, 55:2, 56:3, 56:7, 57:4, 60:10, 60:14, 60:18, 60:20, 62:6, 62:8, 62:13, 63:6, 65:17, 70:12, 71:2, 71:9, 71:15, 71:23, 72:8, 75:23, 76:5, 76:12, 76:13, 76:21, 77:12, 77:19, 78:9, 78:11, 78:13, 78:19, 79:2, 80:23, 81:3, 81:17, 83:16, 83:23, 84:11, 84:15, 84:19, 84:24, 85:15, 86:15, 86:20, 87:3, 87:7, 87:22, 88:22, 89:6, 89:7, 89:13, 89:17, 90:9, 90:13, 90:18, 91:6, 91:12
asserting [1] - 91:12
assertion [1] - 77:18
assigned [2] - 27:9, 54:10
assistant [2] - 42:24, 87:21
assisted [2] - 10:12, 10:17
associated [2] - 6:23, 7:16
assume [11] - 10:22, 11:5, 15:23, 38:6, 48:17, 48:19, 52:15, 63:21, 72:17, 91:11
assumes [1] - 14:4
assuming [1] - 78:9
assumption [1] - 12:24
attachment [2] - 49:5, 49:14
attend [3] - 4:18, 4:20, 5:6
attention [2] - 88:15, 89:20
attorney [1] - 4:9
attorney's [5] - 60:20, 61:13, 61:16, 61:20, 61:24
attorneys [3] - 14:7, 56:4, 85:23
August [3] - 82:10, 82:18, 82:21
authorized [1] - 87:8
available [10] - 34:5, 34:19, 34:23, 35:14, 36:13, 36:16, 81:23, 81:24, 82:4, 83:13
Aviation [54] - 7:23, 8:6, 8:11, 9:12, 9:15, 9:21, 10:6, 10:13, 10:18, 10:21, 10:24, 11:4, 11:13, 12:3, 14:10, 23:25, 29:20, 30:25, 32:14, 35:3, 35:8, 35:14, 36:24, 37:14, 41:11, 41:14, 42:2, 42:14, 43:16, 47:3, 47:25, 52:17, 55:2, 60:10, 60:15, 60:18, 62:6, 70:12, 71:16, 76:12, 76:13, 83:17, 85:6, 85:9, 87:3, 87:23, 89:14, 89:18, 90:10, 90:13, 90:19, 93:16
Aviation's [1] - 18:10
aware [35] - 10:11, 18:4, 18:7, 18:12, 20:5, 26:5, 26:8, 26:17, 29:18, 30:21, 32:25, 35:3, 35:7, 35:10, 36:11, 44:14, 44:20, 44:25, 45:4, 45:7, 45:11, 55:5, 61:10, 70:16, 70:23, 71:23, 72:4, 73:15, 73:18, 73:22, 76:18, 76:22, 91:10, 91:11, 91:14

B

bad [1] - 4:10
BALLPARK [1] - 67:15
based [7] - 66:13, 70:24, 72:17, 74:20, 78:21, 79:19, 89:6
basis [10] - 12:10, 31:12, 31:18, 32:4, 32:6, 60:23, 62:18, 78:24, 79:2, 91:11
Bay [3] - 44:10, 44:13, 44:17
became [3] - 10:4, 27:3, 73:15
become [3] - 26:17, 30:21, 73:22
begin [1] - 20:15
begun [1] - 26:18
behalf [7] - 30:25, 59:19, 59:22, 60:10, 60:14, 86:19, 87:22
below [5] - 9:24, 67:2, 76:25, 77:25, 84:8
Below [1] - 58:21
benefit [1] - 34:23
best [3] - 19:16, 31:16, 42:21
better [1] - 16:25
between [12] - 34:9, 37:25, 39:2, 39:18, 41:22, 42:5, 42:24, 60:18, 74:21, 75:17, 75:18, 89:13
big [2] - 92:14, 92:15
bill [1] - 27:24
billing [3] - 82:8, 82:10, 83:3
bills [1] - 42:17
blood [1] - 57:11
board [5] - 7:3, 7:7, 56:14, 56:17, 56:19
books [1] - 86:18
born [1] - 4:16
Boston [2] - 5:8, 6:4
bottom [6] - 49:12, 65:25, 68:6, 75:12, 81:13, 87:4
Brian [1] - 4:8
brief [2] - 81:8, 93:9
brought [3] - 19:5, 19:7, 19:8
building [2] - 43:8, 54:20
burn [2] - 88:5, 88:13
business [1] - 10:10
BY [7] - 4:7, 9:2, 45:18, 74:12, 80:10, 81:9, 93:10

C

calculate [2] - 28:21, 90:2
calculation [1] - 74:19
calculations [2] - 75:21, 75:24
Capital [2] - 85:6, 85:8
case [3] - 38:14, 71:15, 74:16
cases [1] - 29:18
category [1] - 81:16
Cathy [5] - 86:11, 86:13, 87:3, 87:4,

87:8
cc'd [2] - 52:13, 68:9
CEO [3] - 55:13, 55:15, 55:18
certain [1] - 12:21
certainly [1] - 39:6
certificate [3] - 5:11, 5:13, 5:15
chairman [6] - 7:3, 7:7, 9:14, 9:24, 10:2, 10:4
change [1] - 73:24
changes [1] - 14:11
characterization [1] - 38:4
charge [2] - 54:17, 54:25
charter [24] - 15:7, 15:10, 15:24, 15:25, 16:12, 16:18, 16:23, 18:9, 18:13, 20:12, 25:2, 36:17, 37:24, 37:25, 40:3, 40:15, 41:2, 75:13, 79:17, 83:14, 83:24, 84:9, 92:24, 92:25
chartered [1] - 81:25
charters [2] - 29:22, 36:14
Chicago [1] - 44:5
chief [3] - 8:18, 9:5, 9:11
CIA [2] - 58:8, 58:12
cities [2] - 46:24, 46:25
city [2] - 47:13
claim [2] - 12:4, 35:12
claiming [2] - 30:10, 78:10
claims [1] - 6:6
clean [1] - 88:20
CO [1] - 87:3
collect [2] - 57:11, 72:12
collection [1] - 15:24
college [1] - 4:18
column [2] - 81:16, 82:11
coming [1] - 93:11
commenced [1] - 30:19
comments [3] - 43:22, 44:9, 44:12
commission [4] - 59:23, 78:2, 78:5, 79:7
commission) [1] - 66:6
communicate [1] - 11:12
communicated [1] - 11:3
communications [2] - 93:16, 93:22
Company [2] - 6:4, 19:22
company [9] - 6:10, 6:18, 6:19, 6:24, 7:2, 7:4, 10:7, 12:4, 19:21
complaint [6] - 18:24, 19:4, 29:14, 31:20, 34:8, 71:20
concluded [1] - 94:8
conduct [1] - 27:16
conducted [1] - 10:9
connection [24] - 18:14, 25:3, 35:5, 35:12, 35:18, 39:19, 41:11, 42:15, 47:23, 49:20, 51:20, 52:22, 56:4, 70:13, 70:22, 73:12, 73:16, 79:17, 83:18, 84:22, 85:2, 86:6, 91:8, 91:15
contact [1] - 55:12
contained [2] - 15:13, 45:12
contingent [1] - 83:24
continues [8] - 15:8, 15:15, 16:13, 58:6, 66:4, 67:18, 67:19, 74:22
contract [31] - 12:20, 13:15, 14:5, 18:9, 21:7, 26:2, 26:9, 26:15, 27:6, 28:9, 29:12, 29:25, 30:3, 32:21, 39:20, 40:2, 49:21, 49:24, 64:9, 64:16, 70:14, 70:18, 70:22, 73:12, 73:16, 75:17, 77:3, 77:10, 78:4, 81:19
contracted [1] - 75:14
contracts [1] - 55:6
contributing [1] - 61:13
conversation [3] - 13:8, 13:9, 19:14
conversations [3] - 51:22, 93:15, 93:22
convey [2] - 62:20, 62:22
copy [2] - 54:6, 54:8
Corporation [3] - 6:20, 8:16, 19:23
corporation [2] - 7:18, 7:20
Corporations [1] - 9:4
correct [10] - 19:12, 28:10, 37:4, 51:14, 51:23, 52:5, 55:13, 55:15, 56:24, 78:6
correspondence [1] - 58:17
cost [1] - 67:16
costs [1] - 88:20
couple [1] - 44:6
Court [14] - 34:9, 52:22, 53:12, 56:4, 60:10, 60:21, 74:18, 85:12, 85:18, 85:21, 85:24, 86:3, 86:6, 93:24
created [2] - 8:5, 48:17
Creations [2] - 7:13, 7:16
credit [2] - 91:7, 91:13
crew [4] - 34:5, 34:19, 34:22, 88:20
crews [1] - 34:18
cross [2] - 13:20, 17:25
current [1] - 88:20
customary [1] - 24:9
customer [3] - 15:25, 18:8, 18:13
customers [7] - 15:10, 25:2, 40:15, 41:2, 55:7, 79:18, 83:14
Cynthia [43] - 49:4, 49:6, 49:17, 50:4, 50:18, 51:4, 51:13, 51:18, 52:13, 53:6, 53:10, 53:22, 53:25, 54:10, 54:15, 54:25, 55:18, 56:13, 56:16, 58:3, 58:18, 59:4, 59:16, 60:4, 60:8, 60:13, 65:7, 65:20, 65:24, 66:25, 67:4, 67:6, 67:10, 67:23, 67:25, 68:8, 68:17, 87:18, 89:25, 90:8, 90:12, 91:2, 93:23
Cynthia's [1] - 93:12

