EXHIBIT "D"

## Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------
ASSEMBLY POINT AVIATION, INC.,

                                    Plaintiff,

        - against -

                              Index No: 1:13-CV-0298

RICHMOR AVIATION, INC.,

                                    Defendant.
------------------------------------------------
        The following **EXAMINATION BEFORE TRIAL** of
**MAHLON RICHARDS** in the above-entitled matter was held
pursuant to Notice at **TABNER, RYAN & KENIRY**, 18
Corporate Woods, Albany, New York, on Thursday,
February 27, 2014, commencing at 9:30 a.m. before
Laurel Stephenson, Court Reporter and Notary Public.

A-P-P-E-A-R-A-N-C-E-S:

JOHN J. HENRY, ESQ.
WHITEMAN, OSTERMAN & HANNA, LLP.
One Commerce Plaza
Albany, New York 12260
Attorneys for Plaintiff

WILLIAM F. RYAN, ESQ.
BRIAN M. QUINN, ESQ.
TABNER, RYAN & KENIRY, LLP.
18 Corporate Woods Boulevard
Suite 8
Albany, New York 12211
Attorneys for Defendant
------------------------------------------------
ALSO PRESENT:

Cynthia Suprenant

## Page 2

I-N-D-E-X

INDEX TO EXAMINATIONS

| Examined by: | Page |
| --- | --- |
| Atty. Henry | 5 |
| Atty. Ryan | 152 |
| Atty. Henry | 164 |

PLAINTIFF'S DEPOSITION EXHIBITS

| Number | Description | For Ident. |
| --- | --- | --- |
| 1 | Aircraft Lease Agreement | 5 |
| 2 | P-004952, February 20, 2012 | 5 |
| 3 | P-000198, February 7, 2008 | 5 |
| 4 | P-001590 | 5 |
| 5 | P-000126-P-000127 | 5 |
| 6 | Plaintiff's Exhibit 7, 495 - 500 | 84 |
| 7 | 940 - 944, Malia Keeler e-mail | 84 |
| 8 | Verified Complaint, 186 - 192 | 84 |
| 9 | Response to Defendant's First Interrogatory, 6859 - 6867 | 84 |
| 10 | Defendant's 209 - 393 | 106 |

## Page 3

| Number | Description | For Ident. |
| --- | --- | --- |
| 11 | ** Confidential Exhibit Stipulation of Settlement | 106 |
| 12 | P-000590, January 20, 2013, e-mail | 121 |
| 13 | P-000591, January 22, 2013, e-mail | 121 |
| 14 | P-000592, January 23, 2013, e-mail | 121 |
| 15 | P-000085, January 24, 2013, e-mail | 121 |
| 16 | 8940, February 12, 2013 | 121 |

DEPOSITION EXHIBITS

| Number | Description | For Ident. |
| --- | --- | --- |
| 18 | Defendant's 18547 - 18590 | 152 |
| 19 | January 4, 2012 | 152 |
| 20 | Draft Summary, trips | 152 |
| 21 | Draft Summary, maintenance | 152 |

## Page 4

S-T-I-P-U-L-A-T-I-O-N-S

F-E-D-E-R-A-L

        IT IS HEREBY STIPULATED AND AGREED, by
and between the attorneys for the respective parties,
as follows:

        All objections, except as to the form of
the questions, shall be reserved to the time of the
trial.

        The within examination may be signed and
sworn to before any Notary Public with the same force
and effect as if signed and sworn to before the court.

        Filing of the original transcript of the
examination is waived.

                *    *    *

**MAHLON RICHARDS -- Atty. Henry**

(Plaintiff's Deposition Exhibits Numbers
1 through 5 were marked for identification, this
date.)

**MAHLON RICHARDS,**
called as a witness, having been duly sworn, was
examined and testified as follows:

BY MR. HENRY:

Q    Good morning, Mr. Richards.  My name is John
Henry.  I'm the attorney representing the plaintiff,
Assembly Point Aviation, in this lawsuit.  I want to
ask you some questions regarding the facts underlying
the lawsuit.  Before I do that, I want to go over some
ground rules for your deposition testimony today.

First of all, do you understand that your
testimony is under oath here this morning?

A    Yes, I do.

Q    If you don't understand one of my questions
this morning, please let me know that.  I'll rephrase
the question.  If you answer my question, I'm going to
assume that you understood what I was asking you.

Do you understand that as well?

A    Yes.

Q    Please answer my questions orally since the
court reporter can't take down a nod or a shake of the

---

**MAHLON RICHARDS -- Atty. Henry**

head, and she'll be sure to remind you of that.

Do you understand that as well?

A    Okay.

Q    If you need to consult a document today to
answer one of my questions this morning, please let me
know that, and I'll try to find that document and see
if we can help you out to answer that question.

Do you understand that as well?

A    Yes.

Q    Can you tell me what your educational
background is, sir?

A    High school.

Q    When did you graduate high school?

A    1961.

Q    Did you have any formal education after high
school?

A    No.

Q    What's your current occupation, sir?

A    I'm the president of Richmor Aviation.

Q    How long have you been the president of
Richmor Aviation?

A    I don't know, probably 1985.  I don't know.

Q    When was Richmor Aviation founded?

A    1967.

---

**MAHLON RICHARDS -- Atty. Henry**

Q    Who was the founder?

A    We, at that time, we worked for the company
called Kamyr Incorporated --

Q    I'm sorry.  What was that name?

A    Kamyr, K-A-M-Y-R.  -- who had a corporate
airplane.  We weren't utilizing it as much as they
wanted us to, so we formed a company to charter the
airplane.

Q    Who is we when you say "we formed a company"?

A    Kamyr and myself and my -- another pilot.

Q    Can you describe for me, generally, what your
duties are as president of Richmor?

A    Well, I try to run the company and oversee as
much as I can that's going on, try to control the
costs, get some sales.

Q    Are you the only shareholder of Richmor?

A    No.

Q    Who are the other shareholders, generally?

A    Pardon me?

Q    Generally.

A    Generally.  My family has some shares and
there's some minority shareholders.  I think two other
minority shareholders.

Q    Are you the majority shareholder?

---

**MAHLON RICHARDS -- Atty. Henry**

A    Yes, I am.

Q    Is one of your duties at Richmor to negotiate
and execute contracts on behalf of Richmor?

A    Yes.

Q    Is there anyone else at Richmor who has
responsibility over the negotiation and execution of
the contracts?

A    The only person I could think of would be the
flight school director.

Q    What would those contracts be for, would that
be for flight instruction contracts?

A    Yes, yes.

Q    Would that not include authority to enter
into contracts regarding the charter or maintenance of
aircraft on behalf of Richmor?

A    You say would that include?

Q    Would it include or not include?

A    It would not include.

Q    So, is it fair to say that you'd be the only
person with authority to enter into contracts on
behalf of Richmor for the charter and maintenance of
the aircraft?

A    Yes.

Q    Can you describe for me in the 2002 to 2005

9

MAHLON RICHARDS -- Atty. Henry

1
2   time period, did Richmor own its own aircraft in
3   addition to having possession of aircraft owned by
4   others?
5       A    Yes.
6       Q    Generally, what aircraft did Richmor own
7   during that time period?
8       A    Primarily would be the flight school
9   aircraft.
10      Q    What types of aircraft are those?
11      A    Majority would be single-engine Cessna
12  airplanes.
13      Q    Did it own any Gulfstream aircraft or any
14  similar aircraft to a Gulfstream?
15      A    In 2002?
16      Q    2002 to 2005.
17      A    No.
18      Q    Let me ask:  At any time, did Richmor own
19  aircraft to one that's similar to the one at issue
20  here, i.e., a private corporate jet?
21      A    No -- well, you say a private corporate jet?
22      Q    Yes.
23      A    A private corporate jet similar to a
24  Gulfstream or of just any?
25      Q    Why don't you explain that to me.  What did

10

MAHLON RICHARDS -- Atty. Henry

1
2   Richmor own?
3       A    I believe we owned a light jet.
4       Q    What's a light jet?
5       A    It's a, I think, six passenger twin engine
6   jet, and I believe we owned a turboprop.  Turboprop
7   being a twin engine airplane that's powered by a
8   turboprop engine.
9       Q    What's the range of a light jet?
10          MR. RYAN:  In miles?
11      Q    In miles, hours, however you --
12      A    Three hours.
13      Q    Three hours.  It wouldn't be capable of
14  transatlantic flight?
15      A    It would be capable, but you would have to
16  make stops along the way.
17      Q    How about the turboprop?
18      A    Again, it would be capable, but you'd stop
19  along the way.
20      Q    Okay.  Do you know Mr. Phil Morse?
21      A    Yes.
22      Q    How do you know him?
23      A    He's a customer, has been a customer.
24      Q    How long have you known him for,
25  approximately?

11

MAHLON RICHARDS -- Atty. Henry

1
2       A    Twenty-five years.
3       Q    Okay.
4       A    Something like that, twenty-five, thirty.
5       Q    How did you first meet Mr. Morse?
6       A    I was introduced to him by the president of
7   Kamyr Incorporated.
8       Q    Who was that?
9       A    Ed Allard.
10      Q    What were you introduced for?
11      A    Ed thought Mr. Morse was getting to the point
12  of being interested in having an aircraft.
13      Q    Was this while Mr. Morse was working with
14  NAMIC?
15      A    Yes.
16      Q    And that was his company at the time?
17      A    I believe it was.
18      Q    All right.
19      A    Yes.
20      Q    And NAMIC, was there then a time that NAMIC
21  acquired an aircraft for its use?
22      A    Yes.
23      Q    Did Richmor maintain and operate that
24  aircraft?
25      A    Yes.

12

MAHLON RICHARDS -- Atty. Henry

1
2       Q    About when was that?
3       A    1985.
4       Q    Can you describe for me what kind of aircraft
5   NAMIC had, or if it had multiple aircraft, between
6   1985 and, say, 2002?
7       A    I believe the first airplane was a De
8   Havilland Hawker, which would be a mid-size jet, and
9   then, later on, they acquired a Gulfstream G-III.
10  That would be the -- at that time, that would be all.
11      Q    How long did Richmor maintain and operate
12  NAMIC's planes?
13      A    I would guess five to seven years, while the
14  aircraft were NAMIC airplanes.
15      Q    Then what happened to the airplanes?
16      A    Well, NAMIC was sold, and we continued to
17  operate, I think at that point it was, the G-III for
18  Mr. Morse.
19      Q    All right.  Was that under the name of
20  Assembly Point Aviation, if you know?
21      A    I don't remember.
22      Q    Did Richmor ever charter out the planes that
23  were owned by NAMIC?
24      A    Yes, we did.
25      Q    What were the terms of that charter

13

MAHLON RICHARDS -- Atty. Henry

1
2    arrangement?
3        A    By terms, what do you mean?
4        Q    Was NAMIC compensated in any way for
5    chartering out the aircraft?
6        A    Yes.  If we flew the airplane, then at the
7    end of the month we would remit a bill which would
8    include the revenue for those flight hours.
9        Q    Was Richmor also compensated for those flight
10   hours?
11       A    Yes.  We would receive a commission per
12   flight hour.
13       Q    How much was that commission?
14       A    Well, it varied.
15       Q    I don't mean in dollar terms.  I mean in
16   percentage.
17       A    Right.  Yes.  It varied.  The standard
18   commission was fifteen percent, but if we did it
19   through a broker, whatever we had to pay the broker
20   would come off the fifteen percent, so sometimes it
21   was five percent, ten percent, fifteen percent.
22       Q    Was there a written contract reflecting that
23   arrangement?
24       A    Yes -- reflecting the commission amount?
25       Q    Yes.

14

MAHLON RICHARDS -- Atty. Henry

1
2        A    Yes.
3        Q    And that's between Richmor and NAMIC at the
4    time, correct?
5        A    While NAMIC was -- had the aircraft.
6        Q    That's correct.
7        A    Yes.
8        Q    Do you have a copy of that written contract?
9        A    I don't know.  I say I don't know because I
10   think the contract changed along the way, and I don't
11   remember what the dates were.
12       Q    Okay.  Now, there was a point in time when
13   NAMIC was acquired by Pfizer, correct, are you
14   familiar with that, in the 1990s?
15       A    A little bit.
16       Q    Phil had sold off his interest in NAMIC to
17   another company anyway, correct?
18       A    Yes.
19       Q    What happened with the NAMIC planes at that
20   point?
21       A    I think what happened was I think Phil
22   purchased the airplane that was there at that time
23   from NAMIC or Pfizer.  I wasn't involved in the
24   dealings, so I don't know for sure.
25       Q    But Richmor still had possession of the

15

MAHLON RICHARDS -- Atty. Henry

1
2    aircraft, correct?
3        A    Yes.
4        Q    Was that a G-III?
5        A    I believe it was a G-III.
6        Q    Eventually Mr. Morse purchased the G-IV
7    that's at issue in this lawsuit, correct?
8        A    Yes.
9        Q    Were you involved in the purchase of that
10   airplane?
11       A    Yes.
12       Q    How were you involved?
13       A    I went out and found the airplane for him,
14   and after we located the aircraft and showed it to him
15   and he decided to purchase it, then we would, I
16   believe, put in a prepurchase inspection to make sure
17   that everything was okay.
18       Q    This was a used aircraft at that point; is
19   that correct?
20       A    Yes.
21       Q    What's the year of manufacture, is that 1991?
22       A    I think 1999.
23       Q    Okay.  Did you serve as Mr. Morse's agent for
24   purposes of buying the aircraft, did Richmor serve as
25   Mr. Morse's agent?

16

MAHLON RICHARDS -- Atty. Henry

1
2        A    Yes.
3        Q    Did Richmor receive a commission on the
4    purchase of the aircraft?
5        A    Richmor was supposed to receive a commission
6    on the purchase of the aircraft.  During the
7    negotiations of the sale to Pfizer, I mentioned -- I'm
8    just trying to clarify in my mind which aircraft we're
9    talking.
10       Q    Sure.  Take your time.
11       A    There was an airplane that there was a
12   commission due on during the sale of NAMIC to Pfizer
13   that had not been paid.  I think I mentioned it either
14   to Dave Gilmour or to Mr. Morse, and the conversation
15   that I had with Mr. Morse was, I don't -- I can't
16   afford to muddy the waters during this purchase, so
17   I'll keep my airplane with you and operate it.  You
18   can operate it for me, but I don't want you to talk
19   about a commission.
20       So what I did is I ended up paying the broker
21   that I was working for, or with, to purchase the
22   airplane.  I paid him, I think, over $100,000 and I
23   didn't -- I didn't collect a commission.
24       Q    Now, are you talking about when Assembly
25   Point Aviation acquired the Gulfstream IV, you paid a

17

MAHLON RICHARDS -- Atty. Henry

commission to a third party for that?

A   As I said, I'm not sure whether it was -- I
think it was the Gulfstream IV or the III. I'm
confused. I don't know which one it was, but whatever
aircraft NAMIC owned and operated at the time they
sold the company to Pfizer there was a commission due.
Now I don't know if it was the III or IV. I'm sorry.

Q   Okay. Well, the IV was never owned by NAMIC,
correct?

A   I don't think so, no.

Q   And when the IV was acquired, NAMIC had been
already been sold off to Pfizer; is that correct?

A   I think so. We can find out.

Q   We will come back to that.

So, nevertheless, you personally went out and
helped locate this aircraft, correct?

A   Yes, I did.

Q   Did you make a recommendation to Mr. Morse to
acquire this particular aircraft?

        MR. RYAN: The Gulfstream IV?

        MR. HENRY: Yes.

A   I probably did, because we did operate other
Gulfstreams, and we knew that the G-III had been a
good reliable airplane and that generally the IV was

---

18

MAHLON RICHARDS -- Atty. Henry

probably reliable. Now, whether he came to me and
said, Mahlon, I want you to go out and find a G-IV or
we talked about what the best airplane was, I don't
know.

Q   Did you have any discussions with Mr. Morse
about whether a G-IV would yield a higher charter
revenue, Mr. Morse or Mr. Gilmour or anyone else from
Assembly Point?

A   I don't -- I don't remember.

Q   When you were acquiring or when Assembly
Point was acquiring a G-IV though, was it your
anticipation that Richmor would still receive a
commission if that G-IV were chartered out?

        MR. RYAN: Objection to the form. You
can answer.

Q   Do you know what I'm asking?

A   The G-IV charters for more than the G-III.

Q   And Richmor would still receive a commission
on the G-IV if it were to be chartered out, correct?

A   If we were managing the airplane, we would
receive a commission for the hours flown.

Q   Was it your anticipation that Richmor would
be managing the G-IV?

A   Yes.

---

19

MAHLON RICHARDS -- Atty. Henry

        MR. RYAN: Same objection.

Q   I'm going to show you a document that's been
marked for your deposition as Plaintiff's Exhibit 2.

        (The document was handed to the witness,
and the witness examined the document.)

Q   Exhibit Number 2, is that a copy of the
aircraft pilot and management services agreement
between Richmor and APA for the Gulfstream IV?

A   Yes.

Q   That's dated January 22nd, 2001, if you look
on the --

A   Yes.

Q   Were you involved in the negotiation or any
discussions leading up to the execution of this
agreement?

A   I probably would have been.

Q   Was there anyone else at Richmor who would
have been involved?

A   I don't think so.

Q   Who prepared the agreement?

A   I believe this is the same or similar
agreement that we've always used, so I don't know who
originally prepared it.

Q   When you say "we've always used," what do you

---

20

MAHLON RICHARDS -- Atty. Henry

mean by that?

A   Richmor.

Q   So this is a Richmor standard form agreement?

A   Pretty much standard. It's an agreement that
we've used.

Q   Did Assembly Point prepare this agreement?

A   I don't think so.

Q   Did Richmor have an attorney prepare this
agreement, or this form, at any point?

A   I don't remember how the -- it was originally
prepared. I don't know.

Q   Had it been in use with Richmor for some
period of time before this particular contract was
executed?

A   Yes.

Q   Do you know approximately how long?

A   No.

Q   Does Richmor use this form with respect to
other clients or did it do so at that time?

A   Yes.

Q   With respect to this particular agreement
between Assembly Point and Richmor, this agreement
being the pilot and management agreement, can you
describe for me what discussions that you had with

21

MAHLON RICHARDS -- Atty. Henry

1
2   either Mr. Morse or Mr. Gilmour about entering into
3   the pilot and management services agreement?
4       A   I don't recall.
5       Q   Were there ever any drafts of this particular
6   agreement exchanged between Assembly Point and
7   Richmor?
8       A   I don't remember.
9       Q   Do you know if there's any difference in the
10  structure or terms of this agreement and the one that
11  Richmor had with NAMIC?
12          MR. RYAN:   I'll object to the form.  You
13  can answer.
14      A   I don't know.  I -- I don't think so, but I
15  don't know.
16      Q   As you take a look at the pilot and
17  maintenance agreement, Assembly Point was the owner of
18  the aircraft, correct?
19      A   Yes.
20      Q   And Assembly Point was responsible for all
21  the charters and expenses associated with the
22  aircraft; is that correct?
23      A   Yes.
24      Q   So that would include any maintenance, any
25  repairs, upgrades, hangar charges, correct?

22

MAHLON RICHARDS -- Atty. Henry

1
2       A   Yes.
3       Q   All fuel for the aircraft, correct?
4       A   Yes.
5       Q   Insurance for the aircraft?
6       A   Yes.
7       Q   Any registration, governmental fees for the
8   aircraft were paid by Assembly Point; is that correct?
9       A   Not all.  If we chartered the airplane,
10  there's a federal excise tax due.  We collect it from
11  the customer and paid the government.
12      Q   Do you also have to pay a fee to the FAA for
13  registration of an aircraft?
14      A   Yes.
15      Q   Forgive me, I have no knowledge of the
16  aviation industry.
17      A   Twenty-five dollars.
18      Q   Twenty-five dollars to register a jet?
19      A   Yes.
20      Q   So, what, about a third of what I pay for my
21  car; is that correct?
22          Okay.
23      A   And you only do it once.
24      Q   And only do it once.  Okay.
25          Assembly Point was also responsible for

23

MAHLON RICHARDS -- Atty. Henry

1
2   payment of the flight crew salaries; is that correct?
3       A   Yes.
4       Q   Including pilots, correct?
5       A   Yes.
6       Q   Assembly Point also was responsible for
7   paying for training the pilots, correct?
8       A   Yes.
9       Q   What expenses related to this aircraft were
10  paid for by Richmor?
11          MR. RYAN:   This aircraft, the Gulfstream
12  IV?
13          MR. HENRY:   Yes.
14      Q   Did Richmor ever pay any expenses for this
15  aircraft?
16      A   The expenses that we paid for the aircraft,
17  which we paid all of them, we would bill at the end of
18  the month to Assembly Point.
19      Q   Then Assembly Point would pay all those
20  expenses?
21      A   Yes, correct.
22      Q   They weren't borne by Richmor, correct?
23      A   Only until we got paid.
24      Q   All right.  Can you describe for me how the
25  insurance was paid for?  In whose name was the

24

MAHLON RICHARDS -- Atty. Henry

1
2   insurance policy?  Was it in Richmor's name?
3       A   The basic policy would be Richmor's name and
4   the different aircraft owners that were on the policy
5   would be named.
6       Q   As additional insureds?
7       A   As --
8       Q   Or as insureds?
9       A   As insured, I think.
10      Q   Were there separate policies maintained for
11  each aircraft or was there a global policy in which
12  each aircraft was placed on?
13      A   Global policy and the registration numbers
14  would be listed on the policy.
15      Q   How was that cost allocated or passed on to
16  the owners?
17      A   Well, the underwriter or the broker would
18  tell us how much each airplane cost.  That cost was
19  passed onto the customer.
20      Q   All right.  Regarding the maintenance of the
21  aircraft, did Richmor employees do the maintenance on
22  the aircraft or do you use subcontractors or how does
23  that work?
24      A   Well, we would have done most of the
25  maintenance on the aircraft that we were capable of

25

MAHLON RICHARDS -- Atty. Henry

doing.  If there was something that we were not
trained to do or capable of doing it, we'll sub it out
to another company.

    Q    What were the areas that you would sub out to
another company?

    A    An example might be an engine overhaul.

    Q    Anything else?