D

damages [1] - 74:20
data [3] - 24:13, 88:4, 88:8
date [17] - 4:6, 8:23, 18:7, 18:12, 38:10, 45:17, 46:22, 46:23, 47:13, 58:18, 74:11, 80:7, 81:7, 82:7, 82:13, 83:4
dated [4] - 50:14, 56:15, 59:16, 67:10
dates [3] - 36:25, 50:23, 91:21
Dave [28] - 10:22, 11:5, 11:7, 20:2, 22:11, 22:19, 25:11, 28:8, 28:12, 28:20, 29:24, 30:2, 36:10, 42:7, 42:22, 43:6, 53:21, 57:14, 57:19, 58:5, 65:7, 67:25, 68:9, 87:9, 87:19, 89:2, 89:10
Dave's [1] - 86:14
David [10] - 23:12, 52:13, 54:8, 54:22, 57:9, 67:23, 68:17, 89:25, 90:13, 93:22
David's [1] - 93:12
days [6] - 36:24, 37:2, 37:3, 39:7, 40:22, 44:6
Dear [1] - 58:5
death [1] - 62:25
December [1] - 49:6
decision [1] - 32:2
decisions [1] - 85:17
defendant [2] - 34:6, 74:23
Defendant [5] - 34:7, 34:16, 34:20, 34:23, 34:24
defendant's [9] - 18:23, 31:10, 33:3, 36:20, 55:21, 59:14, 65:22, 78:18, 89:21
Defendant's [9] - 19:2, 25:19, 33:6, 33:18, 52:9, 78:2, 81:12, 82:9, 88:16
definition [3] - 17:3, 17:7, 17:22
degree [3] - 4:24, 5:2, 5:9
degrees [1] - 5:4
demand [1] - 18:24
Department [2] - 9:4, 74:15
departure [2] - 46:24, 47:13
Deposition [11] - 4:5, 8:22, 19:2, 33:6, 33:18, 45:16, 52:9, 74:10, 80:6, 81:6, 88:16
deposition [7] - 31:10, 33:3, 55:9, 55:22, 65:23, 78:18, 93:12
depositions [2] - 25:20, 33:25
describe [1] - 12:17
describes [1] - 58:22
describing [1] - 59:2
description [1] - 82:14
designation [1] - 9:6
destination [1] - 46:24
destinations [2] - 44:20, 45:8
details [6] - 23:23, 24:3, 28:19, 58:20, 67:3, 91:10
determined [1] - 76:6
difference [3] - 20:25, 68:11, 68:17
different [2] - 33:15, 93:3
direct [2] - 88:15, 89:20
directly [1] - 22:24
director [2] - 7:18, 8:10
disagreed [1] - 68:25
discount [2] - 83:19, 83:24
discuss [18] - 21:12, 21:15, 21:18, 24:19, 24:22, 24:25, 27:19, 27:23, 28:4, 32:18, 50:18, 55:6, 61:12, 72:11, 73:10, 76:9, 86:8, 93:11
discussed [10] - 22:7, 31:3, 32:24,

33:14, 61:16, 63:9, 63:11, 63:25, 68:21, 77:18
discussing [3] - 49:16, 50:3, 73:19
discussion [16] - 12:15, 12:17, 12:22, 15:16, 16:14, 19:10, 19:25, 20:6, 20:10, 22:15, 25:5, 28:7, 28:13, 29:2, 29:24, 36:9
discussions [24] - 12:11, 16:2, 16:21, 17:12, 17:20, 30:2, 39:15, 53:6, 53:11, 57:14, 57:23, 66:21, 67:22, 68:16, 69:16, 70:24, 72:11, 72:17, 73:2, 73:6, 76:4, 90:8, 90:12, 93:15
dispute [2] - 37:8, 37:12
distributed [2] - 58:23, 59:2
distribution [5] - 68:12, 68:18, 69:5, 69:10, 69:18
Division [3] - 9:4, 32:2, 76:6
division [1] - 64:21
document [72] - 8:24, 8:25, 9:18, 9:19, 13:21, 13:22, 13:23, 14:2, 14:13, 18:19, 18:20, 18:21, 25:15, 25:16, 25:17, 25:23, 29:6, 29:7, 29:17, 32:12, 32:13, 32:14, 32:15, 32:16, 33:7, 33:19, 33:22, 34:2, 34:3, 36:21, 36:22, 37:20, 37:21, 38:4, 41:7, 41:8, 47:12, 48:12, 48:13, 48:14, 48:21, 49:2, 49:3, 49:13, 49:16, 50:4, 50:16, 50:21, 50:25, 52:3, 59:15, 74:7, 74:8, 74:14, 75:3, 78:16, 80:8, 80:9, 81:14, 81:15, 86:24, 86:25, 87:2, 87:8, 87:10, 87:16, 87:17, 88:17, 88:18, 89:22, 89:23, 90:24
documents [19] - 33:4, 33:5, 36:20, 37:8, 37:11, 47:2, 47:23, 49:6, 51:4, 51:16, 52:10, 52:11, 78:18, 84:16, 84:20, 85:5, 86:19, 89:8, 89:21
dollars [2] - 84:21, 85:2
Don [1] - 50:22
down [9] - 17:9, 56:13, 57:10, 58:4, 65:24, 67:14, 68:10, 74:17
draft [4] - 36:23, 37:4, 37:9, 37:22
drafting [2] - 14:2, 89:11
drafts [2] - 18:4, 25:22
dream [4] - 57:9, 57:15, 57:17, 57:19
Drive [1] - 4:15
due [5] - 66:6, 66:7, 66:9, 66:13, 72:8
duly [1] - 4:3
duration [1] - 21:19
During [2] - 34:4, 34:12
during [2] - 37:14, 65:3
duties [4] - 9:9, 9:10, 9:12, 55:19
DynCorp [5] - 49:24, 50:19, 80:11, 85:6, 85:9