    A    If there was an inspection that required,
let's say, an NDT inspection, which is a
nondestructive testing, there are companies that
specialize in that, and they would come to our
facility and do the x-rays.

    Q    If you did have to pay a subcontractor to
perform maintenance on the aircraft, that cost will be
passed along to Assembly Point, correct?

    A    Yes.

    Q    Did Richmor markup the subcontractor bills or
the contractor bills?

    A    I don't -- I don't think we did.  I think we
included the bill with the --

    Q    By markup, I mean did you add a profit and an
overhead component on to the bill from the
subcontractor?

    A    I don't believe we do, no.

---

26

MAHLON RICHARDS -- Atty. Henry

    Q    The pilots and crew, those were Richmor
employees; is that correct?

    A    Yes.

    Q    But the salaries themselves were paid for by
the owner of the aircraft?

    A    By the owner of the airplane that they were
assigned to, yes.

    Q    Can you describe for me how that was handled?
Was there a dedicated pilot for a particular aircraft
or pilots?  How did that work?

    A    We dedicate pilots to specific airplanes,
sometimes because that's the only airplane that
they're trained to fly, but we have a pool of pilots
that we occasionally use because people have to go to
training a couple times a year.  Most of our pilots
are long-time employees, so they're entitled to
three-week's vacation.  We still have to fly the
airplane while they're in school or training or on
vacation, so we put in other pilots.

    Q    But, nonetheless, they're actual Richmor
employees, correct?

    A    Yes.

    Q    And then the cost for their salaries just
gets passed to the owners; is that correct?

---

27

MAHLON RICHARDS -- Atty. Henry

    A    Explain -- try -- are you talking about the
assigned pilots?  Are you talking about the pilots
that we use when the assigned pilots --

    Q    I'm talking about the assigned pilots.

    A    Okay.  Yes.

    Q    You simply pass the cost of their salaries on
to the owner of the aircraft, correct?

    A    No.

    Q    All right.  How does that work?

    A    The arrangement is, is that we pass the
salary and benefit cost on to the owner and we add a
five percent administration fee for handling all of
the, you know, the check writing and the benefit --
the things that have to be done.

    Q    Okay.  If you have Exhibit 2 in front of you,
can you take a look at Section 6.2 of the agreement.
You'll see there's a salary rate in there of $29,815
per month during the term of this agreement, three
pilots and one cabinet attendant.  Do you see that?

    A    Yes.

    Q    Was that rate ever changed or increased
during the term that Richmor had possession of this
particular aircraft?

    A    I don't know.  I guess I would assume that it

---

28

MAHLON RICHARDS -- Atty. Henry

changed seeing it was over a long period of time,
but --

    Q    So --

    A    -- things -- things --

    Q    This is 2001.

    A    I'm just thinking that there was a time where
the economy wasn't very good and there weren't a lot
of raises.  I'd have to go to payroll to...

    Q    But, otherwise, if the Richmor employees
received raises, there would have been an increase in
the salary charge to the owner, correct?

    A    I would think so.

    Q    So between 2001 and 2007, let's say, before
the economy collapsed, would it be fair to say that
the Richmor employees would have received some raises?

    MR. RYAN:  Objection to the form.  You
can answer if you know.

    A    We can assume that.  I can't state that for
sure without checking with payroll.

    Q    If they did receive raises, that would have
resulted in a change to the salary rate that's in the
contract, correct?

    MR. RYAN:  Objection to the form.  You
can answer.

29

MAHLON RICHARDS -- Atty. Henry

1
2 A Yes.
3 Q Was there ever any writing between Richmor
4 and Assembly Point reflecting a change in the salary
5 rate?  Was there ever a written agreement signed by
6 Assembly Point and Richmor for any change in the
7 salary rate?
8 A Not that I'm aware of.
9 Q There is also, if you look at Section 6.3, a
10 rate specified for hangar rent.  Do you see that?
11 A Yes.
12 Q I'm sorry.  Six point four is hangar rent.
13 Do you see that:  $4,200 per month?
14 A Yes, I do.
15 Q Was that rate ever changed while this
16 contract was in effect?
17 A Yes.
18 Q Was it increased?
19 A Yes.
20 Q Was there a written agreement signed by
21 Richmor and Assembly Point reflecting that increase in
22 the monthly rent charge for the hangar?
23 A There was a change in the rate at the request
24 of Assembly Point.  They wanted the airplane to be
25 located some place other than New York State.

---

30

MAHLON RICHARDS -- Atty. Henry

1
2 Q All right.  Was there a written agreement
3 signed by Assembly Point and Richmor reflecting that
4 change in rate?
5 A Not that I'm aware of.
6 Q That was done orally?
7 A It was orally.
8 Q And the plane was moved to Connecticut?
9 A Yes.
10 Q Do you know what year the plane was moved to
11 Connecticut?
12 A No.
13 Q Sometime in the mid-2000s?
14 A Yes.
15 Q If you look at there's a Section 8.1, which
16 required Richmor to provide invoices by the 15th of
17 each calendar month.  Do you see that?
18 A Yes.
19 Q Did Richmor always provide its invoices by
20 the 15th of each calendar month?
21 A I -- I don't know.  I -- I did not prepare
22 the invoices.  I think my people probably tried to do
23 that.  I don't know.
24 Q That would be the 15th of the month following
25 the month in which the charges were incurred; is that

---

31

MAHLON RICHARDS -- Atty. Henry

1
2 correct?
3 A Yes.
4 Q Do you know of any instance in which the
5 invoice wasn't provided by the 15th of each month?
6 A I don't know personally, no.
7 Q If you look at Section 9, there's provisions
8 there relating to the creation of an operating
9 account.  Do you see that?
10 A Yes.
11 Q Was there ever an operating account
12 established for Assembly Point for this particular
13 aircraft?
14 A No.
15 Q Do you know why that Section 9 is in the
16 contract?
17 A Most management companies charge, I believe,
18 a two-month operating account so that when they are
19 paying all the bills for the aircraft owner during the
20 month, they've got something to pay with.  As you see
21 in this contract, it says zero.  We elected not to do
22 this.
23 Q Was this just a holdover from the form
24 contract that Richmor had?
25 A Yes.

---

32

MAHLON RICHARDS -- Atty. Henry

1
2 Q Why did you not elect to have an operating
3 account requirement for Assembly Point?
4 A I don't know.
5 Q Would it have been based on the fact that you
6 had a prior relationship with the owners of this
7 aircraft?
8 A It could have.
9   MR. RYAN:  Objection to form.
10 Q If you look at Section 12.1, there's a
11 requirement to maintain -- for Richmor to maintain
12 $100 million in insurance coverage for this aircraft
13 and its operations.  Do you see that?
14 A Yes.
15 Q Was that coverage amount ever changed?
16 A It may have been.
17 Q Why do you say that?
18 A Because I can recall customers who wanted
19 more than 100.  We -- we -- we decided that we wanted
20 at least a minimum of 100, but there were customers
21 that decided they wanted more.
22 Q When you say "we," what do you mean by that?
23 A Richmor.
24 Q Wasn't this a requirement for you to maintain
25 that coverage?

33

```
 1              MAHLON RICHARDS -- Atty. Henry
 2       A    It was our policy.  It was a Richmor policy.
 3       Q    Are you aware of any written agreement
 4   changing the amount of that coverage?
 5       A    No.
 6       Q    If there was any change to the amount of that
 7   coverage, would that have been oral?
 8       A    Yes.
 9       Q    If you look at Section 12.2, that requires
10   Richmor to maintain $24 million in insurance, aircraft
11   hull insurance coverage.  Do you see that?
12       A    Yes.
13       Q    Was that amount ever changed?
14       A    I don't know.
15       Q    Are you aware of any written agreement under
16   which that amount was changed?
17       A    I don't know that it was changed.
18       Q    Are you familiar with the -- I don't know if
19   they're called FARs or F-A-Rs, the Federal Aviation
20   Regulations, Part 135 of the FARs -- and please
21   correct me if I'm misusing the terminology.
22       A    Sounds okay so far.
23       Q    Okay.  Is Part 135 of the FARs and Part 91 of
24   the FARs --
25       A    Yes.
```

34

```
 1              MAHLON RICHARDS -- Atty. Henry
 2       Q    -- is it fair to say you're familiar with
 3   those requirements?
 4       A    I'm familiar.
 5       Q    Can you tell me what Part 91 of the FARs is,
 6   generally?
 7       A    It would be non-commercial flying of the
 8   airplane.
 9       Q    Okay.  And what's the difference between Part
10   91 and Part 135?
11       A    Part 135 would be flying commercially or for
12   hire.
13       Q    Are there more stringent requirements for
14   Part 135 flights as opposed to Part 91 flights?
15            MR. RYAN:  Objection to the form.  You
16   can answer.
17       A    In what ways?
18       Q    In what ways?
19       A    Part 135 would require a maximum duty day, a
20   maximum flight day.
21       Q    And what do those mean?
22       A    Means that the number of hours that you're
23   allowed to work after a rest period and the number of
24   hours you're allowed to fly during a period of time.
25       Q    Okay.  Are there use limitations on the
```

35

```
 1              MAHLON RICHARDS -- Atty. Henry
 2   aircraft itself as opposed to the pilots or the crew?
 3            MR. RYAN:  Within those regulations?
 4       Q    Within those regulations.
 5       A    Are you saying are there limitations on the
 6   aircraft?
 7       Q    Yes.
 8       A    Are you asking can an airplane fly -- is it
 9   required to fly a certain number of hours?
10       Q    Or not fly a certain number of hours?
11       A    I'm not familiar with any regulations that
12   say an aircraft can't fly as much as -- no.
13       Q    Okay.  Is there any requirement for a
14   maintenance or inspection after a certain number of
15   hours?
16       A    Yes.
17       Q    Where is that requirement?  Is it in Part 91
18   or Part 135 or both?
19       A    Neither.
20       Q    Where is that requirement?
21       A    That would be in maintenance regulations.
22       Q    Okay.  Are Part 91 and Part 135, are those
23   use regulations would you describe them as?
24       A    They're more requirements on the flight crew,
25   the way a flight crew would operate.
```

36

```
 1              MAHLON RICHARDS -- Atty. Henry
 2       Q    I'll show you what's been marked as Exhibit
 3   Number 3 for your deposition today, which is an
 4   aircraft lease agreement dated January 22, 2001; is
 5   that correct?
 6            (The document was handed to the witness,
 7   and the witness examined the document.)
 8       A    Yes.
 9       Q    This was entered into at the same time as the
10   maintenance and pilot agreement that we were just
11   discussing?
12       A    Yes.
13       Q    What was the purpose of the lease agreement?
14       A    The lease agreement is -- gives us the
15   ability to lease the aircraft for 135, Part 135.
16       Q    Lease the aircraft to third parties, correct?
17       A    Yes, yes.
18       Q    If the aircraft were leased to third parties,
19   what would Assembly Point receive and what would
20   Richmor receive?
21            MR. RYAN:  According to the terms of this
22   agreement, John?
23            MR. HENRY:  Yes, or otherwise.
24            MR. RYAN:  Why don't we take it first.
25   There's two questions.
```

37

MAHLON RICHARDS -- Atty. Henry

2  MR. HENRY: Let me ask the question.

3  MR. RYAN: Okay.

4  Q  So, under this agreement, if an aircraft were

5  leased to a third party, what would Richmor receive

6  and what would Assembly Point receive?

7  A  Richmor would receive fifteen percent, plus

8  or minus, depending on whether it was through another

9  broker, for each flight hour, each hour that the

10  aircraft was flown, and Assembly Point would receive

11  85 percent of the revenue for each hour flown.

12  Q  Okay. Would you have any flights of this or

13  use of this aircraft that were not covered by the

14  lease agreement?

15  A  Ask that again.

16  Q  Did Richmor have any use of this aircraft

17  that were not covered by this lease agreement?

18  A  I -- I'm not sure what you're asking me.

19  We -- if we flew the airplane, I'm assuming it was

20  covered by the agreement.

21  Q  What if you didn't fly the airplane, was it

22  covered by the agreement?

23  MR. RYAN: I'll object to the form.

24  A  Well, if we didn't fly the airplane, nothing

25  happened.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

---

38

MAHLON RICHARDS -- Atty. Henry

2  Q  Well, if you received money for not flying

3  the airplane, something happened, correct?

4  MR. RYAN: Objection to the form.

5  A  Well, we generally don't receive money unless

6  the airplane flies.

7  Q  In this case, you received money for the

8  airplane not flying, correct?

9  A  In which case?

10  Q  In your case.

11  A  Oh, okay. Yes.

12  Q  Was that covered by this agreement?

13  A  I would guess. I'm -- I'm not sure exactly

14  what you're asking.

15  Q  Well, I'm asking, if Richmor received money

16  for not using this aircraft, was that situation

17  covered by this agreement?

18  MR. RYAN: Objection to form.

19  Q  In your view, in your understanding?

20  MR. RYAN: Objection to the form.

21  A  I -- I don't think we received any money for

22  this airplane not flying.

23  Q  You don't think you received any money for

24  this airplane not flying?

25  A  That's correct.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

---

39

MAHLON RICHARDS -- Atty. Henry

2  Q  Well, we'll come back to that point.

3  A  Okay.

4  Q  All right. Who provided the lease agreement

5  that's in front of you?

6  A  Richmor.

7  Q  And Richmor prepared it?

8  A  I don't know.

9  Q  Well, Assembly Point didn't prepare it.

10  A  That's correct.

11  Q  All right. And Richmor provided it to

12  Assembly Point for its review and execution; is that

13  correct?

14  A  Yes.

15  Q  Were there any drafts of the agreement

16  exchanged?

17  A  I don't know.

18  Q  Have you looked in your files for any drafts

19  of the agreement?

20  A  No.

21  Q  Were you asked to do that in connection with

22  responding to discovery in this litigation?

23  A  We were asked to provide the agreement.

24  Q  Were you also asked to look for any drafts of

25  the agreement?

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

---

40

MAHLON RICHARDS -- Atty. Henry

2  A  I don't recall.

3  Q  Did Richmor use this form with respect to

4  other aircraft that it had possession of?

5  A  Yes.

6  Q  And what other aircraft?

7  A  Other aircraft that Richmor -- Richmor would

8  have managed.

9  Q  In the 2001-2000 time period, approximately

10  how many aircraft was Richmor managing?

11  A  I recall around 25 to 30.

12  (Discussion off the record)

13  BY MR. HENRY:

14  Q  In the 2001-2002 time period, in which this

15  agreement was executed, how many aircraft did Richmor

16  have under its management?

17  A  Twenty-five to thirty.

18  Q  All right. Thank you.

19  If you look at Section 1.1 of the agreement,

20  it says that, "Owner agrees to lease to Air Services

21  Provider, and Air Services Provider agrees to lease

22  from Owner, the Aircraft, on an "as needed" and "as

23  available" basis."

24  Do you see that?

25  A  Yes.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

41

MAHLON RICHARDS -- Atty. Henry

1
2    Q    What does that mean, the as needed and as
3  available basis?
4         MR. RYAN:   Objection to the form.  You
5  can answer.
6    A    I -- I would guess it means that we could use
7  it if it was available.
8    Q    When you say "we could use it," what do you
9  mean by that?
10   A    That Richmor could use the airplane if it was
11  available.
12   Q    Meaning not being used by the owner?
13   A    I guess you could read that into it.
14   Q    If you look at Section 1.3, captioned
15  "Non-Exclusivity," do you see that?
16   A    Yes.
17   Q    And it says that, "Air Services Provider and
18  Owner acknowledge and agree that the Aircraft is
19  leased to Air Services Provider on a non-exclusive
20  basis."
21        What does that mean?
22        MR. RYAN:   Objection to the form.  You
23  can answer.
24   A    Just what it says.
25   Q    What does the term non-exclusive mean in your

42

MAHLON RICHARDS -- Atty. Henry

1  mind?
2
3         MR. RYAN:   Objection to the form.  You
4  can answer.
5    A    Non-exclusive.
6    Q    Does it mean that the owner could also use
7  the aircraft?
8         MR. RYAN:   Objection to the form.  You
9  can answer.
10   A    The owner can use the aircraft.
11   Q    And the owner could lease it out to third
12  parties as well?
13   A    Yes, he could.
14   Q    But if it --
15   A    Or he --
16   Q    Go ahead.  I'm sorry.
17   A    We would lease it out to third parties, I
18  guess.
19   Q    Couldn't the owner also lease it out or
20  charter it out on its own?
21   A    No.
22   Q    But the owner could refer a customer to
23  Richmor, correct?
24   A    Yes.
25   Q    If you look at Section 2.2 of the agreement

43

MAHLON RICHARDS -- Atty. Henry

1
2  which is captioned "Scheduling," do you see that?
3    A    Yes.
4    Q    If you look at section b, it says, "Owner and
5  Air Services Provider agree that the availability of
6  the Aircraft for use by Air Services Provider would be
7  subject to availability and subordinate to the
8  scheduling requirements of other lessees."
9         Do you see that?
10   A    Yes.
11   Q    What does that mean in your mind?
12        MR. RYAN:   Objection to the form.  You
13  can answer it.
14   A    I'm not sure what that means.
15   Q    Well --
16   A    Other lessees --
17        (The witness examined the document.)
18   A    I don't know.  To other customers?
19   Q    Doesn't that mean that -- well, let me ask
20  you this:  Air services provider is Richmor, correct?
21   A    Yes.
22   Q    Richmor's use would be subject to
23  availability and subordinate to the scheduling
24  requirements of anyone else, correct?
25        MR. RYAN:   Objection to the form.  You

44

MAHLON RICHARDS -- Atty. Henry

1  can answer.
2    A    Our use of the aircraft would be subject to
3  availability of the scheduling requirements of other
4  lessees?
5    Q    Doesn't that mean that Richmor's use was
6  subordinate to someone else's use, correct?
7         MR. RYAN:   Objection to the form.
8    A    I think it would be subordinate to the
9  owner's use.
10   Q    If you look further on in Section 2.2(b), did
11  the lease agreement require Richmor to present
12  "prospective charter flights to Owner for prior
13  approval and Owner's sole discretion"?  Do you see
14  that?
15   A    Okay.  Ask me the question again, please?
16   Q    Was Richmor required to present to Assembly
17  Point prospective charter flights in advance?
18   A    I -- I don't see here that we were required
19  to do that, but we always checked with them.
20   Q    Okay.  The contract says that, "Air Services
21  Provider shall present flight scheduling requirements
22  for prospective charter flights to Owner for prior
23  approval and Owner's sole direction as far in advance
24  of the date of the proposed charter flight as is

45

```
 1          MAHLON RICHARDS -- Atty. Henry
 2   reasonably practicable."
 3       A    Which one are you reading?
 4       Q    Section 2.2(b).
 5       A    C?
 6       Q    B.
 7       A    Oh, I'm sorry.  I'm looking at C.
 8       Q    If you look at 2.2(b), the second sentence.
 9       A    Okay.
10            (The witness examined the document.)
11       A    Okay.
12       Q    So my question is, under that clause, was
13   Richmor obligated to present prospective flights to
14   Assembly Point before the charter?
15       A    Yes.
16       Q    And Assembly Point had discretion to refuse a
17   charter?
18       A    Yes.
19       Q    Was that provision followed in your
20   experience, in other words, during the course of this
21   contract did Richmor present prospective charter
22   flights to Assembly Point for its approval?
23       A    I believe we did.  That would have been done
24   by the dispatchers but, yes, I would say yes.
25       Q    How was that done?
```

46

```
 1          MAHLON RICHARDS -- Atty. Henry
 2       A    By phone.
 3       Q    So can you describe that for me, what do you
 4   mean by phone, what would happen?
 5            MR. RYAN:  The progression?
 6            MR. HENRY:  Yes.
 7       A    We would get a request for the aircraft, to
 8   charter the aircraft, the dispatcher would call
 9   Assembly Point's person and say, we want to charter
10   the airplane next Wednesday, Thursday, Friday.  Is Mr.
11   Morse going to use the airplane?
12       Q    Okay.  Would the dispatch person tell
13   Assembly Point or its representative who was
14   chartering the airplane?
15       A    Not necessarily, no.
16       Q    Now, if you look at the Section 2.3 of the
17   agreement, it provides for a minimum charter rate of
18   $5,100 per flight hour.  Do you see that?
19       A    Yes.
20       Q    Was that charter rate ever changed?
21       A    Yes.
22       Q    What was it changed to?
23       A    Well, in the contract that we're talking
24   about, 4,900.
25       Q    Were there other situations in which that
```

47

```
 1          MAHLON RICHARDS -- Atty. Henry
 2   charter rate was changed?
 3       A    Not that I recall.
 4       Q    Are you aware of any written agreement
 5   between Assembly Point and Richmor under which the
 6   $5,100 rate in this contract was changed?
 7       A    No.
 8       Q    If you look at Section 4.2, that required the
 9   plane to be operated under either Part 91 or Part 135
10   of the FARs; is that correct?
11       A    Yes.
12       Q    There were certain flights that were operated
13   by SportsFlight Air that are at issue in this case,
14   right?
15       A    Yes.
16       Q    Were the SportsFlight Air flights in
17   compliance with Part 91 or Part 135 of the FARs?
18       A    Yes.
19       Q    They were?
20       A    I believe they were.
21       Q    Did you maintain documentation to establish
22   that those flights were in accordance with Part 91 or
23   Part 135 of the FARs?
24       A    We would have maintained a flight log per
25   every flight.
```

48

```
 1          MAHLON RICHARDS -- Atty. Henry
 2       Q    The flights operated by SportsFlight Air,
 3   would they have been governed by Part 135 as opposed
 4   to Part 91?
 5       A    No.
 6       Q    Would they have been governed by both or how
 7   would that work?
 8       A    Part 91.
 9       Q    Part 91.  Okay.
10            There is also a provision in Section 4.2
11   requiring that the aircraft not be operated in any
12   area excluded from insurance coverage.  Do you see
13   that?  It's the --
14            MR. RYAN:  Second to last line.
15       Q    -- second to last line.
16       A    Okay.
17       Q    Was this aircraft ever operated in any area
18   excluded by insurance coverage?
19       A    I believe our insurance policy was worldwide.
20       Q    Do you know that for a fact or --
21       A    I'd have to look at --
22       Q    -- what are you basing that on?
23       A    I'd have to look at the policy, but that's my
24   recollection.
25       Q    Were there any areas of the world at all, to
```