E

e-mail [32] - 49:4, 49:11, 49:13, 50:14, 50:19, 51:13, 52:13, 55:24, 56:22, 57:20, 57:24, 58:3, 58:17, 58:21, 58:22, 58:25, 59:5, 59:8, 59:10, 59:12, 59:16, 65:23, 66:24, 67:4, 67:10, 67:20, 67:23, 68:8, 87:18, 88:3, 89:25, 90:6
e-mails [1] - 65:11
early [1] - 19:6
education [2] - 5:7, 54:11
effect [1] - 39:16
Eighty [1] - 71:3
Eighty-five [1] - 71:3
either [1] - 67:25
employees [2] - 80:12, 80:19
end [6] - 22:9, 27:25, 28:5, 28:22, 46:22, 47:13
ended [2] - 27:7, 43:5
enforce [1] - 85:21
entered [2] - 13:15, 64:9
entitled [4] - 78:10, 78:12, 79:3, 94:7
entity [1] - 21:9
entries [1] - 17:11
entry [1] - 83:4
equal [1] - 67:17
erroneously [1] - 74:19
established [1] - 64:19
estate [2] - 5:8, 5:16
evidence [2] - 40:21, 74:23
exactly [2] - 30:17, 44:18
examination [1] - 94:6
examined [24] - 4:4, 8:25, 9:19, 13:22, 18:20, 25:16, 29:7, 29:17, 32:13, 33:5, 34:3, 36:22, 37:21, 41:8, 48:13, 49:3, 52:11, 74:8, 80:9, 81:15, 86:25, 87:17, 88:18, 89:23
Except [1] - 15:22
executing [1] - 89:12
executive [3] - 8:18, 9:5, 9:11
Exhibit [42] - 8:22, 9:17, 13:18, 18:17, 18:23, 19:3, 25:14, 25:19, 29:5, 29:15, 31:9, 32:11, 33:2, 33:6, 33:18, 33:19, 33:25, 36:19, 37:18, 41:6, 45:16, 48:11, 48:25, 55:21, 59:14, 59:15, 65:22, 74:6, 74:10, 74:13, 75:12, 78:17, 80:6, 81:6, 81:11, 84:3, 86:23, 87:15, 88:16, 89:20, 89:24
exhibit [7] - 17:24, 31:10, 36:20, 55:22, 78:18, 88:19, 89:21
Exhibits [3] - 4:5, 52:8, 52:9
exhibits [2] - 33:3, 65:23
expectation [4] - 28:16, 68:25, 69:9, 70:25
expectations [4] - 68:12, 68:18, 69:4, 69:18
expected [3] - 53:15, 53:17, 53:20
expense [3] - 10:24, 34:24, 88:21
expenses [3] - 88:19, 88:23, 89:8
expensive [2] - 40:10
expiration [1] - 22:9
expired [3] - 21:16, 29:12, 81:20
explicitly [1] - 63:2
expressly [3] - 63:7, 64:24, 70:11
extension [3] - 23:6, 28:9, 28:14
extent [2] - 7:25, 14:4

F

facility [2] - 54:17, 54:18
fair [2] - 28:20, 42:18
Falcon [2] - 83:5, 83:6
Falls [5] - 12:16, 12:18, 19:16, 19:20, 64:7
far [5] - 10:7, 46:3, 46:4, 46:6, 79:11
February [2] - 90:23, 91:3
fee [3] - 79:9, 79:10, 79:13
fees [6] - 60:21, 61:13, 61:16, 61:20, 61:24, 66:6
Fifteen [1] - 78:3
fifteen [3] - 78:20, 79:3, 79:13
fifty [9] - 23:22, 24:2, 28:17, 35:19, 35:24, 36:2, 36:5, 36:8, 83:25
figure [1] - 67:15
figured [2] - 61:23, 67:12
figures [1] - 37:9
filed [1] - 12:3
finances [1] - 10:13
fine [2] - 12:21, 28:15
finish [4] - 17:14, 17:16, 33:11, 84:18
first [17] - 14:14, 14:17, 22:2, 23:5, 30:6, 30:13, 38:7, 46:7, 47:21, 52:12, 61:3, 62:11, 62:12, 73:22, 75:13, 78:15, 88:5
five [2] - 5:21, 71:3
fleet [1] - 34:17
flew [2] - 9:10, 46:9
flight [27] - 15:6, 15:9, 15:25, 17:3, 17:7, 17:22, 30:7, 30:11, 34:7, 34:18, 34:19, 34:22, 35:13, 39:19, 70:13, 70:15, 78:6, 78:11, 78:21, 79:4, 79:14, 84:22, 85:2, 88:5, 91:9, 93:18, 93:23
flights [11] - 15:7, 26:19, 33:15, 35:15, 36:17, 50:23, 58:8, 58:12, 73:20, 88:2
Florida [2] - 4:15, 38:19
flown [14] - 16:12, 16:16, 21:13, 24:11, 24:14, 27:11, 27:14, 27:20, 70:18, 70:21, 76:17, 76:18, 76:22, 76:25
following [1] - 44:6
follows [1] - 4:4
form [15] - 7:25, 10:14, 13:5, 14:3, 28:25, 29:3, 37:6, 38:4, 39:21, 42:3, 42:10, 49:22, 54:12, 55:16, 87:24
forwarded [1] - 43:6
founded [2] - 7:22, 7:25
founder [1] - 7:3
four [1] - 34:6
fourth [5] - 46:21, 59:17, 68:6, 68:10,

81:11
fuel [4] - 46:23, 88:5, 88:6, 88:11
full [2] - 73:3, 74:17
fully [1] - 34:17
functional [1] - 17:10
funded [1] - 7:17

G

generally [1] - 73:21
gift [4] - 67:19, 67:24, 68:2, 68:3
Gilmour [22] - 10:22, 11:6, 11:8, 20:3, 22:11, 22:19, 23:12, 28:8, 36:10, 42:7, 42:22, 43:7, 52:13, 53:21, 54:22, 57:9, 86:11, 86:13, 87:3, 87:4, 87:8, 87:19
GIV [2] - 49:24, 88:4
Glens [5] - 12:16, 12:17, 19:16, 19:20, 64:7
government [23] - 12:20, 16:25, 19:12, 20:13, 21:4, 21:8, 21:16, 25:2, 26:18, 29:20, 30:23, 39:17, 39:24, 40:3, 44:23, 64:11, 70:22, 79:18, 80:4, 80:22, 81:2, 83:18, 91:18
govtcont.pdf [1] - 49:5
graduate [1] - 4:22
graduating [2] - 5:7, 5:17
Guantanamo [3] - 44:9, 44:12, 44:16
guarantee [5] - 18:9, 18:14, 20:20, 93:18, 93:24
guaranteed [2] - 20:23, 20:24
guaranteeing [1] - 23:21
guess [1] - 10:3
Gulf [1] - 82:14
Gulfstream [1] - 82:12

H

half [2] - 5:21, 6:8
hand [2] - 81:16, 82:11
handed [22] - 8:24, 9:18, 13:21, 18:19, 25:15, 29:6, 32:12, 33:4, 34:2, 36:21, 37:20, 41:7, 48:12, 49:2, 52:10, 74:7, 80:8, 81:14, 86:24, 87:16, 88:17, 89:22
handedly [2] - 80:13, 80:19
happy [1] - 56:14
hashed [1] - 62:24
headquarters [3] - 19:21, 19:22, 19:24
heard [4] - 16:5, 33:21, 67:25, 85:14
hearing [2] - 4:10, 60:4
held [2] - 65:18, 90:23
HENRY [58] - 7:24, 10:14, 11:22, 13:5, 13:7, 14:3, 14:19, 14:21, 14:24, 17:15, 21:20, 21:23, 26:11, 28:25, 29:3, 31:19, 31:25, 33:11, 35:16, 36:3, 37:5, 38:3, 39:21, 42:3, 42:10, 47:19, 48:2, 49:22, 51:24, 52:5, 52:24, 53:8, 54:3, 54:12, 55:8, 55:12, 55:16, 57:21, 62:24, 64:17, 65:15, 66:18, 69:11, 71:6, 71:11, 71:18, 72:20, 73:5, 76:2, 77:9, 77:15, 77:20, 79:5, 79:7, 84:18, 87:24, 89:3, 94:4
herein [1] - 15:13
Heritage [2] - 7:13, 7:16
higher [2] - 5:7, 76:5
hired [1] - 56:3
hmm [7] - 35:2, 47:15, 75:2, 80:15, 82:16, 87:6, 90:5
Homkey [2] - 11:9, 43:2
hour [12] - 16:12, 17:3, 17:7, 17:10, 17:22, 34:6, 77:3, 77:10, 82:14, 82:23, 88:5, 88:6
hours [48] - 12:20, 20:13, 20:22, 21:13, 23:22, 24:2, 24:11, 24:14, 25:7, 27:10, 27:14, 27:20, 28:17, 33:16, 35:19, 35:24, 36:2, 36:5, 36:8, 44:25, 45:5, 46:8, 46:9, 46:11, 46:14, 46:15, 46:18, 46:23, 46:25, 47:13, 48:8, 50:23, 67:17, 70:17, 70:21, 74:22, 74:24, 75:13, 75:15, 76:14, 76:17, 76:18, 76:22, 76:25, 77:7, 78:6, 82:15, 83:25
hundred [1] - 20:22