49

MAHLON RICHARDS -- Atty. Henry

```
1
2    your knowledge, that were excluded from coverage under
3    your insurance policy?
4         A    Not that I'm aware of.  I think worldwide
5    meant worldwide.
6         Q    Have you looked at your insurance policy
7    recently to determine that?
8         A    No.
9         Q    All right.  So you believe that it would
10   cover the aircraft in places like Pakistan or Cuba or,
11   for that matter, North Korea?
12        A    Worldwide is -- they're part of the world, so
13   I would say yes.
14        Q    All right.  After we're done with this
15   deposition, I'm going to make a request that we be
16   provided with a copy of the relevant provisions of
17   your insurance policy so we can take a look at that.
18   I'll make that request of your counsel.
19        A    Okay.
20        Q    If you look at Section 9.1 of the agreement
21   entitled "Notices," do you see that, sir?
22        A    Yes.
23        Q    That required that "All communications
24   declarations, demands, consents, directions,
25   approvals, instructions" -- et cetera, required under
```

50

MAHLON RICHARDS -- Atty. Henry

```
1
2    this agreement be given in writing and to be delivered
3    by hand, registered mail, return receipt requested, or
4    overnight delivery, facsimile or other wire
5    transmission.  Do you see that, sir?
6         A    Yes, yes.
7         Q    All right.  Was that followed during the
8    course of the parties' relationship?  If you needed
9    consent from Assembly Point to do something, for
10   example, charter the aircraft, did you make a --
11   require them to provide a written consent to that
12   activity?
13        A    Every time they chartered -- the airplane was
14   chartered?
15        Q    Yes.
16        A    No.
17        Q    How about in any other instance?  If you
18   needed Assembly Point's consent to do something with
19   the aircraft, did you require them to provide a
20   written consent?
21        A    Such as?
22        Q    Well, was there any time in which you
23   required Assembly Point to provide a written consent
24   to do something with this aircraft?
25        A    Not that I'm aware of, no.
```

51

MAHLON RICHARDS -- Atty. Henry

```
1
2         Q    If you wanted to make improvements of any
3    significance to the aircraft, what would you do?
4         A    We would ask or suggest to them.
5         Q    And you'd do that with a phone call?
6         A    Yes, normally with a phone call.
7         Q    If they orally consented and said it's okay,
8    you would go ahead and do that?
9         A    If it was okay with them.
10        Q    I'm going to show you a document that's been
11   marked for your deposition as Exhibit Number 5 this
12   morning, which is --
13             MR. RYAN:  Your 5?
14             MR. HENRY:  Yes.
15        Q    Is that a copy of the contract that Richmor
16   entered into with SportsFlight Air?
17             (The document was handed to the witness,
18   and the witness examined the document.)
19        A    Yes.
20        Q    And that was on June 14th, 2002; is that
21   correct?
22        A    Yes.
23        Q    Can you describe for me how that contract
24   came about?
25        A    SportsFlight Air -- well, somebody contacted
```

52

MAHLON RICHARDS -- Atty. Henry

```
1
2    us -- I'm assuming it was SportsFlight Air -- and said
3    that they had some flying to do for, I guess, DynCorp
4    and wondered whether we were interested in doing it.
5         Q    Who contacted you?
6         A    I think it would have been Don Moss.
7         Q    Do you know an individual by the name of --
8    and I'll probably mispronounce this name -- Meta
9    Buttenheim?
10        A    Yes.
11        Q    Am I pronouncing it correctly?
12        A    Meta.
13        Q    Is that a woman?
14        A    Yes.
15        Q    Do you recall if she contacted you at all
16   about this opportunity?
17        A    She would have been part of the contact, yes.
18        Q    Who is she?
19        A    She's a broker, charter broker.
20        Q    Is she also located in Columbia County?
21        A    Yes.
22        Q    Did you know her before being contacted with
23   respect to the SportsFlight Air opportunity?
24        A    Yes.
25        Q    How did you know her?
```

53

```
 1              MAHLON RICHARDS -- Atty. Henry
 2      A    At one time, she was an employee of Richmor
 3  Aviation.
 4      Q    When was that?
 5      A    Sometime in the nineties.
 6      Q    Do you know when she left employment with
 7  Richmor?
 8      A    No, I don't.
 9      Q    Can you describe for me the circumstances
10  under which she left employment from Richmor?
11      A    I don't understand what you mean:  The
12  circumstances.
13      Q    Did she quit?  Was she fired?
14      A    Oh, no.  She resigned.  I guess that's quit.
15      Q    Okay.  How about Mr. Moss, did he contact you
16  at all about this opportunity?
17      A    Yes.
18      Q    Do you know who the first contact was from?
19      A    I would think that the first contact would
20  have been Meta.  We did flights for Meta previous to
21  this contract, so I would think Meta probably would
22  have been the first contact.
23      Q    When you say you did flights for Meta before
24  this contract, what do you mean by that?
25      A    Well, she's a charter broker, so occasionally
```

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

54

```
 1              MAHLON RICHARDS -- Atty. Henry
 2  she would call looking for flights.
 3      Q    Did you also do flights for the government
 4  before this contract?
 5      A    I think we may have done one.
 6      Q    I'm going to show you what's been marked for
 7  your deposition as Plaintiff's Exhibit 4 this morning.
 8           (The document was handed to the witness,
 9  and the witness examined the document.)
10      Q    If you look at the first page of Exhibit 4,
11  it references -- first of all, can you tell me what
12  Exhibit 4 is?
13           MR. RYAN:  It's many pages, so.
14      Q    All right.  Well, let's just take the first
15  page.  It appears to be a letter from the Department
16  of State dated January 9, 2002; is that correct?
17      A    Yes.
18      Q    And this references a flight being conducted
19  on the G-IV.  Let me ask you this:  There's a
20  reference to a G-IV with the registration number
21  N83VM.  Do you see that?
22      A    Yes.
23      Q    Operated by Assembly Point; is that correct?
24      A    Yes.
25      Q    Do you believe that's a mistake in the
```

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

55

```
 1              MAHLON RICHARDS -- Atty. Henry
 2  registration number?
 3      A    Yes.
 4      Q    All right.  Should be N85VM?
 5      A    Yes.
 6           MR. RYAN:  Did -- okay.
 7      Q    So this references a flight or a mission from
 8  January 9th to January 31, 2002.  Do you see that?
 9      A    Yes.
10      Q    So was Assembly Point's aircraft used by the
11  government for purposes similar to the SportsFlight
12  Air uses before the SportsFlight Air contract was
13  entered into?  Do you know what I'm asking?
14           MR. RYAN:  Objection to the form.
15      Q    Let me rephrase that.  Was Assembly Point's
16  aircraft, the G-IV, used by the government prior to
17  the SportsFlight Air contract?
18      A    I would say that we did one flight, I
19  believe.
20      Q    That was for a 22-day period?
21      A    That's what it says.  I'd have to look at the
22  flight logs.
23      Q    All right.  So had somebody contacted you
24  about doing flights for the government prior to
25  January of 2002?
```

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

56

```
 1              MAHLON RICHARDS -- Atty. Henry
 2      A    Not that I recall, no.  Prior to?
 3      Q    Well, at this point, January 2002, Richmor
 4  had sole possession and control of the aircraft,
 5  correct?
 6      A    Yes.
 7      Q    All right.  So, if the government were using
 8  the plane in January 2002, that would have been
 9  through Richmor, correct?
10      A    Yes.  Oh, I thought you said prior to
11  January 2002.
12      Q    I am talking about prior to January 2002
13  because it looks like it was leased out in the
14  beginning of January 2002.  Do you recall being
15  contacted at the end of 2001, early 2002 about doing
16  flights for the government?
17      A    No.  The contact would have gone to the
18  charter department anyway.
19      Q    Regardless of the length of the charter?
20      A    Yes.
21      Q    So, in any event though, you were, at some
22  point, contacted by Meta and Don Moss about flights
23  that ultimately became the SportsFlight contract,
24  correct?
25      A    Yes.
```

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

57

```
 1        MAHLON RICHARDS -- Atty. Henry
 2    Q    All right.  When you were contacted, did they
 3  describe the type of aircraft that they were looking
 4  for?
 5    A    Yes.
 6    Q    What did they tell you?
 7    A    It -- that it would depend on the mission.
 8  Some of them would require a longer range aircraft
 9  than other, depended on the mission, but they were
10  generally talking about Gulfstream airplanes.
11    Q    How many Gulfstream airplanes did Richmor
12  have at that time?
13         MR. RYAN:  In 2002, John?
14         MR. HENRY:  Yes.
15    A    Six or seven.
16    Q    Were they G-IIIs, G-IVs or G something
17  else's?
18    A    I think, my recollection says, there were
19  three G-IVs, three G-IIIs, two G-IIs.  Might not be
20  100 percent accurate.  It's a long time ago.
21    Q    Fair enough.  That's perfectly fine.
22         Did you contact any of the owners of any of
23  the other Gulfstream aircraft about entering into a
24  charter arrangement for their aircraft?
25    A    At what time?
```

58

```
 1        MAHLON RICHARDS -- Atty. Henry
 2    Q    In 2002.
 3    A    I don't think so.  There may have been some
 4  conversations, but I don't think so.
 5    Q    Did anybody from SportsFlight Air or Meta
 6  Buttenheim or Mr. Moss come up to look at any of the
 7  aircraft?
 8    A    Not that I recall.
 9    Q    All right.  Did they tell you what they were
10  going to do with the aircraft?
11    A    They told us what it would be flying
12  government people.
13    Q    Do you have any discussion about the range of
14  the flights or how long the aircraft would be tied up
15  for?
16    A    They would have told us some of the places
17  that they were probably going to go to.  Don't know
18  that we really talked about how long the particular
19  flight was going to be.
20    Q    How about what time period that they were
21  going to need the aircraft for or need to have the
22  aircraft available for?
23    A    Twenty-four/seven.
24    Q    For how long?
25    A    For five or six months.
```

59

```
 1        MAHLON RICHARDS -- Atty. Henry
 2    Q    Was there ever any discussion about whether
 3  the aircraft needed any additional equipment for the
 4  government's use?
 5    A    No.
 6    Q    Do you know whether there was ever any
 7  additional equipment installed in the aircraft for the
 8  government's use?
 9    A    Not that I recollect.  By additional
10  equipment, what do you mean?
11    Q    Well, was there any -- this is more for you
12  as an aviation person.  Is there anything that would
13  have been necessary to upgrade the aircraft for longer
14  flights or for longer distances or to travel into
15  different parts of the world, anything like that?
16    A    No.  The airplane was fully equipped to go
17  anyplace in the world, whether it was the G-IIs or
18  G-IIIs or G-IVs, they were all equipped to fly most
19  any place.
20    Q    Are there any navigational systems that may
21  be specialized to particular places of the world?
22    A    No, not that I'm aware of, no.
23    Q    Now, did there come a time that you presented
24  this opportunity to Mr. Morse or Mr. Gilmour or
25  someone from Assembly Point?
```

60

```
 1        MAHLON RICHARDS -- Atty. Henry
 2    A    Yes.
 3    Q    Can you describe for me how that came about?
 4    A    When SportsFlight indicated that they might
 5  want to do this on a longer term basis than just one
 6  flight and they were looking to have the aircraft and
 7  crew available 24/7, at that point I probably would
 8  have called Dave Gilmour to see if there was any
 9  interest in doing that because that would make the
10  aircraft not available for the owner.
11    Q    Do you recall meeting with Mr. Gilmour and
12  Mr. Morse to discuss this opportunity?
13    A    I don't, no.
14    Q    But you recall there were some conversations
15  to that effect?
16    A    Yes.
17    Q    You just don't recall whether they were by
18  phone or in person?
19    A    My recollection is they were by phone.  I
20  don't ever recall meeting as it relates to this, no.
21    Q    Did you take any notes of any of your
22  conversations with them about this opportunity?
23    A    No, no.
24    Q    Do you recall exchanging any e-mails with
25  them about this opportunity?
```

61

MAHLON RICHARDS -- Atty. Henry

1
2    A    I don't think at that point I knew what
3    e-mails were.
4    Q    Fair enough.  Did you make any recommendation
5    to them about whether they should enter into this
6    opportunity?
7    A    I told them that this might give them more
8    hours of flight revenue.
9    Q    Did they express to you any concerns about
10   being able to use the plane?
11   A    Yes.
12   Q    And what did they say?
13   A    Well, they wondered whether it would be
14   available at any time for their use.
15   Q    And what did you tell them?
16   A    I -- I don't remember exactly what I told
17   them.  They knew that we were going to be on call
18   24 hours a day.
19   Q    So, what if Mr. Morse was using the plane and
20   the government needed it?
21   A    We would use another one of our airplanes.
22   Q    Okay.  But otherwise, this plane had to be
23   available to the government's use 24 hours a day
24   7 days a week?
25   A    An airplane needed to be available 24/7, an

62

MAHLON RICHARDS -- Atty. Henry

1
2    airplane.
3    Q    And --
4    A    And a crew.
5    Q    If you look at Exhibit 5, which is the
6    SportsFlight Air contract, where does it say that an
7    airplane needed to be available?
8    A    Well, I don't see it going through this
9    agreement quickly.
10   Q    The contract that's in front of you between
11   Richmor and SportsFlight is a contract for the charter
12   of a Gulfstream IV aircraft, registration N85VM,
13   correct?
14   A    Yes.
15   Q    That is Assembly Point's aircraft?
16   A    Yes.
17   Q    When you presented this opportunity to Mr.
18   Morse and Mr. Gilmour, did you have any discussion
19   with them about the fact that the contract was going
20   to require a certain number of minimum hours per
21   month?
22   A    I -- I don't recall exactly.  I probably
23   mentioned that our contract with Assembly Point was
24   supposed to be around fifty hours a month.
25   Q    With SportsFlight you mean?

63

MAHLON RICHARDS -- Atty. Henry

1
2    A    With -- I'm sorry -- with SportsFlight Air.
3    Q    Did you ever tell Mr. Morse or Mr. Gilmour or
4    anyone else from Assembly Point that they weren't --
5    strike that.
6         Before entering into the contract with
7    SportsFlight Air, did you ever tell Mr. Morse, Mr.
8    Gilmour, or anyone else from Assembly Point, that they
9    would not be entitled to any proceeds from the minimum
10   hours guarantee?
11   A    They knew that our arrangement was that we
12   paid for hours flown, which is what we did every
13   month.
14   Q    Before entering into the SportsFlight
15   contract that's in front of you, did you ever tell Mr.
16   Morse or Mr. Gilmour, or anyone else from Assembly
17   Point that they wouldn't be entitled to share in the
18   proceeds of any minimum guarantee?
19   A    I don't recall that that ever came up.
20   Q    What discussions, if any, did you have with
21   Mr. Morse, Mr. Gilmour, or anyone else from Assembly
22   Point before entering into the SportsFlight contract
23   about the division of revenue from SportsFlight?
24   A    I don't know that that came up because we all
25   knew what the arrangement was.

64

MAHLON RICHARDS -- Atty. Henry

1
2    Q    And the arrangement was an 85/15 split?
3    A    For each flight hour.  Every time the
4    airplane flew, we reported it at the end of the month,
5    and we paid it at the end of the month.
6    Q    But your view is if the airplane didn't fly
7    and you received money for the airplane being made
8    available to SportsFlight, you did not owe any of that
9    money to Assembly Point?
10        MR. RYAN:  Objection to the form.
11   A    It wasn't something that was thought of.
12   Q    So when you presented the opportunity to Mr.
13   Morse and Mr. Gilmour, was it your view that Richmor
14   was entitled to keep 100 percent of the revenue for
15   hours that were not flown on the aircraft?
16   A    We assumed that the hours would be flown.
17   Q    Okay.  And, if the hours weren't flown --
18   because you understood that SportsFlight was
19   guaranteeing a minimum number of hours whether it was
20   flown or not, correct?
21   A    They were supposed to, yes.
22   Q    All right.  Was it your understanding, at the
23   time that you entered into the SportsFlight contract,
24   that Richmor would keep 100 percent of the money for
25   the hours that weren't flown?

65

MAHLON RICHARDS -- Atty. Henry

1
2    A    My thinking and my thought was that we were
3    going to fly the 250 hours, we were going to be paid
4    for it, and we would pay whatever aircraft owner flew
5    those hours.
6    Q    But you were obligated to make Assembly
7    Point's aircraft available for government use 24/7?
8    A    Well, there's a provision to use other
9    airplanes.
10   Q    All right.  And where is that?
11   A    I think Number 6 on the contract.  We needed
12   to let them know if the airplane wasn't available and
13   we needed to provide a suitable backup aircraft, which
14   we did.
15   Q    And you're referring to paragraph 6?
16   A    Yes.
17   Q    On page?
18   A    Page 3 of 5.
19   Q    It says, "RAI will promptly notify SFA" --
20   that's Richmor and SportsFlight, correct?
21   A    Yes.
22   Q    -- "of any force majeure condition, which may
23   result in a failure of the aircraft and shall use its
24   best efforts to find suitable backup aircraft."
25        Is that what you're referring to?

66

MAHLON RICHARDS -- Atty. Henry

1
2    A    Yes.
3    Q    Was there ever any force majeure condition
4    which resulted in a condition of --
5    A    I'm not sure what that means.
6    Q    Let me ask you this:  Was there ever a
7    condition which resulted in the failure of this
8    aircraft?
9    A    There were times when the airplane was not
10   available.  I don't -- I don't know if that's the same
11   thing.
12   Q    Okay.  But this aircraft had never failed?
13   A    Pretty reliable.
14   Q    Okay.
15   A    Well, I'm sure at some point it's failed, but
16   it was still reliable.
17   Q    Let's hope that doesn't happen in flight.
18        Did you ever provide a copy of this contract
19   to anybody at Assembly Point before it was signed?
20        MR. RYAN:  Are you referring to Number 5?
21        MR. HENRY:  Yes.
22   A    I don't think so.
23   Q    If you look at Section 5, which was on that
24   page 3 of 5 -- Section 5.
25   A    Five we're looking at?

67

MAHLON RICHARDS -- Atty. Henry

1
2    Q    Yes.  That section says that "Richmor
3    warrants and represents that it has the right, power,
4    and authority to enter into an agreement and to
5    perform its obligations hereunder."
6        Do you see that?
7    A    Yes.
8    Q    So was it your view that Richmor had the
9    authority to lease this aircraft to SportsFlight?
10   A    With the consent of Assembly Point.
11   Q    Obviously Assembly Point owned the aircraft?
12   A    Yes.
13   Q    And so in order for you to lease it out, you
14   would need their consent?
15   A    Yes.
16   Q    Did you obtain their consent?
17   A    I think we had their consent in the lease.
18   Q    Did you obtain their oral consent as well?
19   A    We discussed what the activity was going to
20   be.
21   Q    And they consented?
22   A    I don't know if I formally said, do I have
23   your consent to do this.  I don't know.
24   Q    All right.  You said that you believed you
25   had the authority to do it based on the lease

68

MAHLON RICHARDS -- Atty. Henry

1
2    agreement with Assembly Point?
3    A    I thought the lease agreement allowed us to
4    do charters on the airplane.
5    Q    On an as needed and as available basis?
6    A    Yes.
7    Q    The lease to SportsFlight though was not an
8    as-needed and as-available basis, correct?
9    A    I guess that's what it was supposed to be.
10   Q    That the aircraft would be available to
11   SportsFlight only when it was not being used by
12   others?
13   A    No.
14   Q    So the lease to SportsFlight was not on an
15   as-available and as-needed basis; is that correct?
16   A    It was -- it was supposed to be -- ask it
17   again, please.
18   Q    All right.  SportsFlight was going to have
19   this plane available for its use 24/7, correct?
20   A    That's what the intent was.
21   Q    All right.  And they had first priority use
22   of this aircraft, correct?
23   A    They were supposed to.
24   Q    Well, they did have.
25   A    They were supposed to.

69

MAHLON RICHARDS -- Atty. Henry

Q    All right.  Under the contract, they were
supposed to have the first priority use, correct?

A    Yes.

Q    So that is not an as-needed or as-available
basis; is that correct?

A    If the airplane was supposed to be 24/7, then
I say that is not on an as-needed, as-available basis.

Q    The hourly rate to SportsFlight was $4,900 an
hour, correct?

A    Per -- the rate was $4,900 per hour.

Q    Was that rate authorized under your lease
agreement with Assembly Point?

A    Under the written lease agreement?

Q    Yes.

A    No.

Q    Was it authorized on some other oral lease
agreement?

A    The conversation between myself and Assembly,
the rate was talked about and agreed to.

Q    So there was an oral agreement to allow you
to charter it to SportsFlight Air at $4,900 an hour,
correct?

A    Yes.

Q    When that oral agreement was entered into,

---

70

MAHLON RICHARDS -- Atty. Henry

you had told Assembly Point that there was a minimum
number of hours guaranteed under this contract?

MR. RYAN:  Objection to the form.  You
can answer.

Q    Had you told Assembly Point that there was
going to be a minimum number of hours guaranteed under
this contract?

A    We probably discussed that Richmor was
going -- supposedly was guaranteed -- oh, here it's
250 hours.  Richmor was guaranteed by SportsFlight
250 hours.

Q    All right.  And if Richmor was guaranteed
250 hours, it would receive fifteen percent of that
revenue, correct?

A    If we flew 250 hours, we received fifteen
percent of the flight hours, sure.

Q    And Assembly Point would receive 85 percent?

A    Whoever -- whatever airplane was flying would
receive the other amount, yes.

Q    Now as I understand your position, there was
never any agreement for Assembly Point to be paid for
hours that weren't flown:  Is that what you're saying?

A    Well, again, there wasn't any thought about
that because I had no reason to think that to begin

---

71

MAHLON RICHARDS -- Atty. Henry

with.

Q    So you had discussions in which there was an
oral agreement to lower the rate to $4,900 per hour,
correct?

A    Correct.

Q    You had discussions in which you advised
Assembly Point that there was a minimum hours
guaranteed, correct?

A    Discussions that the contract between Richmor
and SportsFlight stipulated 250 hours.

Q    All right.  Your testimony is that there was
no discussion of what would happen if that 250 hours
wasn't used?