I

IATA [2] - 88:4, 88:8
idea [90] - 11:2, 13:16, 14:6, 14:9, 14:12, 14:15, 15:3, 15:12, 15:20, 18:11, 18:16, 19:9, 22:14, 22:18, 24:15, 25:8, 25:12, 27:8, 27:12, 27:15, 27:18, 27:22, 28:2, 28:6, 29:13, 29:23, 30:8, 30:20, 32:8, 33:10, 36:15, 36:18, 37:7, 37:17, 38:24, 40:5, 40:8, 40:11, 40:14, 40:18, 40:24, 41:4, 41:15, 41:24, 42:12, 43:13, 43:17, 46:17, 48:9, 54:5, 54:7, 54:9, 54:24, 55:11, 56:6, 57:3, 57:6, 57:22, 60:7, 61:11, 62:7, 63:14, 65:19, 65:21, 69:2, 72:9, 75:25, 76:24, 77:8, 77:11, 77:17, 78:15, 78:22, 78:25, 79:6, 79:16, 79:21, 79:25, 80:5, 80:25, 81:5, 82:6, 82:22, 83:15, 84:2, 84:17, 85:4, 87:11, 88:25
identification [6] - 4:6, 8:23, 45:17, 74:11, 80:7, 81:7
identifying [1] - 37:23
II [1] - 82:12
included [1] - 46:5
Incorporated [3] - 7:14, 77:2, 78:4
Independent [1] - 37:11
indicated [2] - 17:11, 20:11
inform [7] - 23:20, 28:21, 36:6, 53:10, 62:8, 65:17, 75:7
information [2] - 43:20, 46:5
informed [6] - 26:13, 27:3, 30:6, 56:16, 60:13, 80:18
informing [3] - 43:14, 59:4, 67:6
initial [3] - 22:10, 23:8, 26:2
inquire [2] - 24:16, 27:5
instance [1] - 18:13
instances [3] - 18:8, 29:18, 92:21
instrument [2] - 6:20, 19:23
insurance [1] - 6:3
intended [1] - 27:24
interest [9] - 62:2, 62:5, 62:9, 62:14, 63:3, 64:25, 66:7, 66:9, 66:13
intermediary [1] - 29:21
internal [1] - 27:17
interpret [2] - 61:21, 66:16
invoice [8] - 33:14, 45:19, 45:25, 47:24, 82:7, 82:9, 90:3
invoices [19] - 10:24, 29:8, 29:11, 41:9, 41:10, 41:12, 41:13, 41:16, 41:22, 41:25, 42:9, 42:19, 43:4, 43:10, 43:15, 45:4, 45:7, 45:12, 85:8
involved [8] - 14:7, 19:25, 20:4, 20:21, 60:21, 85:23, 86:2, 89:11
Island [4] - 19:21, 53:4, 54:20, 64:7
issue [1] - 38:14
itself [1] - 66:19

J

January [6] - 38:2, 56:15, 59:17, 60:5, 67:10, 74:21
joint [4] - 60:16, 60:24, 61:6, 61:9
journey [1] - 17:11
judgment [4] - 31:13, 32:7, 73:4, 85:21
July [1] - 50:14
June [1] - 4:17
Jupiter [1] - 4:15
jury [1] - 18:24

K

keep [1] - 25:6
keeping [1] - 58:18
Kenly [1] - 4:9
kept [1] - 48:8
kind [2] - 5:15, 69:25
knowledge [11] - 19:16, 28:8, 31:16, 31:23, 47:22, 53:9, 54:4, 55:10, 65:16, 88:10, 89:7
known [1] - 21:9

L

landing [1] - 17:9
last [14] - 14:18, 15:22, 31:11, 35:10, 40:19, 50:11, 50:12, 52:14, 52:15, 55:25, 59:24, 65:25, 74:13, 74:16
law [1] - 54:11

lawsuit [26] - 11:17, 11:19, 12:4, 30:14, 30:18, 30:21, 31:4, 51:11, 52:22, 53:7, 57:12, 58:7, 58:11, 58:15, 58:18, 62:10, 62:15, 63:13, 64:21, 67:13, 68:23, 69:14, 69:19, 93:17, 93:24, 93:25
lawsuits [1] - 63:4
lawyers [4] - 55:25, 56:2, 56:7, 56:10
learned [1] - 30:13
lease [15] - 13:19, 16:25, 18:5, 18:7, 18:12, 37:15, 42:15, 53:25, 54:6, 54:23, 61:5, 61:8, 78:2, 78:17, 78:21
leases [3] - 89:12, 89:13, 89:17
leasing [3] - 13:20, 17:25, 43:20
leave [1] - 5:23
legal [1] - 66:6
lender [3] - 84:16, 84:20, 84:25
length [1] - 12:21
less [4] - 20:19, 40:10, 76:16, 81:17
Less [1] - 77:25
lessees [3] - 14:15, 14:17, 15:3
letter [3] - 80:11, 80:16, 80:24
Liberty [2] - 6:3, 6:5
limited [1] - 34:16
line [2] - 9:21, 66:25
lines [1] - 57:11
list [1] - 88:19
listed [2] - 45:5, 45:8
lists [9] - 38:7, 46:7, 46:21, 46:24, 49:19, 49:23, 75:14, 75:17, 76:16
litigation [9] - 31:12, 32:6, 52:23, 53:12, 56:5, 56:15, 56:17, 56:19, 60:21
loan [4] - 84:4, 84:7, 84:12, 84:20
loans [1] - 84:11
location [1] - 44:24
locations [1] - 44:19
Locha [1] - 4:15
log [1] - 17:11
long-term [1] - 84:9
look [8] - 9:17, 18:17, 49:11, 49:19, 50:10, 59:14, 65:23, 84:3
looking [2] - 14:19, 51:16
LT050602 [1] - 49:24