A    No.

Q    There was no discussion?

A    Not that I recall.  I don't know why we would
have discussed it.

Q    Why do you say that?

A    I assume if the contract says we're going to
fly 250 hours, then we fly 250 hours.

Q    Well, the contract also says you're not going
to lease it out for less than $5,100 an hour.

A    No, I'm saying this contract.

Q    The SportsFlight contract?

---

72

MAHLON RICHARDS -- Atty. Henry

A    Yeah.

Q    All right.

(Discussion off the record.  A brief
recess occurred.)

BY MR. HENRY:

Q    If I can have you look at Exhibit 5, which is
the SportsFlight contract.  If you look at paragraph
1, that required Richmor to name Meta Buttenheim Air
Marketing Services, SportsFlight, and DynCorp as
additional insureds on the Richmor policy for this
aircraft.  Do you see that?

A    I see that.

Q    And was Air Marketing Services, was that Meta
Buttenheim's company or entity?

A    Yes.

Q    She was a broker, as you testified to
earlier, correct?

A    Yes.

Q    Did you have an agreement with her to pay her
a commission on this transaction?

A    Yes.

Q    Was there a written agreement to that effect?

A    I don't know.

Q    What were the terms of your agreement with

73

**MAHLON RICHARDS -- Atty. Henry**

her?

    A    My recollection was that it was a five percent standard broker commission.

    Q    Did you pay her that commission?

    A    Yes.

    Q    Did you pay her the commission on the funds that you received from the SportsFlight settlement?

    A    No.

    Q    Has she ever demanded payment for the funds on the SportsFlight settlement?

    A    No.

    Q    Did you ever inform her of the SportsFlight settlement?

    A    I did not personally.

    Q    Do you know if she's aware of the SportsFlight settlement?

    MR. RYAN:  Objection to the form.  You can answer.

    A    I think so.

    Q    And what makes you say that?

    A    She's friends with the dispatchers.  They go out to eat and socialize, and she still does business with them.

    Q    Has she demanded money from you for

74

**MAHLON RICHARDS -- Atty. Henry**

commission on the SportsFlight settlement?

    A    No.

    Q    If you look at paragraph 1 of the SportsFlight contract, it requires Richmor to maintain a $200 million insurance policy.  Do you see that?

    A    Yes.

    Q    And that's 100 million more or double what was required under the Assembly Point agreement, correct?

    A    Yes.

    Q    Did Richmor increase the coverage on this aircraft to $200 million?

    A    Yes.

    Q    And who paid for that additional coverage?

    A    I believe SportsFlight.

    Q    SportsFlight paid Richmor for the extra $100 million of coverage?

    A    I believe so.

    Q    That wasn't charged back to Assembly Point?

    A    I don't think so.

    Q    All right.  Do you have any records that would reflect that?

    A    I think there are records.  We'd have to look.

75

**MAHLON RICHARDS -- Atty. Henry**

    Q    Okay.  I'm going to again make that request of you to look for those records after your deposition.  I'll put that request in writing to your attorneys as well.

    A    Okay.

    Q    The SportsFlight contract required Richmor to maintain the aircraft and to pay the pilot and flight crew salaries, correct?

    A    Say that again for me?

    Q    Your contract with SportsFlight required you to pay the flight crew salaries and all maintenance expenses for the aircraft; is that correct?

    A    No, I don't think so.  Maybe I'm not understanding the question.

    Q    Well, was SportsFlight responsible for paying maintenance expenses for the aircraft?

    A    No.

    Q    Who was responsible for paying maintenance expenses for the aircraft?

    A    Assembly Point.

    Q    If you look at paragraph 2, third sentence, it says that, "RAI, as operator of the aircraft during the term of this agreement shall be responsible for, at its expense, the maintenance, repair, and periodic

76

**MAHLON RICHARDS -- Atty. Henry**

inspection of the aircraft, inclusive of the engines, instruments, airframe, and each of its other components and subsystems."  Do you see that?

    A    Yes.

    Q    So was Richmor responsible, at least under this SportsFlight contract, for maintenance of the aircraft?

    A    Yes, I mean, that's no different than any other charter.

    Q    All right.  But, in this instance, Richmor didn't pay those expenses, Assembly Point did?

    A    Yes -- well, Richmor paid all the bills --

    Q    Which were then reimbursed.

    A    -- at the end of the month submitted to Assembly Point, yes.

    Q    Richmor didn't bear the expenses ultimately?

    A    Only for a little while.

    Q    All right.  Who flew the aircraft on the SportsFlight flights?

    A    Oh, gosh.

    Q    Was it Richmor pilots?

    A    Rich -- it would have been a combination of Richmor pilots and on occasion where we just ran out of people, we would rent a pilot.  During the term of

**77**

MAHLON RICHARDS -- Atty. Henry

1
2  our activity with SportsFlight, we used nineteen
3  different pilots.
4      Q    So in terms of the actual flights to
5  Pakistan, or wherever this pilot was going, that was a
6  Richmor pilot in charge of the aircraft?
7      A    Yes.
8      Q    Just curious more than anything.
9          In other words, it wasn't an instance in
10 which SportsFlight or the government supplied its own
11 pilots for these trips?
12     A    No.
13     Q    Again, those crew salaries were paid by
14 Assembly Point, correct?
15     A    Yes -- that's not -- that's not 100 percent
16 correct.
17     Q    All right.  In those instances where you had
18 to rent a pilot or something like that, who would pay
19 for that pilot?
20     A    If we had to rent a pilot for a SportsFlight
21 flight, we would, I believe, pass the cost of the
22 rental pilot on to SportsFlight.  If -- if it were --
23 if they were Richmor pilots, they may have been paid
24 by Assembly Point.  They may have been paid by
25 Richmor.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

**78**

MAHLON RICHARDS -- Atty. Henry

1
2      Q    But were there pilots assigned to this
3  particular aircraft?
4      A    There were pilots that were primarily
5  assigned to the aircraft.
6      Q    And those pilots were paid by Assembly Point?
7      A    Those particular pilots would have been paid
8  by Assembly Point.
9      Q    All right.
10     A    But there were other pilots that flew the
11 missions in addition to the three Assembly Point
12 pilots.
13     Q    Who flew the majority of the missions,
14 Assembly Point pilots or other pilots?
15     A    I would think Assembly Point pilots.  I'd
16 have to look.
17     Q    For those instances in which a pilot other
18 than an Assembly Point pilot flew the aircraft, did
19 Richmor ultimately bear the expense of that pilot or
20 was that passed on to SportsFlight?
21     A    It would have been a Richmor pilot and if
22 there weren't more than three pilots on the mission,
23 then SportsFlight would not be billed.  They would be
24 billed if we had to rent -- some of the missions
25 required four pilots.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

**79**

MAHLON RICHARDS -- Atty. Henry

1
2      Q    Okay.  That's due to the length of the
3  flights?
4      A    Yeah.
5      Q    But, in any event, if that happened, that
6  cost was passed on to SportsFlight?
7      A    If it were an extra pilot, yes.
8      Q    If you look at the last page of the
9  SportsFlight contract, it calls for a deposit of
10 $147,000 on guaranteed hours.  Do you see that?
11     MR. RYAN:  Page 5 of 5.
12     A    Okay.
13     Q    That's a ten percent deposit, correct?
14     A    Yes.
15     Q    So, by my rough math, it's expected that the
16 guaranteed hours would, at that point, be
17 1.47 million?
18     A    Yeah, I guess ten percent, ninety percent of
19 it, yeah.
20     Q    And did Richmor receive that deposit?
21     A    I don't think so.
22     Q    Do you know one way or the other whether you
23 actually received that deposit?
24     A    I don't think so.  I'd have to check the
25 records, but they were not good payers.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

**80**

MAHLON RICHARDS -- Atty. Henry

1
2      Q    So was SportsFlight supposed to pay the
3  ten percent basically on execution of the contract?
4      A    Yes.
5      Q    And your testimony is that you don't think
6  they did that?
7      A    I don't think so, no.
8      Q    Why did you go forward with the contract if
9  they didn't pay the deposit?
10     A    Because I trust people.
11     Q    So, if you don't think that you received the
12 deposit, would it be fair to say that you don't think
13 that you paid any portion of the deposit over to
14 Assembly Point?
15     A    No, no, no.  Why would we do that?
16     Q    Do you know one way or the other whether you
17 paid any portion of the deposit over to Assembly
18 Point?
19     A    We would have only paid on hours flown, so if
20 you're saying that that's ten percent of the contract
21 and we flew those hours, then we would have paid a
22 portion, but it wasn't necessarily a portion of the
23 deposit, because I don't think we ever received the
24 deposit.  It took two to three months to get paid on
25 whatever we did.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

81

MAHLON RICHARDS -- Atty. Henry

Q    Turn back to Exhibit 4, which is the
Department of State letters.  I may have asked you
this before, and your counsel will object on the
grounds that it's been asked and answered, but there's
a first flight that's referenced in Exhibit 4 as a
flight or a mission from January 9 through January 31,
2002.  Do you recall any discussions that you had with
Assembly Point about this first flight with
its aircraft?

A    I don't recall.

Q    Do you have any notes or other documents that
would refresh your recollection as to whether you had
those conversations?

A    No.

Q    The flights operated by SportsFlight, were
they in accordance with FAR Part 135?

A    No -- oh, no.

Q    Why was that?

A    Because it was not a 135 flight.

Q    If you look at the sixth page of the
Department of State letters, which are Exhibit Number
4 --

A    Is it 4/23?

Q    Yes.  All right.  In the last sentence it

82

MAHLON RICHARDS -- Atty. Henry

says, "All operations will be accomplished in
accordance with FAR 119.57 and will not be considered
a FAR Part 135 flight."

Can you explain to me what that means?

A    I'm not familiar with 119.57, but it says it
would not be considered a 135 flight, so I guess it
means that it is not a 135 flight.

Q    Do you know if the flights that are reflected
in Exhibit 4, the Department of State letters, are
those all of the flights that were flown on the G-IV
that's owned by Assembly Point under the SportsFlight
arrangement?

A    I don't know.

Q    I'm going to show you a document that's been
marked for your deposition as Exhibit Number 1 this
morning.

(The document was handed to the witness,
and the witness examined the document.)

Q    Can you tell me what that document is, sir?

A    It says that it's a single entity aircraft
charter agreement.  It looks like it's between Capital
Aviation and DynCorp.

Q    Who or what is Capital Aviation?

A    I think they're a broker in Washington.

83

MAHLON RICHARDS -- Atty. Henry

Q    Did you have any dealings with Capital
Aviation relating to the aircraft owned by Assembly
Point?

A    Well, I wasn't aware of any, no.  Our
dealings were between SportsFlight and Richmor.

Q    All right.  How about DynCorp, did you have
any dealings with DynCorp about the SportsFlight
contract?

A    Yes.

Q    And what dealings did you have?

A    It seemed as though one of the main people
that was coordinating the activity by the name of
Steve Lee did a lot of coordinating of the flights and
I think he worked for DynCorp at some point here.

Q    Before entering into the SportsFlight
contract, did you have any discussions with Mr. Lee or
anybody else from DynCorp about the terms of the
SportsFlight contract?

A    I believe we did.

Q    What were those discussions?

A    I think it was primarily about what we were
going to do, what the flights were.

Q    What did he tell you about what the flights
were?

84

MAHLON RICHARDS -- Atty. Henry

A    He -- he said that they would be
government-related flights.  We'd be flying government
people.  They wouldn't ask us to -- they wouldn't ask
us to do anything dangerous or illegal.

Q    Did you have any discussions about what the
aircraft needs were, what type of aircraft and how
often it would be needed?

A    Well, the conversations most generally were
around Gulfstream airplanes, and we would need to be
on call all the time.

Q    And the aircraft would need to be on call all
the time?

A    There would have to be an aircraft on call
all the time, yeah.

(Plaintiff's Deposition Exhibits Numbers
6, 7, 8, and 9 were marked for identification, this
date.)

BY MR. HENRY:

Q    Sir, if you can take a look at Exhibit Number
6.  Can you tell me what that document is, sir?

(The document was handed to the witness,
and the witness examined the document.)

A    It's a letter to Don Moss at SportsFlight
Air.

85

MAHLON RICHARDS -- Atty. Henry

2    Q    There's some accompanying invoices from

3   Richmor?

4    A    There's an invoice it looks like.

5    Q    And that's the revised invoice dated 10/19/06

6   that's the last page of the exhibit that's in front of

7   you?

8    A    I'm looking for the date.  Yeah, 10/19/06,

9   yeah.

10    Q    Okay.  And was this a bill for the unused

11   hours on Assembly Point's plane?

12    A    Yes.

13    Q    At this point, the tail number registration

14   number of the aircraft had been changed; is that

15   correct?

16    A    Yes.

17    Q    Why was the tail number changed?

18    A    For security purposes.

19    Q    What do you mean by that?

20    A    Well, during this time, there were people

21   that didn't agree with what the government was doing,

22   and they had the ability to track airplanes, and they

23   were tracking the airplanes that we were using.

24    Q    Were there any other aircraft that Richmor

25   used for any of the SportsFlight or government flights

---

86

MAHLON RICHARDS -- Atty. Henry

2   for which the tail number had to be changed?

3    A    No.

4    Q    Was it fair to say that this plane became

5   somewhat notorious for being associated with the

6   rendition flights?

7    MR. RYAN:  I'll object to the use of some

8   of the language in that question, but you can go ahead

9   and answer it.

10    A    It was one of the airplanes that people were

11   looking at.

12    Q    It had become the target of negative

13   publicity and hate mail?

14    A    Yes.

15    Q    It would always be linked to renditions; is

16   that correct?

17    A    Probably would.  I don't know.  Always is a

18   long, long time.

19    Q    Well, I'm actually using your words, which

20   are in the first page of the exhibit that's in front

21   of you in which you said that, "G-IV N227SV will

22   always be linked to renditions.  No tail number change

23   will ever erase that and our requests for government

24   assistance in this matter have been ignored."  Is that

25   correct?

---

87

MAHLON RICHARDS -- Atty. Henry

2    A    Yes.

3    Q    In the next sentence you indicated that the

4   owners of N227SV are afraid to fly in their own

5   aircraft.  Is that true?

6    A    There was a comment made to us that Mrs.

7   Morse was hesitant to fly in the airplane.

8    Q    You also indicated that we are losing a

9   management customer due to this association.  Can you

10   explain for me what you meant by that?

11    A    There was a customer that we had that

12   indicated that they weren't comfortable having their

13   airplane managed by a company that was doing this type

14   of thing.

15    Q    Who was that?

16    A    I don't know that I -- I prefer not to --

17   it's another company.

18    Q    Fair enough.  It wasn't a reference to

19   anybody associated with Assembly Point; is that --

20    A    No.

21    Q    So another private aircraft owner?

22    A    Yes.

23    Q    Okay.  Who handled the change of the tail

24   number?

25    A    That would have been my maintenance and

---

88

MAHLON RICHARDS -- Atty. Henry

2   inspection department.

3    Q    You had to repaint the plane as well?

4    A    The tail number, just the number.

5    Q    Was that charged back to Assembly Point?

6    A    I don't know.

7    Q    It would have been in the normal course, no?

8    MR. RYAN:  Objection to the form.

9    A    It would have been under normal

10   circumstances.

11    Q    If you look at the second page through the

12   fifth page, there are some charts that say date of

13   flight, hours, and flight for the next three pages or

14   so.  Can you explain for me what this chart is?

15    MR. RYAN:  They start on 321 and go to

16   324, so why don't you -- I don't want to ask the

17   question for you --

18    MR. HENRY:  No, that's fine.

19    MR. RYAN:  -- why don't you tell him the

20   columns, what they mean, the hours and the flight.

21    A    Okay.  The first column is the date of

22   flight, the second is the flight hours, and the third

23   would be -- well, on 321 would be one of the places

24   that the airplane would have gone.

25    Q    What's the code MUGM?

89

MAHLON RICHARDS -- Atty. Henry

1

2    A    Guantanamo.

3    Q    And LTAG, do you know?

4    A    I don't know.

5    Q    And OAKB?

6    A    Don't know.

7    Q    Were these flights -- what flights were

8    supposed to be on this sheet?

9    A    The flights that we flew on this particular

10   airplane, I believe.

11   Q    Were these hours that were actually used on

12   Assembly Point's airplane?

13   A    I believe so.

14   Q    And all of the hours that were actually used

15   on Assembly Point's airplane, were they all paid for

16   by SportsFlight before the lawsuit?

17   A    All of --

18   Q    I mean before the State Court lawsuit?

19   A    They paid for all of the flying that we did.

20   SportsFlight paid for all of the flying that we did

21   for SportsFlight that we billed them for.  So we would

22   have billed them for the flights that we did, and they

23   would have paid for them.

24   Q    So all the flights that were flown on

25   Assembly Point's aircraft were actually paid for by

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

---

90

MAHLON RICHARDS -- Atty. Henry

1

2    SportsFlight, correct?

3    A    All of SportsFlight's flights were paid by

4    SportsFlight.

5    Q    Correct.  And how about any of the other

6    aircraft, if SportsFlight flew on another -- used

7    another aircraft, actually used another aircraft, were

8    those bills also paid?

9    A    Yes.

10   Q    All right.  And for the hours that were flown

11   on Assembly Point's aircraft and paid for by

12   SportsFlight, did Richmor remit the 85 percent to

13   Assembly Point for those flights?

14   A    At least 85 percent.

15   Q    What do you mean when you say "at least

16   85 percent"?

17   A    When we went into this, I was concerned that

18   there might be occasions where the direct operating

19   cost of the airplane might be more than normal, maybe

20   we went to East Timbuktu and it was $10 a gallon

21   instead of $2 a gallon.  I would look at the flights

22   and make sure that he was getting the appropriate

23   similar revenue.  If there was a time where the direct

24   operating costs exceeded what I thought it should be,

25   then I would give up some or all of my commission.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

---

91

MAHLON RICHARDS -- Atty. Henry

1

2    Q    Okay.  So there were instances in which you

3    paid more than 85 percent to Assembly Point, for the

4    hours that were actually flown, in order to make sure

5    that it wasn't unfair to Assembly Point that they were

6    covering excess costs:  I think that's what I

7    understand you to be saying.

8    A    I think so.

9    Q    All right.  So the invoice that's the last

10   page of Exhibit 6 -- at this point in 2006 the only --

11   was the only thing that SportsFlight owed Richmor the

12   money for the unused hours on Assembly Point's plane?

13   A    No, no.  These are unused hours of their

14   guarantee to us, Richmor.

15   Q    And their guarantee to Richmor was to use

16   Assembly Point's plane for at least fifty hours per

17   month, correct?

18   A    Not correct.

19   Q    All right.  What was their guarantee to

20   Richmor?

21   A    That they would -- that we would have fifty

22   hours of revenue per month.

23   Q    Is that reflected in the contract between

24   Richmor and SportsFlight?

25   A    Yes.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

---

92

MAHLON RICHARDS -- Atty. Henry

1

2    Q    It is?

3    A    Well, in the initial contract, it calls out

4    250 hours for, I believe, a five-month period of time.

5    Q    Fifty hours per month on Assembly Point's

6    aircraft?

7    A    On whatever airplane we used.

8    Q    All right.  Where does it say whatever

9    airplane you used?

10   A    I guess I would refer back to Number 6 where

11   it says, "We'd use our best efforts to find a suitable

12   backup aircraft whenever the named airplane wasn't

13   available."

14   Q    And I believe you testified that if you used

15   a suitable backup aircraft, SportsFlight paid you for

16   those hours?

17   A    Yes.

18   Q    And they paid you for those hours before you

19   filed suit against SportsFlight?

20   A    Yes.

21   Q    The invoice that is the last page of Exhibit

22   Number 6, is this the invoice that Richmor ultimately

23   sued SportsFlight on?

24   A    I think so.

25   Q    Do you have a copy of the State Court

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

93

<u>MAHLON RICHARDS -- Atty. Henry</u>

1 complaint in front of you?

2          Q   I'm showing you a document that's been marked

3 for your deposition as Exhibit Number 8.

4                (The document was handed to the witness,

5 and the witness examined the document.)

6          Q   Is it fair to say that that's a copy of the

7 complaint that was filed by Richmor against

8 SportsFlight Air in New York State Court?

9          A   That's what it says.

10          Q   If you look at the third to last page of that

11 exhibit, is that your signature, sir?

12          A   Yes.

13          Q   Did you understand when you were signing the

14 complaint that you were attesting to the truth of the

15 matters set forth in the complaint?

16          A   Yes.

17          Q   Is there anything in the complaint that you

18 believe is not true?

19          MR. RYAN:   Why don't you read it.

20                (The witness examined the document.)

21          A   Okay.  It looks like it's okay.

22          Q   Well, if you look at the verification page,

23 which is the next page up, you attested that you

24 were -- that the contents of the complaint were true

---

94

<u>MAHLON RICHARDS -- Atty. Henry</u>

1 to your own knowledge, correct?

2          A   Yes.

3          Q   And if you look at the very last page of the

4 complaint, it has the revised invoice dated

5 October 19th, 2006.

6          A   The last page, 192?

7          Q   That's correct.  And that was the invoice

8 that Richmor was suing SportsFlight on, correct?

9          A   Correct.

10          Q   Did you share the complaint with anybody from

11 Assembly Point before it was filed?

12          A   Did I share this complaint?

13          Q   Yes.

14          A   I don't think so.

15          Q   All right.  Did you tell them before Richmor

16 sued that you were suing SportsFlight?

17          A   It was my concern that because of the

18 negative publicity that was happening while we were

19 doing it that, if it went to court, there might be

20 more negative publicity, and I wanted to check with

21 them and see what their feelings were about my suing

22 SportsFlight, just in case it was -- all came out in

23 the news again.

24          Q   So you did speak with somebody at Assembly

---

95

<u>MAHLON RICHARDS -- Atty. Henry</u>

1 Point to let them know that you were filing suit?

2          A   I believe I talked to Dave Gilmour.

3          Q   What did you tell him and what did he tell

4 you, as best you can recall?

5          A   From what I recall, I think I told him we

6 were thinking of suing for money and would they have

7 any problem with that.

8          Q   Did you have any discussion with Mr. Gilmour

9 or anybody else at Assembly Point about how any

10 proceeds of the lawsuit would be divided?