M

Mahlon [42] - 12:11, 12:19, 16:24, 20:2, 20:11, 22:4, 22:23, 23:2, 23:14, 23:20, 24:5, 28:13, 30:22, 36:6, 52:13, 53:3, 53:6, 53:11, 53:23, 54:11, 54:16, 56:13, 58:22, 59:5, 59:16, 60:25, 62:12, 62:19, 64:24, 65:13, 65:17, 66:25, 67:7, 67:10, 67:23, 68:9, 68:11, 69:20, 70:11, 80:12, 85:14, 91:4
Mahlon's [3] - 22:21, 65:16, 85:11
mail [33] - 41:13, 49:4, 49:11, 49:13, 50:14, 50:19, 51:13, 52:13, 55:24, 56:22, 57:20, 57:24, 58:3, 58:17, 58:21, 58:22, 58:25, 59:5, 59:8, 59:10, 59:12, 59:16, 65:23, 66:24, 67:4, 67:10, 67:20, 67:23, 68:8, 87:18, 88:3, 89:25, 90:6
mails [1] - 65:11
Maine [1] - 4:21
maintaining [1] - 88:23
maintenance [7] - 24:19, 36:24, 36:25, 37:16, 46:10, 46:14, 46:16
manage [1] - 10:8
management [2] - 13:19, 17:6
managing [1] - 10:10
March [3] - 43:15, 43:22, 90:16
marked [20] - 4:6, 8:22, 13:17, 25:13, 29:4, 32:10, 33:2, 33:24, 41:5, 45:16, 48:10, 48:24, 74:6, 74:9, 74:10, 80:6, 81:6, 81:10, 86:22, 87:14
market [1] - 20:19
master [2] - 13:20, 17:25
materials [1] - 45:12
matter [1] - 94:7
mean [6] - 17:8, 54:18, 66:12, 66:13, 79:5, 92:4
means [2] - 8:2, 82:24
meant [2] - 19:2, 66:22
media [4] - 43:14, 43:18, 43:23, 73:18
medical [1] - 6:10
meet [1] - 22:25
meeting [58] - 22:23, 23:4, 23:6, 23:7, 23:10, 23:14, 23:20, 23:24, 24:6, 24:17, 24:20, 24:23, 25:5, 25:9, 25:11, 53:4, 61:3, 61:12, 61:14, 61:17, 62:11, 62:12, 63:9, 63:11, 63:17, 63:20, 63:23, 64:2, 64:6, 64:14, 64:15, 64:19, 64:20, 64:22, 64:25, 65:6, 65:9, 65:13, 65:18, 65:20, 69:20, 69:21, 69:22, 69:24, 69:25, 70:2, 70:3, 70:5, 70:6, 70:8, 70:9, 72:25, 83:17, 90:22, 91:3, 94:5
meetings [3] - 27:17, 72:10, 73:10
memorandum [1] - 74:14
memory [2] - 51:17, 82:21
mention [1] - 23:17
mentioned [3] - 23:16, 28:7, 83:19
mentioning [1] - 31:6
mentions [2] - 14:15, 14:17
met [1] - 23:2
meter [1] - 17:10
method [1] - 88:23
middle [1] - 50:11
might [3] - 63:22, 84:12, 88:21
miles [3] - 46:23, 46:25, 47:14
millions [2] - 84:21, 85:2
mine [1] - 92:13
minimum [3] - 15:14, 18:9, 18:14, 93:17, 93:23
minus [1] - 67:16
minutes [1] - 93:8
money [5] - 59:25, 60:6, 67:18, 78:13, 79:14
monitor [1] - 27:10
monitored [1] - 27:13
month [14] - 22:12, 22:15, 23:22, 24:2, 28:14, 28:18, 35:20, 36:2, 36:5, 36:8, 83:25
month's [1] - 88:21
month-to-month [3] - 22:12, 22:15, 28:14
monthly [3] - 43:15, 43:19, 43:23
months [8] - 5:21, 39:10, 57:10, 74:21, 91:23, 91:25, 92:2, 92:5
morning [1] - 44:6
MORSE [1] - 4:2
Morse [3] - 4:13, 50:12, 94:7
Moss [1] - 50:22
MR [71] - 4:7, 7:24, 9:2, 10:14, 11:22, 13:5, 13:7, 14:3, 14:19, 14:20, 14:21, 14:24, 17:15, 21:20, 21:22, 21:23, 26:11, 28:25, 29:3, 31:19, 31:22, 31:25, 33:11, 35:16, 36:3, 37:5, 38:3, 39:21, 42:3, 42:10, 45:18, 47:19, 48:2, 49:22, 51:24, 52:5, 52:24, 53:8, 54:3, 54:12, 55:8, 55:12, 55:16, 57:21, 62:24, 64:17, 65:15, 66:18, 69:11, 71:6, 71:11, 71:18, 72:20, 73:5, 74:12, 76:2, 77:9, 77:15, 77:20, 79:5, 79:7, 80:10, 81:9, 84:18, 87:24, 89:3, 93:7, 93:10, 94:3, 94:4, 94:5
Mutual [2] - 6:3, 6:5

N

N85VM [1] - 31:14
name [2] - 4:8, 4:11
need [2] - 17:18, 93:7
needed [2] - 34:18, 35:4
negative [1] - 31:7
negotiating [1] - 89:12
negotiation [2] - 14:2, 14:4
never [10] - 16:4, 23:16, 26:12, 31:20, 33:23, 37:10, 41:12, 50:7, 70:15, 71:14
New [3] - 6:11, 9:3, 64:7
news [7] - 43:14, 43:18, 43:23, 58:7, 58:11, 58:15, 73:18
next [10] - 15:5, 16:7, 56:12, 56:21, 57:8, 57:10, 58:2, 67:9, 76:16, 83:2
Nice [1] - 94:5
nobody [1] - 42:8
non [7] - 15:24, 17:10, 25:2, 37:25, 39:17, 40:3
non-collection [1] - 15:24
non-functional [1] - 17:10
non-government [3] - 25:2, 39:17, 40:3
non-payment [1] - 15:24
non-SportsFlight [1] - 37:25

north [1] - 6:20
North [1] - 19:23
notes [2] - 25:9, 25:11
Nothing [1] - 15:13
nothing [2] - 71:5, 71:8
notice [3] - 34:6, 34:19, 34:22
November [2] - 26:25, 38:21
Number [7] - 8:22, 31:9, 45:16, 74:10, 75:13, 80:6, 81:6
number [19] - 27:10, 27:13, 27:20, 36:25, 37:3, 46:22, 49:21, 49:24, 55:23, 66:5, 73:25, 76:16, 77:25, 78:5, 81:12, 82:13, 84:8, 84:13
Numbers [1] - 4:5
numbers [1] - 48:8

O

object [12] - 7:24, 10:14, 13:5, 14:3, 29:3, 37:5, 38:3, 39:21, 42:3, 49:22, 55:16, 87:24
Object [1] - 54:12
objection [26] - 11:22, 26:11, 28:25, 31:19, 42:10, 47:19, 48:2, 51:24, 53:8, 54:3, 55:8, 57:21, 64:17, 65:15, 66:18, 69:11, 71:6, 71:11, 71:18, 72:20, 73:5, 76:2, 77:9, 77:15, 77:20, 89:3
obligate [1] - 15:14
obligation [5] - 74:20, 74:23, 75:9, 76:5, 76:10
obligations [1] - 35:7
obtained [5] - 18:8, 18:13, 29:20, 31:13, 32:7
occurred [6] - 19:11, 20:7, 64:16, 65:9, 81:8, 93:9
occurring [1] - 72:18
October [3] - 38:16, 38:21, 90:3
offered [1] - 83:20
office [1] - 12:16
officer [8] - 7:4, 7:6, 7:20, 8:15, 8:19, 9:5, 9:11, 55:4
once [2] - 39:11, 39:12
one [13] - 8:20, 18:18, 38:8, 38:9, 44:23, 45:19, 47:6, 54:22, 58:22, 67:9, 68:7, 70:4, 77:6
operating [1] - 67:16
opportunities [1] - 19:7
opportunity [17] - 12:19, 19:5, 20:12, 20:14, 20:21, 21:16, 21:19, 22:8, 23:4, 23:8, 23:15, 23:17, 25:3, 27:17, 79:18, 83:18
option [3] - 21:15, 21:21, 22:8
oral [1] - 12:14
order [1] - 74:14
original [12] - 21:20, 26:5, 26:9, 26:14, 53:4, 69:20, 69:21, 69:22, 70:2, 70:6, 70:8, 79:11
outlining [1] - 33:15
outside [3] - 53:8, 54:3, 55:10
owe [1] - 67:18
owed [15] - 12:5, 28:22, 30:6, 30:10, 56:23, 57:7, 59:25, 60:6, 78:3, 84:21, 84:25, 90:9, 90:13, 90:18
own [2] - 6:18, 55:9
owner [4] - 7:19, 8:17, 15:8, 46:7
owner's [1] - 16:13