11          A   No.

12          Q   Did you have any discussions about how any

13 expenses of the lawsuit would be borne?

14          A   No.

15          Q   Do you recall that for a fact or are you

16 saying you don't recall whether you had conversations

17 one way or the other?

18          A   I would have no reason to, so I would say no.

19          Q   Do you remember that specifically that you

20 did not have any discussions about either of those two

21 issues?

22          A   Pretty much.  It was our lawsuit and our

23 expense.

24          Q   When did you have this conversation or

---

96

<u>MAHLON RICHARDS -- Atty. Henry</u>

1 conversations with Mr. Gilmour?

2          A   It would have been before we proceeded with

3 the lawsuit.  I don't know -- oh, is this '06, maybe?

4          Q   Well, the complaint is dated April 10, 2007,

5 do you see that, page 14?

6          A   So it would have been prior to April 10th.

7          Q   Was this conversation in person?

8          A   No.

9          Q   It was on the phone?

10          A   Yes.

11          Q   And what month was it?

12          A   I don't recall.

13          Q   Did you take any notes of your conversation?

14          A   No.

15          Q   Did you send any follow-up correspondence to

16 Mr. Gilmour or anybody else from Assembly Point about

17 that conversation?

18          A   No.

19          Q   You testified at the trial of the case.  Do

20 you know if you were also deposed in the lawyer's

21 office like you are being today?

22          A   I don't remember.  I don't remember being --

23 I don't remember.  I'm sorry.

24          Q   Was Mr. Moss deposed?

97

MAHLON RICHARDS -- Atty. Henry

1
2      A    Yes.

3      Q    Did you attend his deposition?

4      A    Yes.

5      Q    Is there any document in Richmor's filings

6  with the State Court or its pleadings or any document

7  that it served that you believe was not truthful?

8      A    Oh gosh, I don't -- I don't know what was

9  filed.

10     Q    Would it be fair to say that whatever was

11 filed with the court by Richmor, was truthful, to your

12 knowledge?

13     A    To my knowledge?

14     Q    Yes.

15     A    And the question was, was it true or false?

16     Q    Yes.

17     A    I -- I can only assume that it would be true.

18     Q    All right.  And was there anything in your

19 testimony at trial that you believe was not true?  You

20 were obligated to tell the truth at trial in the case,

21 correct?

22     A    Yes.

23         MR. RYAN:  Objection.

24     Q    So do you believe that anything in your

25 testimony was untruthful?

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

---

98

MAHLON RICHARDS -- Atty. Henry

1
2         MR. RYAN:  Objection.  Are you referring

3  to any particular fact that we can hone in on, because

4  it's an improper question for impeachment if that's

5  the approach?

6      Q    Okay.  You can answer if you know what I'm

7  asking.  Did you testify truthfully in the State Court

8  case?

9      A    Yes.

10     Q    Okay.  I'm going to show you a document

11 that's been marked as Exhibit Number 9 for your

12 deposition today, which appears to be a copy of

13 Richmor's interrogatory responses in connection with

14 the State Court case.  Do you see that?

15         (The document was handed to the witness,

16 and the witness examined the document.)

17     Q    If you look at the last page of that exhibit,

18 did you also sign those interrogatories under oath,

19

20 sir?

21     A    Yes.

22     Q    If you look at your response to interrogatory

23 number 3(a), which is on the bottom of the second page

24 in particular --

25         MR. RYAN:  Read the question first.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

---

99

MAHLON RICHARDS -- Atty. Henry

1
2      Q    -- in particular -- I'll read the question.

3  There was a preceding question, Interrogatory Number

4  3, which was asking to identify the negotiations

5  leading up to the June 18, 2002, SportsFlight

6  contract.

7      A    Okay.

8      Q    And then there's a follow-up question which

9  asked to identify the specifics of those negotiations.

10 At the bottom of the page you indicate that there were

11 discussions in person at Hudson, New York; Huntington,

12 New York, and Washington D.C.  Do you see that, sir?

13     A    Yes.

14     Q    Did you relay any of those discussions to Mr.

15 Morse or Mr. Gilmour or anybody at Assembly Point,

16 other than what you testified to before, that you had

17 been presented with this opportunity?

18     A    Yes, yes.  Other than that, I don't recall

19 any other discussions.

20     Q    Did Mr. Gilmour or Mr. Morse attend any of

21 those meetings that you had with SportsFlight?

22     A    No.

23     Q    If you look at the next page, there's some

24 people identified.  Donald Moss, he was the principal

25 of SportsFlight, correct?

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

---

100

MAHLON RICHARDS -- Atty. Henry

1
2      A    Yes.

3      Q    Who is Frederick Credno?

4      A    I think he's associated with that other one

5  you showed me, Capital --

6      Q    Capital Aviation?

7      A    I think so.

8      Q    And Steven Lee I think you've already

9  identified, and who is Marisa Perez Eickenhorst?

10     A    Don't know.

11     Q    If you look at Interrogatory Number 5, which

12 is on the bottom of page 4 -- do you see that?

13     A    Yes.

14     Q    -- that asked you to "Set forth in detail

15 every legal and factual basis known to you upon which

16 you base your contention that Plaintiff performed all

17 conditions and obligations pursuant to the terms of

18 the contract."  And then the response is that,

19 "Plaintiff performed all the conditions and

20 obligations pursuant to the terms of the contract by

21 having the Gulfstream IV aircraft available at all

22 times for the benefit of the defendant."  Do you see

23 that?

24     A    Okay.

25     Q    The Gulfstream IV aircraft that's referenced

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

---

**Page 101**

MAHLON RICHARDS -- Atty. Henry

in that response is Assembly Point's aircraft; is that
correct?

    A    That's not correct.

    Q    That's not correct?  It refers to another
Gulfstream IV aircraft?

    A    Well, it's saying that the aircraft is
available at all times.  That part is not correct.

    Q    So when you signed these interrogatories
under oath, that statement was not correct?

    A    That aircraft was not available all the time.

    Q    And what do you mean by that?

    A    It wasn't available all the time.

    Q    Well, as I believe your earlier testimony,
that aircraft had to be available 24/7 for
SportsFlight's use, correct?

    A    An aircraft, yes.

    Q    Does it say an aircraft --

    A    It says --

    Q    -- in the SportsFlight contract?

    A    Oh, in the SportsFlight contract does it say
an aircraft?

    Q    Yes.

    A    It kind of indicates that there needs to be
an airplane available, yes.

---

**Page 102**

MAHLON RICHARDS -- Atty. Henry

    Q    It kind of indicates that?

    A    It -- it indicates that there should be an
airplane available.

    Q    It kind of indicates that by the tail number
on the plane?

    A    Well, the tail number that we put on the
contract was -- it was a tail number.

    Q    Okay.

    A    But we agreed to be available --

    Q    All right.

    A    -- 24/7.

    Q    Your response to Interrogatory Number 5
doesn't say an aircraft.  It says the Gulfstream IV
aircraft; is that correct?

    A    That's correct.

    Q    And you swore to that response under oath,
correct?

    A    That's correct.

    Q    In Interrogatory Number 9, you were asked to
specify Richmor's claim that it had been damaged in
the sum of $2,579,900.67.  Do you see that?

    A    Yes.

    Q    Was that the amount of Richmor's claim
against SportsFlight in the State Court action?

---

**Page 103**

MAHLON RICHARDS -- Atty. Henry

    A    I'd have to check and see if that's the
amount.  I think it's $2,468...

    Q    On the invoice?

    A    Yeah.

    Q    All right.  How about in the complaint, which
in particular, the last page -- I'm sorry, page 14 of
the complaint.

    A    Is this what you're referring to
(indicating)?

    Q    Yes, sir.

    A    Page 14?

    Q    I'm referring to the 14 at the top there.

    A    Oh, okay.

            MR. RYAN:  What's the question there,
John?

    Q    What was the amount claimed in the complaint?

    A    All right.  So it says not less than two
million five seventy-nine and that's the same figure
here.

    Q    Was it your belief that SportsFlight Air owed
you that amount of money as of the date the complaint
was filed on April 10th, 2007?

    A    Yes.

    Q    And you didn't actually collect that amount

---

**Page 104**

MAHLON RICHARDS -- Atty. Henry

of money from SportsFlight Air, correct?

    A    Correct.

    Q    You collected $775,000 from SportsFlight Air
correct?

            MR. RYAN:  Ultimately?

    Q    Ultimately the settlement with SportsFlight
Air was for $775,000?

    A    The settlement was for $775, yes.

    Q    Thousand?

            MR. RYAN:  Thousand.

    A    Thousand.  Okay.

    Q    If you look at Interrogatory Number 10, which
is on the next page, that asks you to "State whether
or not Plaintiff and Defendant entered into any
Agreements, other than those alleged in the complaint,
for Plaintiff's provision of charter flight services
for Defendant from the year 2000 through the present,"
and you responded there were no other agreements.

    A    Yes.

    Q    Is that correct?

    A    I think so, yes.  Well, I -- I think I have
to take that back.

    Q    Okay.

    A    May I take it back?

---

**Page 105**

MAHLON RICHARDS -- Atty. Henry

1
2    Q    You can try.  Did you want to clarify that?
3    A    I'd like to clarify it.  There was a point
4    after the first five months, six months, whatever you
5    want to call it, that they told us that trying to use
6    one airplane wasn't working.  It was inconvenient to
7    SportsFlight.  It was inconvenient to, I believe,
8    DynCorp and the government, and we needed to make
9    other airplanes more available to them.
10   Q    Okay.  When you made those other aircraft
11   available to them and they were flown, SportsFlight
12   paid Richmor for those hours?
13   A    They did.
14   Q    And they did that before you had sued?
15   A    Say it again?
16   Q    They did that before you sued them?
17   A    Yes.
18   Q    So the lawsuit was only for the unflown
19   hours; is that correct?
20   A    It was for the unflown hours as it relates to
21   the -- well, at that time, the fifty hours a month.
22   All the airplanes that we flew would be part of that
23   fifty hours.
24   Q    What do you base that on?
25   A    What do I base that on?

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

---

**Page 106**

MAHLON RICHARDS -- Atty. Henry

1
2    Q    Yes.
3    A    How I interpret what we were supposed to be
4    doing for them.  We were supposed to be providing them
5    fifty hours per month.
6    Q    So didn't you sue SportsFlight to recover the
7    unflown hours on Assembly Point's airplane?
8    A    No.
9    Q    You didn't?
10   A    Did not.
11   Q    Okay.
12        (Plaintiff's Deposition Exhibit Number 10
13   was marked for identification, this date.)
14        (The document was handed to the witness,
15   and the witness examined the document.)
16   BY MR. HENRY:
17   Q    Let me ask you, sir:  Was there a specific
18   contract associated -- I'm sorry.  Strike that.
19        Was there a specific aircraft associated with
20   the SportsFlight contract?
21   A    The initial contract we signed, the
22   assumption was that, during that period of time, the
23   primary aircraft that was going to be used was 85
24   Victor Mike.  That would be the primary aircraft.
25   Q    You had one contract with SportsFlight Air,

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

---

**Page 107**

MAHLON RICHARDS -- Atty. Henry

1
2    correct?
3    A    Yes.
4    Q    And that contract was orally extended,
5    correct?
6    A    Orally extended, yes.
7    Q    So is it your testimony that there was not a
8    specific aircraft associated with the SportsFlight
9    contract as orally extended?
10   A    That's correct.
11   Q    There was not?
12   A    There was not.  It was stipulated in the
13   extension to the contract that there needed to be
14   other aircraft that we would make available, and I
15   think in the -- there was some paperwork where they
16   listed some of the airplanes, but I don't think it
17   was -- it wasn't formal.
18   Q    There was some paperwork in which --
19   A    There was a contract that we started to
20   generate following the initial five months that listed
21   other airplanes in our fleet.
22   Q    Let's talk about the 250 hours under the
23   initial contract.  Part of the lawsuit against
24   SportsFlight was to recover any of those hours,
25   correct?

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

---

**Page 108**

MAHLON RICHARDS -- Atty. Henry

1
2        MR. RYAN:  Can you repeat that question?
3    Q    Part of the lawsuit against SportsFlight was
4    to recover a portion of the unflown hours under the
5    original written contract?
6    A    Oh, gosh, I don't know.  It was my
7    recollection that they certainly flew more than
8    250 hours.  I think they flew well more than
9    250 hours.
10   Q    So it's your testimony that there was not a
11   specific aircraft associated with the SportsFlight
12   contract?
13   A    Yes.
14   Q    Were you asked the following question and did
15   you give the following answer at trial -- and I'm
16   referring to Defendant's 227 of your trial
17   testimony --
18        MR. RYAN:  What page, 227?
19        MR. HENRY:  Yes, it's actually on the
20   bottom.  I don't know which number to use.
21   Q    "Was there a specific aircraft associated
22   with this contract?"
23        Answer:  "Yes, it was a Gulfstream IV,
24   November 85 Victor Mike was the registration."
25        Question:  "N85VM?"

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

109

MAHLON RICHARDS -- Atty. Henry

1
2       Answer:  "Yes."
3       Was that testimony truthful?
4       A    That was -- that aircraft was associated with
5  this contract; that is correct.
6       Q    Was SportsFlight short any hours on the 250
7  guarantee in the initial six-month period?  Were they
8  short by 81 hours?
9       A    I -- I think that that's probably correct.
10 When I -- when I looked at it, I was looking at a
11 month and I guess I should have been looking at a
12 specific date.  I guess it was -- was it May 6th to
13 November 6th?
14          MR. RYAN:  We have the contract right
15 here.
16          (The document was handed to the witness,
17 and the witness examined the document.)
18      A    Yeah, May 6th to November 6th.
19      Q    Yes.  Was SportsFlight short by 81 hours on
20 the initial 250, if you know?
21      A    At November 6th, I believe they were short by
22 81 hours.
23      Q    And you were suing them for that shortage?
24      A    No.
25      Q    No?

110

MAHLON RICHARDS -- Atty. Henry

1
2       A    No.  My conversation with Don Moss, at that
3  time, was that we completed the five months; we were
4  short some hours.  His comment back to us was that we
5  want to continue to do the flying.  We're going to get
6  busier, and we'll make up those hours.  And I said,
7  okay.  And sure enough, by the end of November of that
8  year, he had made up the hours.
9           So, in my mind, no, we were not suing for
10 those 81 hours because they had already been flown and
11 paid for.
12      Q    Did you ever testify to the State Court that
13 part of what you were seeking to recover were unflown
14 hours on other aircraft?
15      A    They were unflown hours on any aircraft, I
16 mean, it was a fifty-hour thing and we used many
17 different airplanes, so they were just unflown hours.
18      Q    But you used many different airplanes but you
19 were paid for each of the hours that were flown on
20 those other airplanes, correct?
21      A    We were paid for all the hours that we flew,
22 whatever airplane.
23      Q    If any of the other aircraft owners wanted to
24 use their aircraft, were they required to obtain the
25 government's permission before doing so?

111

MAHLON RICHARDS -- Atty. Henry

1
2       A    I would say no.
3       Q    So for the entire period of time that the
4  SportsFlight contract was in effect, all the way
5  through 2005, was the Assembly Point plane supposed to
6  be reserved for the government's use under the
7  contract with SportsFlight?
8       A    No.
9       Q    Okay.  Were you asked the following question
10 and did you give the following answer during your
11 trial --
12          MR. RYAN:  What page?
13          MR. HENRY:  Defendant 273.
14      Q    -- during your trial testimony --
15          MR. RYAN:  Wait until I get there.
16      Q    "Was the 85 Victor Michael plane supposed to
17 be reserved during this period for the government use
18 pursuant to this contract?"
19          Answer:  "Yes."
20          The Court:  "Exclusively?"
21          Question:  "Exclusively?"
22          Answer:  "Yes."
23          Is that correct?
24      A    No.  You want to go on with your reading?
25      Q    Well, let me ask you this:  Was that

112

MAHLON RICHARDS -- Atty. Henry

1
2  testimony correct?  Was the 85 Victor Michael plane
3  supposed to be reserved during this period for the
4  government use pursuant to this contract?
5       A    I think that was the intention originally,
6  yes, although -- during the initial time it was
7  supposed to be.
8       Q    Well, what did you mean when you said
9  pursuant to this contract?
10          MR. RYAN:  Objection.
11      Q    I'm just stating your --
12      A    Well, the contract -- the contract was for a
13 six-month, five-month period of time.
14      Q    And so you only recovered against
15 SportsFlight on a six-month contract?
16      A    No, no.
17      Q    You recovered against SportsFlight on a
18 contract for several years, correct?
19      A    That's correct.
20      Q    Because it was orally extended, correct?
21      A    Month-to-month.
22      Q    And the written contract was extended on a
23 month-to-month basis, right?
24      A    Yes.
25      Q    And the written contract required Assembly

113

MAHLON RICHARDS -- Atty. Henry

1
2  Point's aircraft to be reserved exclusively for the
3  government's use during that period, correct?  That's
4  your testimony during the trial, correct?
5      A    That's the testimony there.  I guess as I
6  think about it, there were other airplanes that they
7  stipulated.
8      Q    Where?  Where were those other airplanes
9  stipulated to?
10     A    In an agreement that we started to do and
11 then we just decided to just do it verbally.
12     Q    And SportsFlight attempted to introduce that
13 agreement into evidence in the State Court action and
14 was denied, correct?
15          MR. RYAN:  Objection.  Don't answer the
16 question.  He doesn't remember.
17          MR. HENRY:  That's fine.
18          MR. RYAN:  It was five years ago.
19     Q    You didn't recover against SportsFlight on
20 the basis of that contract that was never signed,
21 correct?
22          MR. RYAN:  Objection.
23     A    I believe we recovered on the basis that
24 there was an agreement that we were going to fly so
25 many hours for so many months and we didn't.

114

MAHLON RICHARDS -- Atty. Henry

1
2      Q    When SportsFlight used other planes for
3  flights, did you credit those other hours towards the
4  monthly minimum?
5      A    Yes.
6      Q    Did you have any conversations with anybody
7  at Assembly Point in which -- strike that.
8          You testified earlier that before you filed
9  the complaint against SportsFlight, you had a
10 conversation with Mr. Gilmour telling them that you
11 were about to do this and you were concerned about
12 potential publicity, correct?
13     A    Yes.
14     Q    How about after the lawsuit was filed, what
15 communications did you have with Assembly Point about
16 the progress in the litigation?
17     A    Very, very little.
18     Q    Do you remember any specific communications
19 about the progress of the lawsuit?
20     A    I remember -- I think I remember telling Dave
21 Gilmour, after we got the judgment, that we had got
22 the judgment.  I don't remember much prior to that.
23     Q    Do you remember meeting with Ms. Suprenant at
24 Richmor's offices in Schenectady in January 2009 at
25 which point the litigation was discussed?

115

MAHLON RICHARDS -- Atty. Henry

1
2          MR. RYAN:  Ms. Who?
3          MR. HENRY:  Suprenant.
4          MR. RYAN:  Hi.
5          MS. SUPRENANT:  Hi.
6      A    I remember a meeting in Schenectady that the
7  purpose of the meeting was to discuss how we could
8  reduce the expenses on the operation of Mr. Morse's
9  airplane, because it wasn't being utilized as much as
10 he wanted to and were there things that we could do to
11 help that.
12     Q    What discussions do you recall about the
13 lawsuit?
14     A    I don't.
15     Q    Do you know of anything that would help you
16 recall, any documents or records that would help you
17 recall?
18     A    No.
19     Q    Did you take any notes?
20     A    I may have taken some notes as it related to
21 the -- how we could reduce the expenses of the
22 operation of the aircraft.
23     Q    Do you recall specifically whether you did or
24 didn't take notes?
25     A    I think I did.

116

MAHLON RICHARDS -- Atty. Henry

1
2      Q    All right.  Have you looked for any of those
3  notes in response to our discovery demands in this
4  litigation?
5      A    Yes, I've looked through my paperwork.
6      Q    And were you able to find any notes?
7      A    No.
8      Q    Now, the trial was in July of 2009, correct,
9  that's the date on the transcript?
10     A    Okay.  Yes.
11     Q    Do you recall having any discussions with
12 anybody from Assembly Point after the trial about the
13 results of the case?
14     A    After the trial?
15     Q    Yes.
16     A    As I stated, I believe I called Dave Gilmour
17 and told him that we had been successful, and I may
18 have -- I'm sure at some point I mentioned it to
19 Cynthia, but I don't know when.
20     Q    Do you recall meeting with Cynthia in 2009,
21 at which point the lawsuit was discussed at all?
22     A    In 2009?
23     Q    Yeah, we talked about one meeting in
24 January of 2009 --
25     A    At Schenectady.

**Page 117**

MAHLON RICHARDS -- Atty. Henry

1
2  Q   -- at Schenectady.  Do you recall any other
3  meetings with Cynthia in 2009 after the trial at which
4  the litigation was discussed at all?
5  A   When did we meet in Schenectady?
6  Q   January.
7  A   January of 2009?
8  Q   Yes.  Before the trial in July 2009.
9  A   This was the trial to?
10  Q   Against SportsFlight Air.
11  A   Against SportsFlight.  Okay.  Prior to the
12  judgment, was that?
13  Q   It would have been after trial at least.
14  MR. RYAN:  After July of 2009, did you
15  have any discussions with Cynthia about the trial?
16  Q   Or about the litigation at all.
17  A   I'm confused about the trial to -- or the
18  trial to get the money.
19  Q   Right.
20  A   There's two different things, I think.
21  Q   Oh, okay.  So are you talking about the
22  proceedings to enforce the judgment?
23  A   That's what I'm wondering:  Which?
24  Q   All right.  I'm only talking now about the
25  actual trial, when it was hot out in July of 2009 and

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6932

**Page 118**

MAHLON RICHARDS -- Atty. Henry

1  you went and testified in front of the judge.
2
3  A   Judge.
4  Q   Okay.  After that, do you recall any
5  discussions with anybody from Assembly Point about the
6  trial or the litigation?
7  A   Again, after the judgment, after the judge
8  decided that we were right, I would have mentioned it
9  to Dave Gilmour over the phone, and I may have
10  mentioned it to Cynthia.
11  Q   How about before the judgment was actually
12  entered, while there were some proceedings to
13  determine the amount of the judgment, does that
14  refresh your recollection at all?
15  A   Proceedings to determine the amount of the
16  judgment?
17  Q   Right.
18  A   No, I recall -- I recall a discussion with
19  Cynthia, but I think it was after the judgment, and it
20  was about, you know, we would have conversations about
21  things, and during the conversation, this might come
22  up because it might have been about the settlement.
23  Q   Let me ask you this:  Do you recall any
24  discussions with anybody from Assembly Point about how
25  the proceeds of the lawsuit would be distributed?