P

P-000085 [1] - 67:9
P-000086 [1] - 68:5
P-000582 [1] - 90:21
P-000624 [1] - 65:22
P-000625 [1] - 66:24
P-000653 [1] - 89:24
P-000690 [1] - 56:12
P-000691 [1] - 57:8
P-000699 [1] - 56:21
P-000711 [2] - 55:22, 55:24
P-001209 [1] - 49:12
P-001219 [1] - 49:19
P-001223 [1] - 50:10
P-001224 [1] - 50:21
P-004084 [2] - 58:2, 58:10
p.m [1] - 94:6
packets [4] - 45:20, 45:25, 46:5, 47:24
page [24] - 9:20, 14:13, 15:21, 16:7, 17:7, 46:7, 46:21, 49:12, 52:12, 56:12, 56:21, 57:8, 58:2, 58:10, 59:15, 74:13, 74:16, 75:12, 75:13, 76:16, 78:19, 81:12, 83:2
pages [2] - 32:15, 47:11
paid [8] - 28:4, 40:12, 42:14, 42:17, 71:2, 76:17, 77:2, 77:7
paperwork [3] - 56:23, 56:25, 57:5
paragraph [20] - 19:4, 29:15, 31:10, 31:11, 34:4, 34:10, 34:12, 34:15, 34:21, 50:11, 52:14, 56:13, 59:17, 65:25, 68:6, 68:10, 74:17, 84:13, 88:3
paragraphs [1] - 34:25
pardon [2] - 13:4, 91:24
part [4] - 17:24, 40:19, 52:15, 52:16
Partial [1] - 90:22
participated [1] - 13:25
parties [2] - 81:25, 86:2
partly [1] - 7:19
parts [1] - 13:18
party [1] - 21:3
pass [1] - 57:12
passenger [2] - 92:16, 92:19
pay [4] - 60:2, 60:20, 74:23, 78:13
payment [1] - 15:24
per [10] - 16:12, 23:22, 24:2, 28:17, 35:19, 36:2, 36:8, 77:3, 77:10, 88:6
percent [12] - 16:12, 23:25, 62:14, 63:3, 68:22, 70:13, 70:21, 71:3, 78:3, 78:20, 79:3, 79:13
period [6] - 25:25, 60:2, 75:18, 82:8, 82:10, 83:3
permission [1] - 29:20
person [3] - 19:18, 19:19, 44:15
personal [2] - 37:24, 39:5
perspective [5] - 68:11, 68:17, 69:4, 69:9, 69:17
Phil [7] - 58:5, 58:6, 58:10, 59:25, 67:12, 67:18
PHILLIP [1] - 4:2
Phillip [2] - 4:13, 94:7
phone [4] - 59:24, 67:2, 67:3, 67:7
phrase [3] - 16:18, 16:23, 35:11
pilot [1] - 13:19
pilots [1] - 79:23
place [1] - 13:10
Plaintiff [2] - 34:17, 34:18
plaintiff [5] - 19:6, 19:7, 19:8, 29:19
Plaintiff's [6] - 31:13, 32:9, 33:25, 34:5, 34:24, 74:19
plane [32] - 10:8, 10:10, 20:12, 20:23, 23:21, 24:12, 26:18, 35:19, 36:4, 36:7, 36:13, 36:16, 39:16, 39:25, 40:3, 41:9, 41:11, 42:15, 43:24, 44:16, 44:20, 45:2, 45:5, 45:8, 48:8, 79:24, 81:23, 81:24, 85:6, 91:17, 92:19
planes [5] - 49:20, 49:23, 81:19, 81:21, 81:22
pleadings [6] - 11:22, 11:25, 12:2, 12:3, 71:18, 85:20
Point [126] - 7:23, 8:6, 8:11, 8:15, 9:12, 9:14, 9:21, 10:6, 10:12, 10:17, 10:20, 10:23, 14:10, 15:17, 16:3, 16:15, 16:22, 17:21, 18:5, 18:10, 19:22, 21:2, 23:21, 23:25, 25:6, 26:13, 27:5, 27:10, 27:16, 27:19, 27:23, 28:3, 28:5, 28:17, 28:22, 29:10, 29:19, 30:5, 30:7, 30:9, 30:25, 33:9, 33:13, 33:22, 35:13, 35:19, 35:21, 35:25, 36:7, 36:12, 37:15, 37:16, 37:23, 38:7, 38:22, 38:25, 39:4, 39:17, 39:19, 40:21, 40:22, 41:22, 42:2, 42:13, 43:16, 45:20, 46:2, 47:3, 47:24, 48:7, 52:17, 52:20, 55:2, 56:3, 56:7, 57:4, 60:10, 60:14, 60:18, 60:20, 62:6, 62:8, 62:13, 63:6, 65:17, 70:12, 71:2, 71:9, 71:15, 71:23, 72:8, 75:23, 76:5, 76:12, 76:13, 76:21, 77:12, 77:19, 78:9, 78:11, 78:13, 79:2, 80:23, 81:3, 83:16, 83:23, 84:12, 84:15, 84:19, 84:24, 85:15, 86:15, 86:20, 87:3, 87:7, 87:23, 88:22, 89:6, 89:7, 89:13, 89:17, 90:9, 90:13, 90:18, 91:6, 91:12
point [1] - 26:17
Point's [6] - 18:15, 24:22, 35:12, 38:13, 78:19, 81:17
portion [1] - 55:24

position [4] - 7:2, 7:6, 7:8, 55:2
positive [1] - 65:4
possession [1] - 18:5
possible [1] - 42:8
Possibly [1] - 82:3
possibly [1] - 74:2
pounds [2] - 88:6, 88:11
prepare [1] - 75:23
prepared [4] - 32:15, 36:23, 37:23, 75:21
preparing [1] - 14:8
prerogative [1] - 50:13
present [9] - 15:6, 15:9, 23:5, 23:10, 23:12, 65:3, 65:5, 65:20, 93:17
previously [1] - 52:25
price [1] - 16:25
printout [1] - 9:3
priority [1] - 14:14
proceeds [14] - 31:4, 52:22, 53:7, 53:11, 58:23, 59:2, 59:6, 64:21, 67:13, 68:12, 68:18, 69:5, 69:10, 69:18
production [1] - 18:24
prohibit [2] - 61:6, 61:9
project [2] - 80:14, 80:20
promise [6] - 35:13, 35:18, 35:20, 35:23, 35:25, 36:12
promised [1] - 23:25
prospective [2] - 15:7, 15:10
provide [3] - 37:15, 54:6, 80:23
provided [7] - 10:25, 15:22, 26:2, 54:8, 84:15, 84:20, 91:8
Provider [4] - 15:6, 15:14, 15:23, 16:11
provides [9] - 16:7, 16:11, 17:8, 34:4, 56:22, 57:9, 59:18, 67:11, 74:18
provision [6] - 15:17, 16:3, 16:16, 16:19, 16:23, 84:8
provisions [2] - 78:21, 84:13
Pruyn's [4] - 19:21, 53:4, 54:20, 64:7
publicity [1] - 31:7
purportedly [1] - 49:4
purports [15] - 52:12, 57:8, 58:2, 59:15, 65:24, 67:9, 68:8, 74:14, 80:11, 84:3, 87:2, 87:18, 88:19, 89:24, 90:2
purpose [2] - 29:21, 81:22
purposes [1] - 39:17

Q

questions [2] - 66:3, 94:4
QUINN [13] - 4:7, 9:2, 14:20, 21:22, 31:22, 45:18, 74:12, 80:10, 81:9, 93:7, 93:10, 94:3, 94:5
Quinn [1] - 4:8