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6932

**Page 119**

MAHLON RICHARDS -- Atty. Henry

1
2  A   I would have had a discussion that I wanted
3  to give Mr. Morse some of the money.
4  Q   And that would have been in 2013 after the
5  plane had been removed from Richmor's control; is that
6  correct?
7  A   No.
8  Q   All right.  So let me ask you this:  What
9  conversations do you recall about giving Mr. Morse a
10  sum of money?
11  A   I certainly don't recall dates or places or
12  phone calls.  I just know that I had discussed it.
13  Q   All right.
14  A   I can't give you any specific times.
15  Q   Was it before or after Richmor received the
16  settlement funds?
17  A   I would think it would have been both.
18  Q   Why were you offering to make a gift to Mr.
19  Morse?
20  A   Mr. Morse has been a very good customer.  I
21  guess, after the fact, I wish we'd never done this
22  because he got bad publicity.  We got extremely bad
23  publicity, and I just felt that I should pay him
24  something.
25  Q   Fair to say that Mr. Morse is a relatively

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6932

**Page 120**

MAHLON RICHARDS -- Atty. Henry

1
2  wealthy gentlemen?
3  A   I believe he is.
4  Q   Is it your habit or Richmor's business to
5  make gifts to wealthy gentlemen?
6  A   I don't -- doesn't make any difference to me
7  whether somebody's rich or poor if I want to do
8  something for them.  It certainly wasn't the amount of
9  money.  It was just a gesture.
10  Q   Did you have any discussions about settling
11  the SportsFlight case with APA, with Assembly Point?
12  In other words, did you talk to them about the status
13  of any settlement discussions that you may have been
14  having with SportsFlight Air?
15  A   Now, this is after the fact when we're trying
16  to collect the money; is that correct?
17  Q   Yes.
18  A   There were some discussions that I would have
19  had with Cynthia.  You know, I remember one time where
20  we were talking and we were at a point where they were
21  offering 50,000 a month or something, and I kind of
22  asked her for her opinion.
23  Q   Why did you ask her for her opinion?
24  A   Well, I asked her for her opinion and I asked
25  her for some ideas because I knew at one time she told

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6932

121

MAHLON RICHARDS -- Atty. Henry

1
2    me that she was a lawyer, and we were kind of looking
3    for -- we were having a lot of trouble in getting any
4    money, and it seemed to be the thought from most
5    everybody that we weren't going to get any money,
6    including the folks at Assembly Point and including my
7    employees and, it seems, anybody I talked to.
8           So I was asking anybody and everybody what
9    their experience and thoughts were on:  We spent
10   $100,000.  We've got nothing to show for it.
11   Everybody tells us that they've had enough time to
12   hide the money and do whatever, whose got an idea.
13      Q    Did you ever seek approval from Assembly
14   Point to settle the case with SportsFlight?
15      A    No.
16           (Discussion off the record.  A brief
17   recess occurred.
18           (Plaintiff's Deposition Exhibits Numbers
19   11 through 16 were marked for identification, this
20   date.)
21   BY MR. HENRY:
22      Q    Mr. Richards, I'm going to hand you a series
23   of documents marked as Exhibit 11 for your deposition
24   today, and these appear to be the stipulation of
25   settlement, a letter to your counsel dated August 1,

122

MAHLON RICHARDS -- Atty. Henry

1
2    2012, and a copy of a check.  I'll ask you to take a
3    look at these.
4           (The document was handed to the witness,
5    and the witness examined the document.)
6       Q    Do those documents reflect the settlement
7    that was entered into being Richmor and SportsFlight
8    Air?
9       A    Yes.
10      Q    And so the case against SportsFlight Air was
11   ultimately settled in July of 2012 for $775,000; is
12   that correct?
13      A    Yes.
14      Q    The settlement check was sent to your counsel
15   on or about August 1st, 2012, correct?
16      A    Yes.
17      Q    Did you tell anybody from Assembly Point that
18   you had received the money from SportsFlight Air?
19      A    No -- well, at what point in time?
20      Q    Well, when you received the funds?
21      A    No.
22      Q    Why not?
23      A    I don't know.  I guess I was trying to figure
24   out what my intentions were as far as sharing
25   something with Mr. Morse.

123

MAHLON RICHARDS -- Atty. Henry

1
2           MR. RYAN:  Just so the record is clear,
3    and I don't mean to be interrupting here, the remitter
4    on the check is Classic Air Charter, not SportsFlight.
5           MR. HENRY:  Okay.
6       Q    Is it fair to say that the settlement check
7    that was received was in resolution of the litigation
8    against SportsFlight?
9       A    Yes.
10      Q    When did you first tell anybody from Assembly
11   Point that you had received the settlement funds?
12      A    I believe it was December of '13 or January
13   of '14.
14      Q    Okay.  Would that have been December of
15   '12 -- 2012 -- or January 2013, being a year ago?
16      A    Oh, okay.  All right.  You're right.
17      Q    Who did you tell?
18      A    Cynthia Morris.
19      Q    Did there come a point in time when Assembly
20   Point had decided to move the aircraft from Richmor
21   management to another company?
22      A    Yes.
23      Q    When were you first made aware of that
24   decision?
25      A    Officially, I think it was December, again,

124

MAHLON RICHARDS -- Atty. Henry

1
2    the same thing December '12, January '13.  Rumors
3    prior to that.
4       Q    Rumors from the pilots or from somebody at
5    Assembly Point?
6       A    Yeah, we had a pilot sitting in the lobby and
7    somebody came up to him and said, by the way, we're
8    taking your airplane.  The pilot -- at that point, the
9    pilot called and mentioned that to me and asked me if
10   I knew anything about it, and I said, hadn't heard a
11   word.
12      Q    Do you know if you told Assembly Point that
13   you had received the settlement funds before you were
14   aware that they were moving the plane to another
15   company or was it after?
16      A    After.
17      Q    Who did you tell?
18      A    Cynthia.
19      Q    What did you say to her?
20      A    Well, we had lots of discussions and e-mails
21   during that period of time that we discussed lots of
22   different things, and I believe I sent her an e-mail
23   and said, I've got a couple of things I'd like to
24   discuss with you, and that was one of them.  And I
25   think what I said is that we received a settlement.

125

MAHLON RICHARDS -- Atty. Henry

1
2        At that point in time, I wasn't allowed to
3   talk to Mr. Morse, and I asked her to relay to him
4   that I still felt I wanted to share something.  I
5   would have to pay it over a period of time, but I
6   still wanted to do it.
7        Q    Why did you feel you wanted to share
8   something?
9        A    He's been a good customer for a long time.
10  He got some of the negative publicity that we got, and
11  I just felt that's what I wanted to do.  That's --
12  that's what I do.
13       Q    Was it related at all to the fact that it was
14  his aircraft that was at issue in the SportsFlight
15  case?
16       A    Well, sure, his aircraft was -- that's why we
17  got negative publicity, his was one of the aircraft.
18       Q    Did you offer to share the proceeds of the
19  SportsFlight settlement with any of the other owners
20  of any of the other aircraft that were used by
21  SportsFlight?
22       A    Well, I guess you have to understand that
23  from the beginning we tried to use his airplane as
24  much as we could.  As a result of doing that, his
25  airplane was exposed to that type of tracking more

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6932

126

MAHLON RICHARDS -- Atty. Henry

1   than others, so.
2        Q    Did you offer to share the proceeds of the
3   SportsFlight lawsuit with any owners other than
4   Assembly Point?
5        A    I did not.
6        Q    I'm going to show you a document that's been
7   marked as Plaintiff's Exhibit 12 for your deposition
8   today.
9             (The document was handed to the witness,
10  and the witness examined the document.)
11       Q    It's an e-mail from Cynthia to you dated
12  January 20th, 2013; is that correct?
13       A    Yes.
14       Q    If you look in the second paragraph, starting
15  the third sentence, it says, "You and I spoke after
16  you filed the lawsuit against SportsFlight to recover
17  money owed under a contract to charter Phil's
18  airplane.  You said you were doing this on his behalf,
19  and that you'd just take your usual charter commission
20  (15 percent) out of anything received.  That's what
21  you said on the phone late last week:  that you knew
22  you owed Phil the money, but you wanted me to ask him
23  to let you pay it over some period of time."
24             Do you see that?
25

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6932

127

MAHLON RICHARDS -- Atty. Henry

1
2        A    I see that.
3        Q    Do you agree with her statement about your
4   conversation with her?
5        A    No.
6        Q    What do you not agree with?
7        A    Well, it says, "You and I spoke after you
8   filed the lawsuit against SportsFlight to recover
9   money owed under a contract to charter Phil's
10  airplane."
11            Well, we did have a contract with
12  SportsFlight to fly some government flights.  It
13  wasn't specifically on Phil's airplane.
14            "You said you were doing this on his" -- "You
15  said you were doing this on his behalf."  Well, I
16  wasn't.  In my mind, I wasn't doing it on his behalf.
17  If I was doing it on his behalf, I certainly would
18  have expected that he would have participated some
19  amount in the $100,000 that I spent, and that he would
20  have participated in some amount in all of the many
21  discussions that we had with our lawyers for, gosh,
22  two, three, four, five years, and there was none of
23  that.
24            And then I don't -- "That's what you said on
25  the phone last week."  I did say on the phone last

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6932

128

MAHLON RICHARDS -- Atty. Henry

1
2   week that I felt I still wanted to pay Phil some
3   money, and that I would want to do it and tell him
4   that I'll do it, and I want to do it over a period of
5   time.  I did say that.  If she's referring to the fact
6   that -- to that I agreed on the commission, that part
7   of it is not correct, but I did -- I did say that I
8   still wanted to pay him some money and that it would
9   need to be over a period of time.
10            The last sentence in that paragraph about how
11  to get the money and the comment that they'd probably
12  be squirreled away, I recall that because everybody,
13  including Cynthia and Dave and my employees and I
14  think even the lawyers were under the impression that
15  there wasn't going to be any money, and I guess my
16  assumption at that was, well, nobody is interested
17  because nobody thinks we're going to get any money.
18  That's what my thought was.
19            (The witness examined the document.)
20       Q    So did you call Cynthia back and tell her
21  that you disagreed with her characterization of this
22  conversation?
23       A    We either had discussion on the phone or
24  discussion on e-mail.  I -- we had a lot of -- there
25  was a lot of conversation during that period of time.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6932

129

MAHLON RICHARDS -- Atty. Henry

1   I don't recall exactly when and how it was.

2       Q   When you received this e-mail, did you

3   respond to her characterization of your conversations?

4       A   I believe I did.

5       Q   How did you respond?

6       A   I believe there's an e-mail that I sent that

7   maybe there was a question about, well, if it wasn't

8   85/15, how did you -- how did you -- what was your

9   thinking of how you would determine what amount you

10  wanted to share, and I think I stated something in an

11  e-mail:  Well, here's one of the ways that I might

12  have gone.

13      Q   With respect to this particular e-mail,

14  though, you didn't e-mail her back and tell her she

15  was all wet about what you had said to her?

16          MR. RYAN:  Objection to form.

17      Q   I can substitute incorrect for all wet.

18      A   I was going to say, I don't generally tell

19  anybody that they're all wet.  Everybody has their own

20  opinion.

21      Q   Did you respond to her in an e-mail saying

22  her characterization of your conversation was

23  incorrect?

24      A   Well, my response in -- in how I said I might

130

MAHLON RICHARDS -- Atty. Henry

1   calculate it is the same as saying this is how I think

2   I would have done it.  I wouldn't have done it 85/15.

3       Q   You didn't tell her though that she was not

4   recalling the conversation correctly?

5       A   I don't remember, don't remember.

6       Q   All right.  Let's take a look at Exhibit

7   Number 13 for your deposition today, which is an

8   e-mail from Cynthia to you dated January 22nd, 2013;

9   is that correct?

10          (The document was handed to the witness,

11  and the witness examined the document.)

12      A   Yes.

13      Q   It says in the second sentence, "When we've

14  spoken, we've talked about this as charter revenue of

15  which, after legal fees, Richmor would take its

16  customary 15 percent of."  Is that true?

17      A   I'm sorry.  Say that again for me.

18      Q   Is that sentence true?

19      A   What sentence?

20      Q   "When we've spoken, we've talked about this

21  as charter revenue of which, after legal fees, Richmor

22  would take its customary 15 percent of."

23      A   No, I never recall that.

24      Q   Did you respond to her e-mail and say, no, I

131

MAHLON RICHARDS -- Atty. Henry

1   never recall that?

2       A   My response was how I may have calculated

3   what the amount would be.

4       Q   The amount of your gift?

5       A   Yes.

6       Q   But you didn't say that she mischaracterized

7   your conversations?

8       A   I may have done that during the actual

9   conversation, but I don't remember every word that

10  I -- I just don't remember every word.

11      Q   You're not aware of an e-mail response to

12  this saying you're not remembering our conversations,

13  correct?

14      A   I remember an e-mail response outlining how I

15  may have calculated the gift.

16      Q   I'm going to show you a document that's been

17  marked Exhibit 14 for your deposition today.

18          (The document was handed to the witness,

19  and the witness examined the document.)

20      Q   This is an e-mail from you to Mr. Morse dated

21  January 23rd, 2013; is that correct?

22      A   Yes.

23      Q   It's responding to an e-mail from Phil?

24      A   Yes, well, I guess this was an e-mail that I

132

MAHLON RICHARDS -- Atty. Henry

1   sent to Phil saying that I'm available on my cell

2   phone.

3       Q   Right.

4       A   Yeah.

5       Q   And you're --

6       A   And supposedly it's Phil's response to me.

7       Q   Okay.  Maybe I can show you another document.

8   We can have it marked if you want.

9           (The document was handed to the witness,

10  and the witness examined the document.)

11      Q   That appears to be an e-mail from Phil to you

12  dated January 23rd, 2013, at 10:53 a.m.  Do you see

13  that?

14      A   Um-hmm.

15      Q   It looks like Mr. Morse had e-mailed you

16  first and said, "Before we talk, you need to answer

17  the questions Cynthia asked you -- how it came to pass

18  that you received the settlement of the lawsuit in

19  August and we only found out about it last week."

20          Do you see that?

21      A   I see that, yeah.  In both of these, right?

22      Q   Right.

23      A   And this is the same thing?

24      Q   Yes.  And then you responded with your phone

133

MAHLON RICHARDS -- Atty. Henry

1
2  number for Phil to give you a call to answer his
3  questions; is that correct?
4        A    That's what it looks like, yeah.
5        Q    All right.  And did you have a conversation
6  with Phil?
7        A    I was not allowed to talk to him.
8        Q    Did you attempt to call him?
9        A    Yes, I did.
10       Q    Did you leave him voice mail messages?
11       A    I'm sorry?
12       Q    Did you leave him voice mail messages?
13       A    Yes, I did.
14       Q    Did he return your call at all?
15       A    No, he did not.
16       Q    I'm going to show you a document that's been
17  marked for your deposition as Plaintiff's Exhibit 15.
18            (The document was handed to the witness,
19  and the witness examined the document.)
20       Q    Was this the communication that you were
21  referring to earlier regarding your offer of a gift to
22  Mr. Morse?
23       A    Yes.
24       Q    If you look at the second paragraph, it says
25  "To come up with a BALLPARK figure I would have

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

134

MAHLON RICHARDS -- Atty. Henry

1
2  started with the rate of $4,600 times 85% minus the
3  operating cost of $2,500 times the 167 hours would
4  equal $235,470."
5        Do you see that?
6        A    I see that.
7        Q    Can you explain for me those calculations?
8        A    It states -- no.
9        Q    Let's start with the hourly rate.  Where did
10  you come up with the rate of $4,600 per hour?
11       A    I guess I thought that that was the flight
12  hour rate that we were being paid from SportsFlight.
13       Q    All right.  So that probably should have been
14  4,900 per hour?
15       A    Yeah, probably.
16       Q    Where did the 85 percent come from?
17       A    Eighty-five percent is the amount that we
18  normally -- that we remit to the owner when we fly the
19  airplane.
20       Q    And what's the operating cost of $2,500?
21       A    That would be fuel maintenance and engine
22  reserves for the hour that the airplane flies.
23       Q    Wasn't that already paid by Assembly Point?
24       A    No, the airplane didn't fly.  These are
25  not -- we -- we pay when -- we pay when we have a

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

135

MAHLON RICHARDS -- Atty. Henry

1
2  flight hour on an owner's aircraft.  When we have a
3  flight hour on an owner's aircraft, they incur an
4  operating expense, a direct operating expense.
5        Q    The owner does?
6        A    The owner incurs a direct operating expense
7  when the airplane is flown.
8        Q    Why were you backing out the hourly operating
9  cost in this calculation?
10       A    It was just a way of saying, well, let's see
11  now, I haven't given an amount that I want to give
12  him.  What's a way of figuring it out?  So this is
13  just what came to mind at that time.  This is the way
14  I would figure it out.
15       Q    All right.  Where is the 167 hours, where
16  does that come from?
17       A    I don't know.  I don't know where that -- was
18  167 the hours that we were paid in the suit?
19       Q    Well, you sued for 2.5 million and settled
20  for 775,000.
21       A    But I thought there were hours that were
22  related to it.
23            (The witness examined a document.)
24       A    Well, the hours that were originally was 236,
25  and I think the court backed some out?

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

136

MAHLON RICHARDS -- Atty. Henry

1
2        MR. RYAN:  I don't know.
3        Q    As you sit here today, do you know where you
4  came up with 167 hour figure?
5        A    Well, that's what I'm trying to explain.  I
6  thought it was the hours that we had sued for.
7        Q    Well, you sued for 1,800 unused hours.
8        A    No.
9        Q    Minus the hours flown.
10       A    Minus the hours.  Okay.
11       Q    Right?
12       A    All right.
13       MR. RYAN:  Well, look at it.  Don't let
14  him put words in your mouth.
15       Q    Maybe we could look at it.  Do you have the
16  complaint which has the invoice attached to it?
17            (The document was handed to the witness,
18  and the witness examined the document.)
19       A    Okay.
20       Q    Does that help you determine how the
21  167 hours was calculated?
22       A    Well, that's what I just said.  It says
23  236.2 hours but my recollection is that the court
24  backed off some of those hours so that the settlement
25  wasn't for 236.  It was something less than 236, and

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

137

MAHLON RICHARDS -- Atty. Henry

maybe that's how I came up with the 167.

Q     But the judgement itself was much larger than
the settlement, correct?

A     Yes.

Q     So was there any real way to measure the
settlement against the judgment amount?

        MR. RYAN:  Objection.

Q     If you know.

A     (There was no response.)

Q     In other words, was the settlement amount
tied to payment for a certain number of hours?

        MR. RYAN:  Same objection.  You can
answer, if you know.

Q     If you know.

A     I think so.

Q     You think so?

A     Well, it was the hours plus interest.  The
settlement amount, I believe, included interest.

Q     I'm not talking about the judgment amount,
the amount the court awarded you.

A     Oh, the settlement amount.

Q     I'm talking about the amount you ultimately
agreed to accept.

A     Well, I don't know what -- I don't know

138

MAHLON RICHARDS -- Atty. Henry

what --

Q     That was just --

A     -- that makes up of it.  It was just an
amount of money.

Q     It was just a negotiated number?

A     Yeah.

Q     You wanted to pay that amount over a period
of time; was that correct?

A     That's correct.

Q     Why was that?

A     Because business is slow.  Even though I
didn't have the money to pay it, I felt that he
would -- that I could pay it over a period of time.

Q     What did you do with the $775,000 that had
been received in August of 2012?

        MR. RYAN:  Objection.  You can answer.

A     It went to the accountant, and he put it in
the bank the same way he would any other money.

Q     It was placed into Richmor's general
operating account?

A     Yes, yep.

Q     Was any of the proceeds of the lawsuit
distributed out to any of the owners of the business?

A     No.

139

MAHLON RICHARDS -- Atty. Henry

Q     Was it used to pay Richmor's general
expenses?

A     Yes.  It would -- it would be used like any
other money that was in the company, whether it be to
pay salaries or light bills, there was no difference.

Q     The last sentence of that e-mail that's in
front of you, the January 24, 2013, e-mail says, "I
apologize for all of this.  I never thought our
relationship would end this way."

Q     What do you mean by that?

A     In the first place, I didn't think our
relationship would end with him deciding to have
somebody else manage the airplane, and I found it hard
to believe that we were in dispute about something,
because for 25 years it was an excellent relationship
and we -- we agreed on things.

Q     When you say you agreed on things, those were
usually oral agreements?

A     Normally oral agreements, yeah, but, I mean,
we agreed on the contract, too.  I guess that's in
writing.

Q     But did you ever feel a need that you had to
have your agreement on things relating to the aircraft
in writing, other than the original contract?

140

MAHLON RICHARDS -- Atty. Henry

        MR. RYAN:  Objection.  You can answer.

A     I didn't feel that, no.

Q     And Assembly Point didn't demand that of you?

A     No.

Q     After this exchange of e-mails about the
gift, the plane was then moved to a different
operator; is that correct?

A     Yes.

Q     Was there also a dispute at the end of the
relationship about releasing the plane to the Morses?

A     There was conversation about whether we
should release the plane to the other operator prior
to the bills being settled.

Q     Did you ultimately release the aircraft to
the other operator?

A     I did.

Q     Had the outstanding bills been paid by
Assembly Point at the time that you agreed to release
it?

A     No.

Q     Do you recall meeting with Cynthia and David
Gilmour in Massachusetts in early February 2013?

A     Yes.

Q     What was the purpose of that meeting?