R

raised [1] - 23:5
rate [9] - 16:12, 16:19, 16:23, 20:17, 20:19, 67:15, 77:3, 77:10, 83:24
rather [1] - 92:12
read [6] - 29:15, 71:20, 75:5, 85:11, 85:17, 85:20
reading [1] - 49:13
reads [1] - 80:12
real [3] - 5:8, 5:16, 68:11
really [1] - 7:15
reason [1] - 17:11
reasons [1] - 83:9
Rebecca [3] - 58:3, 87:19, 87:20
recap [1] - 90:22
receipts [1] - 45:13
receive [12] - 4:24, 5:2, 5:4, 5:9, 5:11, 5:13, 5:15, 28:17, 29:10, 41:13, 71:9, 78:20
received [2] - 43:3, 59:23
receiving [7] - 41:10, 47:18, 49:6, 58:17, 58:25, 90:6, 90:24
recently [1] - 66:4
recess [2] - 81:8, 93:9
reciprocal [1] - 36:12
recollection [6] - 13:3, 13:6, 13:8, 42:21, 74:4, 81:18
record [3] - 4:12, 17:15, 17:19
recorded [1] - 17:9
records [6] - 37:16, 40:20, 40:21, 40:25, 65:8, 88:23
recover [4] - 52:16, 72:18, 73:3, 78:14
recovered [10] - 12:9, 62:3, 62:14, 63:4, 68:23, 71:4, 71:5, 71:9, 71:17, 72:4
recovery [3] - 63:12, 63:15, 73:7
refer [2] - 46:13, 70:5
reference [1] - 82:23
referenced [1] - 61:15
references [2] - 19:5, 82:11
referred [1] - 56:25
referring [2] - 23:7, 66:10
refers [5] - 15:3, 46:8, 46:11, 46:18, 66:8
reflect [2] - 40:25, 46:15
refresh [4] - 51:17, 74:3, 81:18, 82:21
refunds [1] - 15:24
regard [1] - 44:3
regarding [6] - 18:5, 56:23, 57:7, 85:5, 89:8, 89:17
related [1] - 51:7
relation [1] - 18:10
relayed [2] - 12:23, 22:11
remember [6] - 47:7, 51:4, 58:20, 79:11, 80:21, 83:10
remit [1] - 16:12
removal [1] - 91:12
remove [1] - 91:7
rendition [2] - 44:8, 73:20
renew [4] - 21:15, 21:21, 22:8, 23:18
renewal [3] - 23:15, 23:16, 29:25
rephrase [1] - 91:16
report [1] - 43:24
reporting [1] - 43:18
reports [3] - 10:24, 43:19, 43:23
represented [2] - 84:21, 84:25
requested [1] - 14:11
require [1] - 78:13
required [1] - 34:7
requirements [2] - 15:7, 15:10
reserve [1] - 5:22
reside [1] - 4:14
response [3] - 67:4, 71:22, 77:22
responsible [2] - 80:13, 80:19
retail [1] - 17:2
retaining [1] - 89:8
retire [2] - 7:8, 7:12
revenue [3] - 79:19, 79:22, 80:2
revenues [1] - 15:25
review [1] - 41:25
reviewed [5] - 10:24, 42:8, 42:18, 43:9, 53:25
Rich [1] - 35:23
Richards [1] - 12:12
Richmor [118] - 4:9, 10:25, 11:3, 11:13, 12:3, 13:15, 15:9, 15:19, 16:15, 16:22, 17:21, 18:8, 18:13, 19:5, 19:7, 19:8, 20:24, 21:4, 21:6, 22:13, 23:25, 26:18, 27:6, 27:20, 27:24, 28:3, 28:22, 29:11, 29:19, 30:6, 30:10, 31:13, 32:7, 32:14, 32:18, 32:24, 33:14, 34:9, 35:3, 35:7, 35:14, 35:21, 35:25, 36:4, 36:7, 36:12, 36:24, 37:14, 37:15, 37:22, 39:16, 39:18, 41:10, 41:14, 41:21, 42:14, 43:15, 43:19, 45:20, 45:25, 46:18, 47:2, 50:22, 51:7, 51:11, 51:20, 52:16, 52:20, 56:4, 57:11, 60:5, 60:9, 60:11, 60:18, 62:2, 62:5, 62:8, 66:11, 68:24, 69:3, 69:8, 69:17, 70:20, 70:25, 71:16, 72:2, 72:5, 72:8, 72:11, 72:12, 72:18, 73:3, 73:11, 74:15, 75:10, 76:7, 78:10, 78:13, 78:20, 79:3, 79:20, 79:23, 80:2, 80:18, 83:17, 83:25, 84:21, 84:25, 86:9, 87:2, 89:13, 89:17, 90:2, 91:7, 92:25, 93:16
Richmor's [8] - 30:14, 35:18, 58:7, 58:11, 58:15, 69:4, 78:5, 91:17
right-hand [2] - 81:16, 82:11
rightly [1] - 12:5
risk [1] - 15:23
Rose [2] - 11:9, 43:2
run [2] - 34:11, 35:6
Ryan [1] - 4:9

S

salesman [1] - 6:13
Sarah [3] - 11:9, 43:2, 43:12
saw [3] - 31:20, 31:23, 41:12

scheduling [2] - 15:6, 15:9
school [1] - 54:11
Scotland [3] - 38:8, 38:9, 38:16
second [13] - 9:20, 50:11, 50:12, 52:14, 56:21, 59:15, 59:17, 74:13, 74:16, 74:17, 80:12, 88:3
section [1] - 14:22
Section [2] - 15:21, 15:22
see [19] - 14:21, 14:23, 34:12, 34:15, 34:21, 34:24, 49:25, 50:14, 52:18, 68:14, 74:25, 75:15, 75:18, 77:4, 80:14, 81:17, 82:12, 87:5, 90:4
seeing [6] - 47:7, 47:8, 47:21, 50:24, 80:21, 90:15
seeking [2] - 85:21, 91:7
seem [2] - 58:6, 58:10
sell [1] - 5:16
send [3] - 43:15, 45:25, 51:8
sending [3] - 47:2, 51:4, 67:23
sent [11] - 29:11, 33:14, 41:21, 41:25, 47:24, 51:10, 51:18, 58:22, 59:12, 85:9, 90:2
sentence [12] - 14:15, 14:17, 15:5, 15:22, 31:11, 31:22, 50:12, 52:14, 55:25, 56:22, 59:18, 80:12
September [6] - 38:7, 38:9, 38:11, 83:3, 83:4, 83:6
served [1] - 86:5
service [1] - 13:20
Service [1] - 16:8
services [1] - 34:7
Services [4] - 15:6, 15:14, 15:23, 16:11
set [1] - 10:7
settle [1] - 12:4
settlement [6] - 12:9, 66:10, 68:13, 68:19, 69:6, 69:13
seven [2] - 64:13, 64:14
shall [4] - 15:6, 15:14, 15:23, 16:11
Shall [1] - 17:8
share [6] - 52:21, 62:9, 64:25, 79:19, 79:22, 80:2
shared [1] - 62:5
sharing [4] - 31:4, 53:6, 53:11, 61:16
sheet [4] - 9:7, 36:23, 37:9, 37:22
short [1] - 34:19
show [16] - 13:17, 25:13, 29:4, 32:10, 33:2, 33:24, 36:19, 41:5, 48:10, 48:24, 52:8, 65:8, 74:6, 81:10, 86:22, 87:14
sic [1] - 17:17
sign [2] - 86:19, 87:8
signature [3] - 9:21, 9:22, 87:4
signed [1] - 54:22
signing [1] - 84:4
similar [6] - 47:9, 47:12, 80:24, 83:4, 84:8, 84:13
single [2] - 80:13, 80:19
single-handedly [2] - 80:13, 80:19
situation [1] - 22:12
six [5] - 5:21, 51:21, 52:2, 52:3
skim [1] - 81:11
skip [3] - 66:6, 66:8, 66:12
small [1] - 6:10
smaller [2] - 92:22, 93:5
Smith [2] - 87:19, 87:20
sociology [2] - 5:3, 5:6
sole [2] - 31:11, 32:5
someone [1] - 44:7
somewhere [1] - 92:19
sorry [17] - 4:11, 5:12, 16:20, 19:2, 19:8, 26:7, 35:16, 44:11, 48:19, 55:14, 59:20, 61:7, 63:10, 70:19, 82:19, 84:10, 84:23
sound [1] - 55:25
sounding [3] - 56:14, 56:17, 56:19
speaking [1] - 67:3
speaks [1] - 66:18
special [1] - 92:11
specific [2] - 58:20, 91:21
speculation [5] - 42:11, 71:7, 71:12, 77:16, 89:4
split [16] - 12:5, 12:7, 12:14, 24:4, 24:6, 24:10, 24:16, 53:16, 61:18, 61:23, 63:12, 72:16, 72:17, 73:2, 79:12, 79:14
SportsFlight [70] - 13:15, 21:10, 25:25, 26:6, 26:9, 26:14, 27:6, 27:24, 28:5, 28:9, 28:23, 29:11, 29:12, 29:22, 29:25, 30:2, 30:14, 32:21, 32:23, 33:15, 34:9, 35:5, 35:8, 36:13, 36:17, 37:25, 39:20, 40:2, 40:16, 58:8, 58:12, 60:9, 62:3, 62:10, 62:13, 64:8, 64:15, 67:13, 68:13, 68:19, 69:5, 69:14, 69:19, 70:14, 70:18, 72:14, 72:19, 73:4, 73:12, 73:16, 74:16, 75:9, 75:14, 76:6, 76:10, 76:17, 76:18, 76:22, 77:2, 77:7, 78:4, 78:14, 79:19, 80:23, 81:19, 82:2, 90:3, 91:8, 91:16, 91:17
start [2] - 46:22, 47:12
started [3] - 6:18, 64:11, 67:15
starting [1] - 58:19
starts [1] - 68:10
State [14] - 9:4, 34:8, 52:22, 53:12, 56:4, 60:10, 60:21, 85:12, 85:18, 85:21, 85:24, 86:3, 86:6, 93:24
state [1] - 4:11
statement [4] - 31:15, 32:5, 54:2, 65:3
stone [1] - 57:12
stories [1] - 73:19
struck [1] - 53:23
stuff [1] - 55:10
subject [6] - 31:12, 32:6, 55:9, 58:8, 58:12, 66:25
subpoenas [1] - 86:5
subsequent [2] - 89:12, 89:16
success [2] - 80:13, 80:20
sudden [1] - 68:2
sue [5] - 30:22, 30:23, 58:16, 61:4, 62:13
sued [2] - 60:9, 63:21
suing [5] - 30:24, 63:16, 63:19, 71:16, 71:24
summary [4] - 36:23, 37:4, 37:9, 37:22
supports [1] - 74:23
supposed [5] - 12:6, 12:7, 68:22, 88:4, 88:13
Supreme [1] - 74:18
surprised [3] - 58:7, 58:11, 58:14
suspect [1] - 26:20
sworn [1] - 4:3