141

MAHLON RICHARDS -- Atty. Henry

1
2     A     The purpose was to discuss the settlement.
3     Q     Okay.  And who attended that meeting on
4  behalf of Richmor?
5     A     Myself.
6     Q     Was it just you, Cynthia, and David?
7     A     Yes.
8     Q     Did you take any notes at that meeting?
9     A     No.
10    Q     What did you say to Cynthia and David?
11    A     That's a pretty broad question.
12    Q     As best you can recall.
13    A     I guess some of the conversation would be the
14  same as I indicated in the e-mails, that I felt that I
15  wanted to share some of the proceeds with Phil and
16  that I didn't know what the amount would be.
17    Q     Did they tell you that they believed that you
18  owed 85 percent of the proceeds?
19    A     Yes, they did.
20    Q     What was your response?
21    A     My response was that I didn't agree.
22    Q     And did you tell them why?
23    A     I would guess I could tell them why.
24    Q     Do you know specifically whether you told
25  them why?

---

142

MAHLON RICHARDS -- Atty. Henry

1
2     A     I don't know the words, no.
3     Q     How long was the meeting?
4     A     Oh, gosh, I guess maybe an hour, hour and a
5  half.
6     Q     Did you tell them that you didn't believe
7  Richmor owed anything to Assembly Point?
8     A     I -- I could have told them that, yes.
9     Q     Do you recall that specifically?
10    A     No, I don't.
11    Q     Was there any discussion at that meeting of
12  your offer of a gift to Mr. Morse?
13    A     Yes, I believe there was.
14    Q     And what discussion?
15    A     Again, that I felt that I wanted to share
16  something with him, there may have been conversation
17  about paying it over a period of time, the same as
18  there was in the other discussions.
19    Q     Was there any discussion about the
20  calculations of how that gift -- strike that.
21          Was there any discussion about how you
22  calculated the amount of that gift?
23    A     I don't remember.
24    Q     What was their response to your offer of a
25  gift?

---

143

MAHLON RICHARDS -- Atty. Henry

1
2     A     I think one of their responses were that if
3  we were talking about $50,000, it probably wouldn't
4  make sense to go to court.  If we're talking about a
5  larger amount, then I guess we'll go to court.
6     Q     After that meeting, was there anything else
7  at that meeting that you can recall?  Anything else
8  happen at that meeting that you can recall?
9     A     Not that I recall, no.  What do you mean
10  "happen"?
11    Q     Did you talk about anything else other than
12  what you've testified to already?
13    A     I would think that we did, but I don't recall
14  exactly what it was.
15    Q     Did you take any notes at that meeting?
16    A     No.
17    Q     Didn't record it in any way?
18    A     No.
19    Q     After that meeting, did you have any other
20  communications with anybody from Assembly Point?
21    A     I don't think so, no.  I wasn't allowed to
22  talk to Mr. Morse, and I don't -- I don't think so.  I
23  don't think I talked to Cynthia or Dave after that, I
24  don't think.
25    Q     I'm going to show you a document that's been

---

144

MAHLON RICHARDS -- Atty. Henry

1
2  marked as Plaintiff's Exhibit 16 for your deposition
3  today.
4          (The document was handed to the witness,
5  and the witness examined the document.)
6     Q     This is a copy of a letter that I wrote to
7  you dated February 12th, 2013; is that correct?
8     A     Yes.
9     Q     Did you receive that letter?
10    A     I believe I did.
11    Q     In that letter I asked you to respond to us
12  within seven days; is that correct?
13    A     Yes.
14    Q     Did you respond?
15    A     I don't believe I did.
16    Q     Why not?
17          MR. RYAN:  Object.  I'm going to direct
18  him not to answer.  It's irrelevant and immaterial.
19  It's not probative of the issues in the lawsuit.
20    Q     You didn't respond to this letter; is that
21  correct?
22          MR. RYAN:  Don't answer the question.
23          MR. HENRY:  Well, I think that's an
24  absolutely improper objection and an improper --
25          MR. RYAN:  Well, my objection I was

145

MAHLON RICHARDS -- Atty. Henry

1
2  noting with the prior question:  It's irrelevant and
3  immaterial, and it's not probative of any of the
4  issues in this lawsuit.
5       MR. HENRY:  Those aren't grounds to
6  direct him not to answer.  We're under the federal
7  rules.  If you want to assert a privilege, you
8  certainly can.
9       Q   I think he already answered the question
10  anyway:  He didn't respond to that letter, correct, is
11  that correct?
12       MR. RYAN:  Did you respond?
13       THE WITNESS:  I did not.
14       Q   In operating Richmor, were there ever any
15  instances, other instances other than SportsFlight, in
16  which Richmor entered into a charter under which hours
17  were guaranteed?
18       A   There may have been on occasion, yes.
19       Q   And can you describe those for me?
20       A   It would be a time when -- when there's a lot
21  of charter activity.  Let's say the most recent time
22  might be President's weekend, always busy.  We may
23  receive a call from another operator saying, gee, we'd
24  like to reserve your airplane for this day, and we'll
25  pay you for two hours if you let us reserve the

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6932

146

MAHLON RICHARDS -- Atty. Henry

1
2  airplane.
3       Q   Whether it's used or not?
4       A   Whether it's used for not.
5       Q   And what does Richmor do vis-à-vis the owner
6  of the aircraft in those situations where the aircraft
7  is not actually flown?
8       A   I don't remember a time when the airplane
9  wasn't actually flown.  As I stated, it only happens
10  at a time when thing are very busy.  For instance,
11  this President's weekend, we had two airplanes that
12  would fall under that category.  Both airplanes flew
13  more than the two hours, so we paid the owner for the
14  hours that we flew.
15       Q   Was there ever any instance in which Richmor
16  was paid for hours that were not flown?
17       A   There may have been.
18       Q   Do you have records that would show you
19  whether that has ever happened?
20       A   If it was fairly recent, we might.  See,
21  that's very difficult, because if the airplane flies,
22  then we have a record.  If the airplane doesn't fly,
23  then we don't have a record.
24       Q   Well, don't you have an invoice to whoever
25  chartered the aircraft for the unused hours?

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6932

147

MAHLON RICHARDS -- Atty. Henry

1
2       A   We may have.  If there's a time when the
3  airplane wasn't used, we may have an invoice, yes.  As
4  I say, I just -- I don't remember those times because
5  when it's done, it's a busy time and it's normally
6  used.
7       Q   But your answer is you're not sure if that's
8  ever happened?
9       A   I'm not sure if that's ever happened.
10       Q   Do you know of any instance in which a plane
11  was not flown and money was paid over to the owner?
12       A   No.
13       Q   Who at Richmor was responsible for searching
14  for documents in response to our document demands in
15  this litigation?
16       A   There were lots of us that were searching.
17  There wasn't a person that was responsible for doing
18  that.  The dispatchers did it.  I did it.  The billing
19  people in the back room did it.  The receptionist at
20  the front desk did it.  We spent hours and hours and
21  hours.
22       Q   Do you know if anybody searched your e-mail
23  servers for documents in response to our demands?
24       A   My e-mail server?
25       Q   Yes.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6932

148

MAHLON RICHARDS -- Atty. Henry

1
2       A   No.
3       Q   No you don't know or no they didn't search?
4       A   No, my e-mail servers -- my e-mail wouldn't
5  go back to that period of time.
6       Q   I'm asking if anybody looked on your e-mail
7  servers for documents in response to our discovery
8  demands in this case.
9       A   I think I would have gone through some of the
10  old e-mails, but I generally delete them after they
11  don't apply.
12       Q   All I'm asking is if you've looked.
13       A   Yes.
14       Q   Do you know for a fact that you've looked for
15  e-mails?
16       A   I know for a fact that I looked, yes.  And I
17  know that -- I remember that the dispatchers saying
18  that they looked but their comment was that they
19  always delete their stuff.  I guess you get too much
20  stuff and you just get rid of it when it doesn't
21  apply.
22       Q   Do you know how far back your e-mails go?
23       A   Mine --
24       Q   I mean your --
25       A   -- mine probably go back to last year.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6932

149

MAHLON RICHARDS -- Atty. Henry

2  Q   Does Richmor have any document retention

3  policy?

4  A   Yes.

5  Q   And what is that policy?

6  A   I believe we have to retain our -- most of

7  our documents for seven years.

8  Q   And that's --

9  A   After the seven years, we try to clean stuff

10  out.

11  Q   That's under the FAA regulations or --

12  A   I'm thinking the government, the IRS, maybe.

13  Q   The IRS.  Okay.

14  A   As far as the FAA regulations, I think we're

15  required to keep our log books, aircraft log books and

16  entries there.  I don't know as far as the work order.

17  Of course, that would be an IRS requirement, so I

18  would say seven years.

19  Q   Do you know how long the FAA requires you to

20  keep the flight records?

21  A   I don't know.

22  Q   How about the maintenance records?

23  A   Well, the maintenance records are permanent.

24  They go with the aircraft.  So, all of the maintenance

25  books and records on a particular airplane, when it's

150

MAHLON RICHARDS -- Atty. Henry

2  sold or goes to another operator, are loaded into the

3  airplane and flown with the airplane to the other

4  operator.

5  Q   From the beginning of the aircraft's

6  existence through its life?

7  A   Through delivery, yeah.

8  Q   Are those all paper documents?

9  A   Yeah, boxes and boxes and boxes.

10  MR. HENRY:  If we can take a break for

11  about five minutes.  I just want to look at my notes.

12  (A brief recess occurred.)

13  BY MR. HENRY:

14  Q   Sir, are you familiar with Richmor's computer

15  system on which it tracks charter flights?

16  A   Yes, a little bit.

17  Q   Is there a name for that system?

18  A   FlightPak.

19  Q   FlightPak?

20  A   FlightPak.

21  Q   Are you familiar with an abbreviation used on

22  that system for GTD?

23  A   No.  GTD?

24  Q   GTD.

25  A   No.

151

MAHLON RICHARDS -- Atty. Henry

2  Q   Is there any code on that system for

3  guaranteed hours?

4  A   Oh.

5  MR. RYAN:  Objection.

6  Q   If you know?

7  A   I don't know.

8  Q   Who at Richmor operates or maintains that

9  system?

10  A   The people in dispatch are normally the

11  people that put the information into the system.

12  Q   Who are those people?

13  A   Teri Riegel and Malia Keeler, Sharon Marks.

14  Q   Are any of those people related to you?

15  A   Sharon is my daughter.

16  Q   How about Teri and Malia, have they been with

17  Richmor for a long period of time?

18  A   Forever.  Malia was fifteen when she started.

19  Q   So is it fair to say that both of them would

20  have been at Richmor back in the 2002-2005 time frame?

21  A   Yes, yes.

22  Q   One final question:  Do you know how much

23  Richmor expended in attorney's fees on the State Court

24  litigation against SportsFlight?

25  A   I think it was around 100,000.

152

MAHLON RICHARDS -- Atty. Henry

2  Q   Do you have documents that would show how

3  much was actually spent?

4  MR. QUINN:  Off the record.

5  (Discussion off the record)

6  MR. HENRY:  I have no further questions.

7  MR. RYAN:  We have a few follow-up.

8  (Deposition Exhibits Numbers 18 through

9  21 were marked for identification, this date.)

10  BY MR. RYAN:

11  Q   Mahlon, I'm going to show you what's been

12  marked as Exhibit Number 18.  Can you take a look at

13  that.

14  (The document was handed to the witness,

15  and the witness examined the document.)

16  A   Okay.

17  Q   Can you identify Exhibit 18 for the record,

18  please?

19  A   These are end of the month documentation and

20  bills showing what happened with the aircraft during

21  that particular month.

22  Q   To whom is the invoice addressed?

23  A   Mr. Phillip Morse, Assembly Point Aviation.

24  Q   And does is pertain to a particular aircraft?

25  A   Yes, it pertains to 227 Sierra Victor.

153

MAHLON RICHARDS -- Atty. Ryan

1
2     Q    Is that a Gulfstream IV?
3     A    Yes, it is.
4     Q    And the billing period is what?
5     A    Well, the first bill here is May 31st of '02,
6  and if they're in sequence, the last one is January --
7  December of '05.
8          MR. HENRY:  I'm going to interpose an
9  objection:  I think this is nothing that I inquired
10 about during the course of my examination.  You're
11 entitled to ask him clarification questions about my
12 examination but not to obtain his direct testimony on
13 my deposition.
14         MR. RYAN:  Well, like you said, it's the
15 federal rules and it's pretty much free exchange of
16 discovery.  I only have a few questions.
17         MR. HENRY:  Sure.  Then I'll let you
18 proceed over my objection.
19    Q    What information is contained on Exhibit 18?
20    A    It shows the utilization of the aircraft, all
21 expenses that were paid during the particular month on
22 the aircraft, and revenue for the aircraft.
23    Q    And the total due, there's a total due entry
24 at the bottom?
25    A    Yes.

154

MAHLON RICHARDS -- Atty. Ryan

1
2     Q    And that's due who?
3     A    If it's a positive, it's due Richmor
4  Aviation.  If it's a credit, it's due Assembly Point
5  Aviation.
6     Q    Now, with regard to Exhibit 19, can you
7  identify that?
8          (The document was handed to the witness,
9  and the witness examined the document.)
10    A    At the end of the year, our auditor selects
11 some clients to verify what the accounts receivable is
12 from that particular client, requesting that they
13 agree or disagree and send the agreement or
14 disagreement or comments back to the accountant.
15    Q    And Exhibit 19, if I'm correct, contains four
16 pages; am I right?
17    A    Yes.
18    Q    And to whom was this -- well, there's four
19 letters of four different dates; am I correct?
20    A    Yes.
21    Q    And to whom were the four letters sent?
22    A    Assembly Point Aviation.
23    Q    What is the date of each letter?
24    A    January 4, 2012; December 27, 2010;
25 December 30, 2009; January 14, 2008.

155

MAHLON RICHARDS -- Atty. Ryan

1
2     Q    And who was Cathy Gilmour, do you know?
3     A    I believe she's the lady in Massachusetts
4  that we send the bills to.
5     Q    Were they acknowledged?
6     A    These were acknowledged, yes.
7     Q    By whom?
8     A    By Cathy Gilmour.
9     Q    Is Ms. Gilmour an employee of Assembly Point,
10 do you know?
11    A    Three were acknowledged by Cathy Gilmour, one
12 was acknowledged by Sarah, which was a lady that was
13 there, I think, prior to Cathy.  And, I'm sorry, what
14 was the next question?
15    Q    What does the signature mean?
16    A    It means that they agree with the amount --
17         MR. HENRY:  Object to the form, but you
18 can go ahead and you can answer.
19    A    -- the amount we say they owe us at that
20 particular time.
21    Q    Now, we've had marked Exhibits 20 and 21.  I
22 just want to make sure that I have them correctly.
23         (The documents was handed to the
24 witness, and the witness examined the documents.)
25    Q    One other question on 19:  James Valachovic,

156

MAHLON RICHARDS -- Atty. Ryan

1  is he still --
2
3     A    He's our chief financial officer who actually
4  sends the letter out.
5     Q    Is he still employed by Richmor?
6     A    Yes.
7     Q    How long has he been an employee there?
8     A    I would guess 25 years.
9     Q    We had two exhibits marked 20 and 21.  Why
10 don't we start with 20.  Can you identify Exhibit 20
11 for us?
12    A    It shows the -- when the aircraft -- when the
13 Assembly Point aircraft was used, in the first page
14 and a half, by Assembly Point Aviation.  So it shows
15 166 days during this period of time that it was used
16 by Assembly Point Aviation.
17    Q    Who prepared this two-page document?
18    A    I got the information and one of my people
19 typed it up.
20    Q    What's the significance, if any, to the
21 166 days on the second page?
22    A    Well, that's 166 days that the airplane was
23 not available to support the SportsFlight contract.
24    Q    On the bottom of that is charter trips?
25    A    That's 26 days, which again, where the

157

```
 1              MAHLON RICHARDS -- Atty. Ryan
 2   airplane was doing something other than standing by
 3   for SportsFlight.
 4       Q    Now Exhibit 21, what is that?
 5       A    These are the days that the aircraft was out
 6   of service for maintenance, so it's 104 days where the
 7   airplane was getting maintenance done to it.
 8       Q    What is the significance, if any, to the
 9   104 days?
10       A    Well, it's not available to fly if it's torn
11   apart for maintenance.
12       Q    Same question with regard to Exhibit 20 with
13   respect to the charter trips of 26:  What is the
14   significance, if any, of that?
15       A    It wouldn't be available to support the
16   SportsFlight activity.
17       Q    Now we also had marked here as one of Mr.
18   Henry's exhibits -- if I can find it.
19              MR. RYAN:  We had this marked today,
20   right?
21              MR. QUINN:  No, that was marked at
22   Cynthia's deposition.
23       Q    Today we had marked Plaintiff's Exhibit
24   Number 3 for identification, and you recall that you
25   were asked questions by Mr. Henry about the aircraft
```

158

```
 1              MAHLON RICHARDS -- Atty. Ryan
 2   lease agreement; am I correct?
 3       A    Yes.
 4       Q    You were asked about certain sections within
 5   the agreement, and I'm calling your attention to
 6   Section 2.2(c) where it reads, "Minimum usage by Air
 7   Services Provider."
 8            Did I read that correctly?
 9       A    Yes.
10       Q    The air services provider is Richmor Aviation
11   according to the terms of Exhibit 3; am I correct?
12       A    Yes.
13       Q    For the record, "Nothing contained herein
14   shall obligate Air Services Provider to any minimum
15   usage of the Aircraft, it being understood and agreed
16   that Air Services Provider's usage shall be on an "as-
17   needed" and "as-available" basis;".
18            Did I read that correctly?
19       A    Yes.
20       Q    What, if anything, is the significance of
21   that language?
22       A    That we're not required to fly the airplane a
23   certain number of hours, and that we shall use it on
24   an as-needed, as-available basis, so we can use it if
25   we need it, if it's available, but we're not required
```

159

```
 1              MAHLON RICHARDS -- Atty. Ryan
 2   to fly it a certain number of hours.
 3              MR. RYAN:  I'm just going to take a
 4   minute.
 5            (A brief recess occurred.)
 6              MR. RYAN:  I just have a few more.
 7   BY MR. RYAN:
 8       Q    Let's just deal with the first page of number
 9   18.  That's an invoice for the period dated May 31,
10   2002; am I correct?
11       A    Yes.
12       Q    All right.  And there are entries that start
13   with aircraft wash and clean and end with wireless
14   communication; am I correct?
15       A    Yes.
16       Q    Now, in between those there were several
17   entries.  What are they?
18       A    Well, the next one is the crew cost, would be
19   the salary, benefits, and the administration fee for
20   the crew that was assigned to the airplane.  In this
21   case, I believe it's three pilots.  The current
22   month's trip expenses would be the trip expenses
23   associated with Assembly Point Aviation's use of the
24   airplane, I believe.  Federal excise tax credit, when
25   you charter an airplane, you pay a tax on the charter
```

160

```
 1              MAHLON RICHARDS -- Atty. Ryan
 2   rate, so you are reimbursed for part of the federal
 3   excise tax on the fuel that you purchase.
 4            Flight attendant fees would be a flight
 5   attendant that we used on one of the flights.  Flight
 6   phone, for flight services.  Flight safety would be
 7   for training.  Hangar rent would be for hangaring the
 8   aircraft.  Insurance surcharge, at one point the
 9   insurance bills were quite high, so we tried to get
10   some of it back by an insurance surcharge to the
11   charter customer.
12            Maintenance would be work that we did on the
13   aircraft.  Management fee is our fee for managing the
14   whole process of taking care of the aircraft.
15   Miscellaneous aircraft supplies, the miscellaneous
16   expenses are -- are expenses that we pay during the
17   month and are passing along to the owner of the
18   aircraft.  On the road fuel would be fuel that we
19   purchased while we were flying the airplane on a
20   particular trip.
21            Prior month's trip expense would be an
22   expense that Assembly Point Aviation had on one of
23   their trips where the bill came in later on.  The
24   revenue would have been the revenue for hours that we
25   flew on the airplane.  Richmor fuel is fuel that we
```

161

MAHLON RICHARDS -- Atty. Ryan

1

2　put into the airplane at one of our home bases.  Trade

3　hour would be a charge for time that was used on our

4　other airplanes, and then the wireless communications

5　is for phone charges, probably aircraft phone charges

6　or cell phone phone charges.

7　　Q    Now I note in the final column -- there's a

8　column to the far right on Exhibit 18; am I correct?

9　　A    To the right, yes.

10　　Q    Yes, and some of them have -- they're all

11　numbers; am I correct?

12　　　　Right here (indicating).

13　　A    Yes.  They all have amounts, yep.

14　　Q    All right.  And some amounts have parentheses

15　around them.  What does that mean?

16　　A    Those are credits.

17　　Q    Credits to whom?

18　　A    Credits to Assembly Point Aviation.

19　　Q    What is the significance of the credits?

20　　A    It would be money that we were paying them

21　for the -- for flying their airplane or for excise tax

22　that we were going to get back later on.  We credit

23　them to them each month, although we don't get it back

24　until later on.  The insurance surcharge, as I say, we

25　would charge the charter customer an hourly insurance

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

---

162

MAHLON RICHARDS -- Atty. Ryan

1

2　rate and we would pay that back to Assembly Point, and

3　then the revenue would be the revenue for the flight

4　hours that we flew.

5　　Q    What is the significance of a deposit of

6　$27,906.77 at the bottom?

7　　A    Oh, that's the amount -- after you add up and

8　subtract all these figures, that's the amount that is

9　due to Richmor from Assembly Point.  It's the

10　difference between the debits and the credits.

11　　Q    And I note on the third page that's a credit

12　due Assembly Point; am I correct?

13　　A    Yes.

14　　Q    For $23,063.05?

15　　A    Yes.

16　　Q    Okay.  Now, on your direct examination you

17　were asked some questions about the crew.  Can you

18　explain, just for the record, what crew costs are?

19　　A    Crew costs that we bill the customer is for

20　the crew's salary, for their benefits, and for the

21　administration cost.

22　　Q    For the period of time in question here, were

23　there crew costs for which Richmor did not seek

24　reimbursement from Assembly Point?

25　　　　MR. HENRY:  Object to the form.  If you

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

---

163

MAHLON RICHARDS -- Atty. Ryan

1

2　can tell me what time period you're asking.

3　　Q    From 2002 through and including 2005.

4　　A    Okay.

5　　Q    Were there crew costs for which Richmor did

6　not seek reimbursement from Assembly Point?