T

Tabner [1] - 4:8
tail [1] - 73:25
take-off [1] - 17:8
task [1] - 54:10
taxes [2] - 10:18, 10:20
telephone [1] - 19:17
ten [2] - 92:16, 92:19
ten-passenger [2] - 92:16, 92:19
term [4] - 21:18, 22:9, 37:14, 84:9
terms [9] - 10:13, 26:5, 26:8, 26:14, 55:19, 61:10, 70:25, 89:16, 92:8
testified [15] - 4:4, 13:7, 19:10, 26:11, 31:20, 51:3, 51:25, 52:25, 53:2, 71:19, 73:6, 83:16, 83:20, 93:14, 93:21
testimony [2] - 85:11, 93:12
thanked [1] - 81:3
THE [3] - 14:23, 14:25, 21:25
themselves [3] - 11:23, 11:25, 71:19
thereafter [1] - 88:7
third [4] - 17:24, 55:25, 56:12, 81:25
Third [1] - 74:15
thirdhand [2] - 22:18, 28:8
three [6] - 6:15, 13:18, 57:10, 79:23, 93:7
Three [1] - 20:22
today [4] - 83:21, 93:11, 93:14, 93:21
tons [1] - 88:5
took [2] - 13:10, 92:22
top [4] - 46:7, 49:24, 55:24, 90:22
topics [1] - 86:8
total [4] - 74:22, 75:13, 76:9, 78:3
towards [2] - 65:25, 68:5
track [2] - 25:6, 48:6
Trade [1] - 82:14
trade [1] - 82:23
transaction [2] - 64:9, 91:16
travel [1] - 65:8
trial [1] - 18:24
Tribune [1] - 44:5
trip [10] - 38:7, 38:8, 38:13, 39:24, 46:22, 47:12, 82:13, 83:4, 88:21

trips [4] - 37:23, 37:24, 37:25, 92:7
true [4] - 31:15, 31:23, 32:5, 38:6
trying [1] - 52:16
turn [10] - 14:13, 17:6, 29:14, 31:9, 37:18, 46:21, 47:11, 55:21, 78:17, 90:21
turned [1] - 68:2
twenty [1] - 34:6
twenty-four [1] - 34:6
two [9] - 11:10, 22:3, 22:4, 22:9, 32:15, 47:11, 66:3, 66:5, 82:15
two-year [1] - 22:9
type [1] - 46:4
typed [1] - 91:2
types [1] - 47:23

U

um-hmm [7] - 35:2, 47:15, 75:2, 80:15, 82:16, 87:6, 90:5
under [6] - 78:2, 78:3, 81:16, 82:11, 82:13
University [1] - 4:21
unused [16] - 25:7, 30:7, 30:10, 35:13, 39:19, 70:13, 78:6, 78:11, 78:20, 79:4, 79:14, 84:22, 85:2, 91:9, 93:18, 93:23
up [8] - 4:10, 10:7, 17:9, 43:5, 58:18, 67:14, 76:14, 91:3
upstate [1] - 6:11
usage [1] - 39:16
usual [1] - 59:22
utilizing [1] - 34:17

V

various [5] - 41:9, 49:20, 49:23, 50:22, 88:19
venture [4] - 60:17, 60:24, 61:6, 61:9
verbally [2] - 62:21, 62:22
versus [1] - 74:15
vivid [1] - 13:3

W

wash [1] - 88:20
ways [1] - 58:4
week [1] - 59:24
wheels [2] - 17:9
wheels-down [1] - 17:9
wheels-up [1] - 17:9
wife [2] - 48:6, 86:14
Wimbledon [1] - 48:6
withdrawn [1] - 35:10
witness [46] - 4:3, 8:24, 8:25, 9:18, 9:19, 13:21, 13:22, 18:19, 18:20, 25:15, 25:16, 29:6, 29:7, 29:17, 32:12, 32:13, 33:5, 34:2, 34:3, 36:21, 36:22, 37:20, 37:21, 41:7, 41:8, 48:12, 48:13, 49:2, 49:3, 52:11, 74:7, 74:8, 80:8, 80:9, 81:14, 81:15, 86:24, 86:25, 87:16, 87:17, 88:17, 88:18, 89:22, 89:23
WITNESS [3] - 14:23, 14:25, 21:25
word [4] - 14:18, 16:15, 57:19, 63:15
writings [1] - 90:15
written [3] - 26:2, 26:9, 26:15

Y

year [4] - 4:16, 6:8, 22:9, 73:23
years [13] - 5:22, 6:15, 22:3, 22:4, 44:22, 48:20, 51:21, 52:2, 52:3, 64:13, 64:14, 79:12, 92:5
York [3] - 6:11, 9:3, 64:7
yourself [8] - 29:16, 37:12, 57:9, 65:24, 66:25, 68:9, 87:19, 89:25

**ERRATA SHEET**

Please note any error and/or corrections thereof on this sheet. The rules require a reason for any change or correction. It may be general; such as, "to correct stenographic error," or "to clarify the record," or "to conform with the facts." INDEX NO. 1:13-CV-0298

CASE: ASSEMBLY POINT AVIATION, INC. v. RICHMOR AVIATION, INC.

DEPOSITION OF: PHILLIP H. MORSE DATE: ________

| PAGE | LINE | CORRECTION | REASON FOR CHANGE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Signature of Deponent