7　　A    Yes.

8　　Q    Explain how that came about.

9　　A    Well, there would be a lot of different

10　scenarios.  Let's say that we had a mission for

11　SportsFlight to go fly wherever and it required three

12　crew members.  We'd send the airplane out with those

13　crew members, and sometimes the airplane would come

14　back after a long hard flight for many days and the

15　next day the owner would want to use the airplane.  We

16　were not able to use the same pilots for that next

17　activity, so we would just take some pilots from our

18　pool of pilots and fly the flight.

19　　　　I don't believe we charged for any of those.

20　I believe the only charges that we made for other

21　pilots would be if one of those pilots we had to rent

22　from the outside, we might pass that charge along.

23　Other times, the requirement of the SportsFlight

24　contract was that we had to have people on call

25　24 hours a day seven days a week.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

---

164

MAHLON RICHARDS -- Atty. Ryan

1

2　We tried to use the Assembly Point Aviation

3　aircraft just as much as we possibly could.  You can't

4　have pilots on call 24 hours a day and still be able

5　to go out and fly these missions at any point in time

6　with a crew that's been on call.  So as I mentioned

7　previously, during the course of this contract, we

8　used nineteen different pilots on this airplane.  We

9　certainly didn't come close to collecting the time

10　that was devoted by crew members.

11　　　　MR. RYAN:  Thank you.  I don't have

12　anything else.

13　　　　MR. HENRY:  I have a couple of follow-up.

14　BY MR. HENRY:

15　　Q    Do you have the Exhibit 18 in front of you,

16　which is the invoices that you were just testifying

17　about?

18　　A    Yes.

19　　Q    The tail number that's indicated on the first

20　page, what's the tail number there?

21　　A    227 Sierra Victor.

22　　Q    Was that the tail number in May of 2002?

23　　A    I don't know.  I assume.

24　　Q    That was not the tail number in May of 2002,

25　correct?

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

165

MAHLON RICHARDS -- Atty. Henry

A   No, I don't -- I don't know when it was
changed.  You mean from 85 Victor Mike to 227 Sierra
Victor?

Q   That's correct.

A   Yeah.

Q   That's the incorrect tail number?

A   Yes.

Q   In May of 2002, would Richmor have had any
way of knowing if the tail number was changed what it
would be?

A   No.

Q   So, was this document created in 2002?

A   This document was created in 2002, yes.

Q   And so the tail number, Richmor knew when it
created this document what the tail number was going
to be?

A   No.  We were asked to go back and find
whatever information that we could find on the
operation of the airplane.

Q   Okay.

A   I'm not a bookkeeper.  I don't work in the
back, so I don't know for sure, but I know that the
information, the paper information I believe, had been
discarded because of the time period.  I think what

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

166

MAHLON RICHARDS -- Atty. Henry

Kathy did was go back into the computer and pull out
the monthly invoices.  I'd have to go back to her and
find out.

Q   Who is Cathy?

A   Cathy is a lady.

Q   What's her last name?

MR. QUINN:  Gallo.

A   Gallo.  I'm sorry.  She's been with us a long
time too.

Q   Do you have Exhibit Number 3 in front of you,
which was the lease agreement?  I have the wrong
exhibit.  It's the aircraft pilot and maintenance
agreement.

The rate for the flight crew under Assembly
Point's pilot and maintenance agreement was $29,815
per month; is that correct?

A   Yes.

Q   These invoices reflect that more than that
amount was charged to Assembly Point.  For example, if
you look at an invoice dated February 17th, 2005,
which is Defendant's 18579 on the bottom --

A   What was it?

MR. RYAN:  18579.

Q   18579.

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

167

MAHLON RICHARDS -- Atty. Henry

MR. RYAN:  Right, John?

MR. HENRY:  That's correct.

A   Okay.

Q   That's different than the rate that's
specified in the pilot and maintenance agreement,
correct?

A   Yes, it is; that's correct.

Q   Was there a written agreement increasing that
rate?

A   Other than the bill, I would say no.

Q   You charged that additional rate and Assembly
Point paid it, correct?

A   Yes, they did.

Q   The same for the hangar rent:  The rent under
the maintenance and pilot agreement was $4,200 per
month, correct?

A   Correct.

Q   And these invoices reflect that that rent
went up to $7,000 per month?

A   Correct.

MR. RYAN:  Well, where is that?

Q   For example, Defendant's 18581, which is an
invoice dated April 20th, 2005; is that correct?

A   That's correct.  That's after they requested

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

168

MAHLON RICHARDS -- Atty. Henry

that the aircraft be moved out of the state.

Q   Was there a written agreement amending the
pilot and maintenance agreement to provide for that
increased rent?

A   Just the bill.

Q   Just the bill which Assembly Point paid?

A   Which they agreed to and paid, yes.

Q   All right.  Do you have Exhibit Number 19 in
front of you, which was the one that your counsel had
just asked you some questions about.

These are the audit documents that you were
testifying about where Richmor would send information
to Assembly Point, information for verification of
amounts owed; is that correct?

A   That's correct.

Q   The latest one of these is January 4, 2012,
correct?

A   Yes.

Q   At that point, had Richmor received any
settlement funds from SportsFlight Air?

A   No, no.

Q   You were asked some questions about Exhibits
Numbers 20 and 21.  Who prepared Exhibit Number 20?

A   I determined the days and the typing was done

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

169

MAHLON RICHARDS -- Atty. Henry

1  by somebody else.

3  Q   When did you do that?

4  A   Sometime after this proceeding.  I don't know
5  what the date is.

6  Q   It was sometime after this litigation, this
7  litigation meaning Assembly Point's litigation --

8  A   Yes.

9  Q   -- was commenced against Richmor?

10 A   Yes.

11 Q   Was that at direction of your counsel,
12 without getting into the details of any conversations?

13 A   No.

14 Q   Was this prepared in order to respond to the
15 allegations made in this lawsuit?

16 A   It was mostly prepared for my benefit.  As I
17 got into this activity, I wondered myself what we had
18 done with the aircraft during that period of time,
19 because I know that there was many, many flights by
20 Mr. Morse, and I just wanted to see for my own benefit
21 how many days the airplane wasn't available.

22 Q   So this document was prepared at least in
23 2013 or later, because that's after the lawsuit was
24 commenced, is that fair to say?

25 A   That's fair to say.

170

MAHLON RICHARDS -- Atty. Henry

2  Q   And it reflects transactions that took place
3  eleven years or so earlier starting in 2002?

4  A   Well, the dates are 2002 through 2005.

5  Q   So it obviously wasn't prepared in 2002 to
6  2005, the document itself?

7  A   This document itself?

8  Q   Yes.

9  A   No, the material that I got it from was
10 prepared as it happened.

11 Q   What did you use to determine the number of
12 days, what records?

13 A   I used the flight record information.  What
14 it is, when we do a flight, we keep -- the pilots are
15 required to keep track of it on their flight log.  At
16 the end of the flight, they turn that flight log in to
17 billing and operations.  The lady in operations is
18 required to put the information into the part of
19 FlightPak that's called postflight.  There's a
20 preflight and there's a postflight.

21 They don't -- they aren't always the same
22 because customers change their minds.  So she puts it
23 into postflight and then it's retained.  If you want
24 to go back and see what happened on the airplane, you
25 can just go into postflight and it will show you.

171

MAHLON RICHARDS -- Atty. Henry

2  That's where I got the information from.

3  Q   What did you physically do to compile the
4  number of days?  Did you look in the computer system?
5  Did you look on paper records?

6  A   I printed it out and I looked at the paper.
7  It was too hard for me to take it off the screen, so I
8  printed out this period of time, which I think is an
9  exhibit, I think, and I went by -- I mean, it tells
10 everything that happened with the airplane, what day
11 and when they took off from where and where they went.

12 Q   Okay.  And similar questions for Exhibit
13 Number 21.  It says maintenance date and number of
14 days.  Is this also a document that you prepared after
15 this litigation was commenced?

16 A   Yes.

17 Q   What did you look at to compile this
18 information?

19 A   The same, the documents that I looked at to
20 prepare the Exhibit 20.

21 Q   So those documents would also show when the
22 plane was in for maintenance?

23 A   Yes, because everybody that's scheduling or
24 doing something with the aircraft needs to know what's
25 going to happen with it and when it's needed for a

172

MAHLON RICHARDS -- Atty. Henry

2  certain thing.  We can't schedule maintenance on the
3  airplane and then find out that dispatch scheduled a
4  flight on it.

5  Q   Is there some sort of code that indicates
6  maintenance for the day, that it's in maintenance for
7  the day?

8  A   I think it says M something.  I don't know
9  what it...

10 Q   Well, when you prepared this sheet, did you
11 know?

12 A   That's why I say I think it says.  I don't
13 know if it's M-T something or M-A-I-N, but it
14 indicates that the aircraft is in maintenance.  I
15 could look at one of the things and show you.

16 Q   You were asked some questions about pilot
17 charges.  Is it fair to say that the pilots that were
18 assigned to this aircraft and paid for by Assembly
19 Point flew flights for SportsFlight?

20 A   They did fly flights for SportsFlight, yes.

21 Q   Was that the majority of the pilots?  The
22 majority of the pilot time, was that flown by the
23 pilots assigned to this aircraft?

24 A   I can't answer that without looking at the
25 postflight.

173

MAHLON RICHARDS -- Atty. Henry

Q   Now, did you do that, you looked at the
documents in order to compile Exhibits 20 and 21 --

A   Yes.

Q   -- but you haven't looked at whose pilots
actually flew the planes?

A   Not at relation to what particular flight was
flown by what particular crew, no.

Q   Is there any preference in the aviation world
to have the pilots who are assigned to an aircraft be
the first or the primary pilots to do the flights?

A   They would normally do the -- if they're
assigned to the aircraft, they would normally fly the
aircraft if they were available.

Q   Okay.  Fair enough.  The maintenance days
that are reflected on your Exhibit Number 21, how did
those maintenance days compare to any other G-IV, was
that a high level of maintenance days, a low level?

MR. RYAN:  Based upon his experience or
on the time frame indicated here or --

MR. HENRY:  Sure.

MR. RYAN:  Okay.  Let's start with the
time frame here.  Do you know?

A   Typically we try to accumulate inspections on
an airplane so we don't have to take it down a lot of

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

---

174

MAHLON RICHARDS -- Atty. Henry

times.  So normally, once a year, we take an airplane
down for three to five weeks and try to get as much
done as we can so that the rest of the time it's not
out of service for a long period of time and it's more
available.  So I would think based on 2003, 2004 the
30 days and the 24 days are very, very -- probably
less than what you would see on some airplanes.

Q   When Richmor entered into the contract with
SportsFlight, you would have had some anticipation
that this plane wasn't going to be available due to
maintenance issues for certain periods of time; is
that correct?

A   That's correct.  That's correct, and that's
why we knew, right from the beginning, that we were
going to need to use other aircraft.

Q   But, again, when those other aircraft were
used, SportsFlight actually paid for those hours?

A   Yes, they did.

MR. HENRY:  I have nothing further.

MR. RYAN:  Nor do we.

(Whereupon, at 2:39 p.m. the examination
of Mahlon Richards in the above-entitled matter was
concluded.)

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

---

175

STATE OF NEW YORK

SS:

COUNTY OF

I, MAHLON RICHARDS, having been duly sworn,
do hereby certify that the foregoing typewritten
transcript of my testimony, with corrections, if any,
constitutes a true, full and accurate transcript of
the testimony given by me in the above-entitled
action.

MAHLON RICHARDS

Sworn to before me this 9th
day of April, 2014.

NOTARY PUBLIC

My Commission Expires
SHARON R. RICHARDS
Notary Public
State of New York, Reg.#01RI4533896
Qualified in Columbia County
My Commission Expires July 25, 2015

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

---

176

C E R T I F I C A T I O N

I, LAUREL STEPHENSON, a Court Reporter and
Notary Public in and for the State of New York, do
hereby certify that the foregoing record taken by me
at the time and place as noted in the heading hereof
is a true and accurate transcript of same, to the best
of my ability and belief.

Laurel Stephenson

Date:  MAR 1 1 2014

** PLEASE NOTE:  This transcript is not to be
distributed to any third-party.  You may copy it or
send it internally within your own offices and
branches.  Notify this office first if you need to
distribute or copy any portion of it for any other
purposes.

Martin Deposition Services, Inc.
Malta Commons Business Park
100 Saratoga Village Boulevard
Building 37, Suite 37C
Malta, New York 12020
Phone: (518) 587-6832
Toll free: (800) 587-6832
Fax: (518) 587-1539
Website:  Www.martindepo.com

LAUREL STEPHENSON
Martin Deposition Services, Inc.
(518) 587 - 6832

### ERRATA SHEET

Please note any error and/or corrections thereof on this sheet. The rules require a reason for any change or correction. It may be general; such as, "to correct stenographic error," or "to clarify the record," or "to conform with the facts."

CASE: Assembly Point Aviation, Inc. v Richmor Aviation, Inc. (Case No.: 1:13-cv-0298)

DEPOSITION OF: MAHLON RICHARDS          DATE OF DEPOSITION: 2-27-2014

I, Mahlon Richards, do hereby certify that the following corrections and additions are true and accurate to the best of my knowledge and belief.

| PAGE | LINE | CORRECTION | REASON FOR CHANGE |
|---|---|---|---|
| 19 | 22 | Add "generally" between "is" and "the" | To clarify the record. |
| 20 | 5 | Add "in terms of general structure" after "It's" | To clarify the record. |
| 20 | 8 | Add at end: ", but Assembly Point reviewed it, had attorneys, and had an opportunity to make objections and changes" | To clarify the record. |
| 20 | 16 | Add "generally" after "Yes" | To clarify the record. |
| 21 | 23 | Add "Not sure what you mean regarding charters. Yes, generally for expenses, to the extent Assembly Point was billed and paid for any of them" | To clarify the record. |
| 22 | 2 | Add ", generally, to the extent Assembly Point was billed and paid for any of them" after "Yes " | To clarify the record. |
| 22 | 4 | Add ", generally, to the extent Assembly Point was billed and paid for any of it" after "Yes " | To clarify the record. |
| 22 | 6 | Add ", generally, to the extent Assembly Point was billed and paid for any of it" after "Yes " | To clarify the record. |
| 23 | 3 | Add ", generally, to the extent Assembly Point was billed and paid for any of it" after "Yes " | To clarify the record. |
| 23 | 5 | Add ", generally, to the extent Assembly Point was billed and paid for any of them" after "Yes " | To clarify the record. |
| 23 | 8 | Add ", generally, to the extent Assembly Point was billed and paid for any of it" after "Yes " | To clarify the record. |
| 23 | 18 | Add at end: "or a customer, generally speaking" | To clarify the record. |
| 23 | 21 | Add at end: ", if Assembly Point was billed for them.  In addition, customers also paid expenses." | To clarify the record. |
| 23 | 23 | Add ",although I would have to review the records to answer this question" after "paid" | To clarify the record. |

| 24 | 19 | Add "generally" before "passed" | To clarify the record. |
| 26 | 8 | Add ", to the extent they were billed and paid for any of them" after "yes" | To clarify the record. |
| 27 | 6 | Add ", generally, to the extent they were billed and paid for any of them" after "Yes" | To clarify the record. |
| 27 | 11 | Add "Although I would have to check the records, generally" before "The arrangement" | To clarify the record. |
| 29 | 8 | Add at end: "regarding the second question.  There were written invoices paid by Assembly Point that reflect changes agreed to by the parties" | To clarify the record. |
| 30 | 5 | Add at end: "although there were written invoices paid by Assembly Point that reflect changes agreed to by the parties" | To clarify the record. |
| 30 | 7 | Add at end: "and through the submission of invoices paid by Assembly Point" | To clarify the record. |
| 31 | 25 | Add ", although the parties appear to have changed the standard terms" after "Yes" | To clarify the record. |
| 33 | 8 | Add at end: ", it is possible, but I would need to review the records to respond." | To clarify the record. |
| 38 | 11 | Add ", you could say that Richmor received money from Sportsflight, although it was not for this airplane not flying.  It was for Richmor's lawsuit and for Sportsflight not flying enough hours in Richmor's fleet of Gulfstreams, among other things." | To clarify the record. |
| 39 | 6 | Add ", possibly, I assume" | To clarify the record. |
| 39 | 10 | Add "as to the general form" after "correct" | To clarify the record. |
| 39 | 14 | Add ", as to the general form, I assume" after "Yes" | To clarify the record. |
| 40 | 5 | Add ", in general" after "Yes" | To clarify the record. |
| 47 | 7 | Add ", although I direct you to the account statements between the parties for whatever period of time you are referring to" after "No" | To clarify the record. |
| 50 | 16 | Add at end: ", I don't think so, not to merely charter in general, although the invoice packets and accountings reflected the parties' terms and bargain." | To clarify the record. |
| 50 | 25 | Add after "no" ", although Assembly Point would have provided invoice packets and paid bills, and Richmor would have required written consent to obligate Richmor to pay for any hours not flown, to share settlement proceeds, or to otherwise modify the material terms of the parties' bargain in the manner suggested by Assembly Point in this action" | To clarify the record. |

| 61 | 21 | Add at end: "because we had to be available 24/7, not to accommodate Assembly Point as you suggest." | To clarify the record. |
| 62 | 2 | Add at end: "The government required transportation 24/7.  Assembly Point had the opportunity to receive payment for only the actual hours flown." | To clarify the record. |
| 62 | 14 | Add at end: "and no.  The initial written contract was a charter for N85VM, any substantially similar aircraft, and any suitable backup aircraft.  Sportsflight and Richmor further used additional aircraft after the initial written contract and agreed upon different rates for such aircraft." | To clarify the record. |
| 62 | 16 | Add at end: ", but only the N85VM.  Assembly Point did not own any of the other aircraft used to fly the missions." | To clarify the record. |
| 62 | 23 | Change "our" to "Richmor's" and "Assembly Point" to "Sportsflight" | To clarify the record. |
| 63 | 2 | Add after "Air": "The contract for the 50 hours per month was between Richmor and Sportsflight.  Assembly Point was not a party to the Richmor-Sportsflight contract" | To clarify the record. |
| 64 | 16 | Add at end: "There were also no 'hours not flown on the aircraft.'  Assembly Point did not receive a guarantee for any minimum usage of its airplane." | To clarify the record. |
| 64 | 21 | Add at end: "guarantee Richmor (not Assembly Point) a minimum number of hours of flight time" | To clarify the record. |
| 65 | 9 | Add ", and we used other aircraft as discussed at trial during the state court proceedings" after "airplanes" | To clarify the record. |
| 69 | 24 | Add at end: "there was oral consent, although I direct you to the account statements between the parties for whatever period of time you are referring to." | To clarify the record. |
| 75 | 6 | Add ", and you should review the record on appeal and our discovery materials provided to date" after "Okay" | To clarify the record. |
| 85 | 12 | Change "Yes" to: "You are correct in saying that the cover letter references Assembly Point's airplane, but this was not a bill for unused hours on Assembly Point's airplane in the way you suggest.  The bill was for the unused hours on the Sportsflight contract to which other airplanes were used and Assembly Point was not a party." | To clarify the record, to conform to the facts, and to prevent opposing counsel from taking my words out of context. |
| 89 | 10 | Add at end of the sentence ", as well as other airplanes." | To clarify the record. |
| 89 | 13 | Add at end of the sentence ", as well as other airplanes." | To clarify the record. |
| 94 | 10 | Add at end: "Actually, no, we were suing on the Sportsflight contract.  The invoice was attached as part of the account stated claim we didn't recover on." | To clarify the record. |

| 107 | 6 | Add at end of sentence: ", and also through performance and invoicing, with whatever modifications that went along with it." | To clarify the record. |
| 109 | 5 | Add at end: "although you are not correct in suggested that Assembly Point's airplane was a material term of this contract and that only its airplane could be used or not used." | To clarify the record. |
| 112 | 19 | Add at end of sentence ", although I would direct you to the state court decisions on that issue" | To clarify the record. |
| 112 | 21 | Add at end of sentence "and through performance and invoicing" | To clarify the record. |
| 112 | 24 | Add at end of sentence ", although I am not saying that all of the terms from the written contract were the same" | To clarify the record. |
| 113 | 5 | Add ", meaning those limited transcript lines that you were referring to" after "there" | To clarify the record. |
| 113 | 11 | Add at the end of the sentence: ", as well as through performance and invoicing" | To clarify the record. |
| 127 | 7 | Add after "Well," "basically everything.  For example," | To clarify the record. |
| 134 | 15 | Add at end: ", but not sure" | To clarify the record. |
| 138 | 10 | Add at end ", I was thinking about paying the amount referenced in the subject email" | To clarify the record. |
| 139 | 22 | Add "and there is also the submission of invoices and payments of invoices by Assembly Point" | To clarify the record. |
| 140 | 3 | Add at end, "not for those items that our invoices referenced changes for, but yes absolutely I would have required a signed writing by Richmor if I thought Assembly Point wanted to recover 85% of Richmor's recovery from the state court action" | To clarify the record. |
| 159 | 2 | Add at end, "and we are not required to pay Assembly Point for any minimum number of hours. We are not guaranteeing Assembly Point any minimum revenue or flight time." | To clarify the record. |

<u>Additional Comments</u>:  Assembly Point has attempted to take my testimony and the state court documents out of context.  I disagree with Assembly Point's interpretation of my testimony and state court documents.  I do not agree to permit Assembly Point to use my testimony in the manner they have attempted to rely upon it.  For example, contrary to Assembly Point's assertion, the state court litigation and ultimate settlement between Richmor and Sportsflight was NOT explicitly limited in scope to payments earned on Assembly Point's aircraft, pursuant to the Sportsflight contract.

Date: 4/9/14                                  _Mahlon H. Richards_
                                                    Mahlon Richards

A STATE OF NEW YORK )
                                          )ss:
COUNTY OF Columbia )

On the 9th day of April , 2014, before me, the undersigned, a notary public in and for said state, personally appeared MAHLON RICHARDS, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                      _Sharyn R. Richards_
                                       Notary Public

                                SHARYN R. RICHARDS, NOTARY PUBLIC
                                State of New York, Reg. # 01HA4936905
                                Qualified in Columbia County
                                My Commission Expires July 25, 2014

s