EXHIBIT "E"

## VERIFICATION

STATE OF NEW YORK   )
                    - )ss.:
COUNTY OF Columbia  )

Mahlon W. Richards, being duly sworn, deposes and states that deponent is the President of Defendant Richmor Aviation, Inc.; that deponent has read the foregoing Supplemental Response to Plaintiff's First Set of Interrogatories and knows the contents thereof; that the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters deponent believes them to be true.

*[signature]*
Mahlon W. Richards

Sworn to and subscribed to before me this
9th day of April, 2014.

*[signature]*
Notary Public-State of New York

SHARYN R. RICHARDS, NOTARY PUBLIC
State of New York, Reg. # 01RI4938905
Qualified in Columbia County
My Commission Expires July 25, 2014

5

EXHIBIT "A"

EXHIBIT "A"

**Brief Summary of Some of the Basic Arguments**
(Assembly Point v Richmor)

I. **Background**

Richmor Aviation is an aircraft management and charter corporation. At the relevant time, Richmor employed over 100 employees and had an aircraft fleet of up to 25 to 30 airplanes, including a fleet of Gulfstreams. Assembly Point is the owner of a Gulfstream airplane, with unlimited resources and several affiliations.

The parties' relevant Lease Agreement prohibited any obligation on Richmor to pay for any minimum usage and limited payment to Assembly Point for only hours actually "flown" (Lease Sections 2.2[c] & 5.3; Lease, Sixth Whereas Clause; Management Agreement, Section 1.1 ["Flight Hour"]).

Even Assembly Point's President testified that the Lease was intended to apply to only hours that were actually flown on the aircraft (David Gilmour Testimony, at 11).

SFA: 2002 to 2005

In 2002, non-party Sportsflight Air ("SFA") informed Richmor that the U.S. Government desired to use a Gulfstream airplane for transportation. The Government, however, was unaware of when it may need to perform a trip and desired Richmor to be on call with an airplane and crew 24/7.

Based on the details, Richmor considered its Gulfstream airplanes as suitable for the trips. It further elected to provide Assembly Point with the opportunity to have its airplane fly some of the missions. Given the size of the ultimate consumer (i.e., the U.S. Government) and the potential sales volume, Richmor obtained Assembly Point's approval to provide SFA with a very minor $200 per hour discount off the general $5,100 hourly rate. SFA, in turn, intended to charge the U.S. Government around $5,400 per hour for the use of the airplane.

In the summer of 2002, Richmor and non-party SFA executed a written contract with Richmor ("SFA contract") to transport Government agents to the places that they wanted to go in the time they wanted to get there. The initial written contract guaranteed Richmor 250 flight hours for a six month term (May 6, 2002 to November 6, 2002), with an option to renew for 50 hours per month thereafter.

The tail number of Assembly Point's airplane was identified in the SFA contract. However, it did not identify Assembly Point's specific airplane as a material term, and there was nothing special about that particular Gulfstream (other than perhaps luxury accessories which were irrelevant for the purpose of the agreement). The SFA contract further expressly permitted the use of other suitable aircraft for the missions if the need arose, and nothing prohibited Richmor and SFA from agreeing to use other aircraft.

1

Assembly Point was not named as a party or even a third party beneficiary of the SFA contract. In fact, Assembly Point did not know the identity of the customer (SFA) or the SFA contract terms or even see the SFA contract until around 2009.

Richmor further denies making any oral promises to Assembly Point to guarantee it any minimum usage or minimum payment. This is consistent with the testimony of most of Assembly Point's witnesses, who could not recall any such promises being made. Assembly Point's President, in contrast, testified that he heard Richmor orally promise Assembly Point to provide it with 50 hours of flight time or approximately 85% of $250,000 in revenue per month. The alleged promise was made at some unknown times and in the presence of Assembly Point's CEO (who couldn't recall it). This alleged promise and several others allegedly heard by the President were neither contained in the complaint, nor reduced to any writing. The alleged promises were also not confirmed in any other deposition testimony.

Around the end of the six month term, Richmor prepared a written draft extension agreement expressly identifying other airplanes on the written proposal with set prices for them. Although that document was not executed, Richmor and SFA nonetheless orally agreed to renew their relationship on a monthly basis until January 2005, with a 50 hour per month guarantee promised to Richmor each month for the use of an airplane.

Unlike the initial six month period, other aircraft (Gulfstreams) were also used on the missions after November 6, 2002, generally at slightly lower rates than the rate charged for Assembly Point's aircraft. The use of the other aircraft was not insignificant. From December 8, 2002 to December 7, 2004, for example, at least approximately 20% of the missions (from the 2006 invoice) were flown on other aircraft, totaling at least $828,109 invoiced to Sportsflight.

During this time, Richmor also remained on call when Assembly Point's airplane was not available. The government also requested other airplanes for security reasons. Richmor also used 19 pilots for the missions, whereas only three of them had been assigned to Assembly Point's airplane.

From May 2002 to January 2005, Assembly Point did not inquire about the unused flight time or the number of hours being flown by the Government. Although Assembly Point attempts to dispute this, it relies upon its President's testimony about alleged undocumented oral conversations with Richmor's owner, Mahlon Richards (and no other witnesses) that do not appear anywhere in the complaint.

Assembly Point admittedly did not assign anyone to monitor the unused flight time or conduct any meetings about it. Assembly Point also neither asked to see a copy of the SFA contract, nor objected to the parties' detailed monthly accountings which did not reflect any credits for any unused flight hours.

2

In fact, Assembly Point admittedly destroyed critical documents provided to it by Richmor from 2002 to 2005, including (1) the parties' invoices, and (2) the back-up data and other materials provided to Assembly Point with the invoices. Incredibly, Assembly Point did not retain a single invoice or any other documents provided to it by Richmor from the relevant time period. It also did not keep track, maintain, or create any written documentation regarding the hours flown each month, the revenue received, and the amounts allegedly owed to it for the subject dispute.

Post-2005

In 2005 and 2006, Richmor billed SFA for the unused flight time and, when it refused to pay, commenced litigation in state court in 2007 (without any reference to Assembly Point in the pleadings).

Thereafter, Assembly Point lost revenue on the airplane from the financial crisis. In response, Cynthia Suprenant sought to increase the airplane's revenue stream. Cynthia was a highly successful and intelligent business woman with a recent law degree from Albany Law School in 2006.

In late 2008, Cynthia saw an opportunity to take advantage of Mahlon Richards (a high school graduate, without any college education or legal training similar to Cynthia's). At that time, Cynthia had learned that Richmor had commenced a lawsuit against SFA and that Assembly Point's aircraft had been used by SFA.

Cynthia immediately emailed Richmor for documents concerning the lawsuit and noted that she "assumed" that Richmor was seeking to obtain "part" of the money from the lawsuit for Assembly Point. In response to the email, Cynthia was _not_ told that Richmor was seeking any part for Assembly Point, let alone 85% of it. Instead, Richmor provided Cynthia with documents evidencing that other airplanes were used for the SFA contract.

Nonetheless, Cynthia alleges that she had a brief conversation in 2009 with Mahlon and that Mahlon said that Richmor sued on behalf of Assembly Point and promised to pay Assembly Point 85% of the judgment or settlement (neither of which were in existence or certain at the time). This would have directly contradicted the terms of the Lease, which prohibited any minimum hourly obligation on Richmor's part, required payment for only hours flown, and did not require Richmor to pay Assembly Point any share of interest recovered from customers. It also contradicts the Restatement (Second) of Contracts, which would have required a reduction of this alleged 85% amount by the costs (i.e., fuel and other substantial non-overhead expenses) that Assembly Point saved for not having to fly the hours.

The only written document provided to Richmor purportedly evidencing a discussion about SFA and the lawsuit was one sentence in an email from Cynthia stating: "I'm also happy to be a sounding board on _your_ litigation" (emphasis added). In fact, despite her years of legal training, Cynthia did not put the terms of the alleged agreement

3

in writing or request a signature, as required by the Lease and typically done by law school graduates. This alone constitutes evidence that no such promise or discussion occurred (see FRE 803 [7]). In fact, Cynthia admittedly neither reviewed the Lease at that time, nor even had a copy of it until 2013.

Mahlon denies making the alleged promises. Rather, Mahlon recalls saying that he would like to provide something to Assembly Point's owner based on negative publicity from the SFA trips. Mahlon neither said that he had a legal obligation to make any such provision, nor agreed to any specific amount. Rather, Mahlon wanted to see how much he could recover from SFA prior to determining how much he thought about providing to Assembly Point's owner. This is consistent with an Assembly Point internal email from its President, explaining that Richmor recovering in the state court litigation and passing it on to Assembly Point was his "dream."

Further, Cynthia waited to inform Richmor in writing about the alleged promises until 2013, only after Assembly elected to leave Richmor for other financial opportunities. In the 2013 communications, Cynthia (for the first time) attempted to accuse Mahlon of admitting that Richmor sued on behalf of Assembly Point and owed 85% of the settlement funds to Assembly Point.

Mahlon responded by way of telephone and email by disagreeing that he had made any such promises or had any legal obligation to pay. Mahlon also confirmed his desire to provide a "gift" (or non-legal obligation) of a much smaller sum based on the negative publicity. In both communications, Mahlon noted that other airplanes had been used.

## II. Liability

### That Portion of the Claim Seeking Millions of Dollars is Time Barred

Assembly Point asserts that Richmor owes it millions of dollars for unused flight time from 2002 to 2005. For example, Assembly Point asserts that Richmor improperly billed SFA in 2005 and 2006 and assumed the risk of non-payment. These assertions, however, were indisputably not raised until 2013, more than six years after the alleged breach. As such, they are barred based on the six year statute of limitations period.

### The Plain Language of the Lease Bars the Claim

The plain language of the relevant Lease bars the claim. Section 2.2(c), for example, provided that "Nothing contained herein shall obligate [Richmor] to any minimum usage of the aircraft ...." Section 5.3 further limited Richmor's obligation to remit funds for only hours "flown" on the airplane. It did not require any remittance for any hours not flown.

Similarly, the "charter rate" is based on a "Flight Hour," which is defined and incorporated into the Lease as "the time from take-off to landing (i.e., wheels-up to

wheels-down), as recorded time on the Aircraft hour meter, or, if nonfunctional for any reason, as indicated in the journey log entries" (Management Agreement, Section 1.1; Lease Agreement, Sixth Whereas Clause). This definition limited itself solely to actual hours flown.

In fact, Assembly Point's President (who signed the Lease) testified that the Lease was intended to apply to only hours that were actually flown on the aircraft (David Gilmour Testimony, at 11).

Assembly Point also cannot cite a single provision from the Lease providing them with any right to receive 85% of the interest Richmor billed customers or recovered from them. Cynthia also admitted that the parties did not have any specific oral discussion about interest. Further, although Assembly Point's CEO recalls a meeting in 2008 or 2009 with Richmor promising to pay 85% of any interest, this again contradicts the terms of the Lease and is not contained anywhere in the pleadings or other documents. None of the other witnesses even recalled the 2008 or 2009 meeting.

The Lease Prohibited Oral Modifications

In addition, the Lease expressly prohibited oral modifications and required "an instrument in writing signed by the party against which the enforcement of the change ... is sought" (Lease, Section 12.7). It also required "[a]ll communications, declarations, demands, consents, directions, approvals, instructions, requests, and notices... [to] be in writing ...." (Lease, Section 9.1).

Here, there is no written modification, let alone one signed by Richmor regarding the alleged oral promises. As such, Assembly Point has no claim.

Moreover, Assembly Point asserts that the parties orally modified certain overhead expenses from the amounts set forth in the Lease. However, those alleged oral changes were evidenced by monthly invoices and payments. Here, in contrast, there is not one document or payment evidencing the alleged debt, let alone one signed by Richmor. Even Assembly Point concedes that it did not make any entries in its books and records, accounting records, internal billing records, tax returns, or quickbooks to reflect the debt that Richmor allegedly owes to APA for which APA seeks to recover in this action.

Further, Assembly Point also apparently asserts that the parties performed. Again, the only "performance" was the payment for hours flown. The Lease expressly prohibited imposing any minimum obligation on Richmor. Had Assembly Point desired to share in any additional amounts in connection with the SFA contract, it should have put the request in writing and obtained Richmor's signature.

5

Assembly Point Cannot Demonstrate a Meeting of the Minds on Definite Terms

In addition, there was no meeting of the minds on definite terms. Richmor outright denies making any of the alleged promises other than to pay for hours actually flown. Assembly Point, in contrast, is not even in agreement with itself as to what the terms were. It does not know what Richmor allegedly promised and has no idea about when it accepted the alleged promise, what it accepted or even how it accepted. (Express Indus. & Terminal Corp. v New York State DOT, 93 NY2d 584, 589-590 [1999] ["The first step ... is to determine whether there is a sufficiently definite offer such that its unequivocal acceptance will give rise to an enforceable contract"]).

Similarly, although Assembly Point focuses heavily on seeking to obtain 85% of the settlement proceeds, there was no judgment or settlement at the time of the alleged 2009 and 2010 conversations, respectively, and there was indisputably no discussion on key issues such as interest, the amount of attorney's fees, Assembly's Point's obligations to pay attorney's fees if there was no recovery, settlement, and the distribution in the event of a settlement for less than the full amount of the judgment. In fact, Assembly Point asserts that the conversations lasted only a few minutes. In essence, even accepting Assembly Point's assertions as true, Assembly Point asserts nothing more than "a mere agreement to agree, in which a material term [was] left for future negotiations, [and, as such] is unenforceable" (166 Mamaroneck Ave. Corp., 78 NY2d 88, 91 [1991]" (internal quotation marks omitted)]).

Moreover, Assembly Point had no basis to assume that the alleged minimum usage allegedly orally promised to it would continue after the first six months. In fact, unlike the initial six month period, other aircraft (Gulfstreams) were used on the missions after November 6, 2002.

During this time, Richmor also remained on call when Assembly Point's airplane was not available. The government also requested other airplanes for security reasons. Richmor also used 19 pilots for the missions, whereas only three of them had been assigned to Assembly Point's airplane.

In addition, although Assembly Point used its airplane only four days during the initial six month term of the SFA contract, it increased its use dramatically thereafter. In fact, Assembly Point used the airplane 162 days from November 7, 2002 until the end of the SFA relationship in January 2005. During this time, Assembly Point also did not pay Richmor any revenue for this personal use of the airplane.

Further, while Assembly Point's airplane required only two days of maintenance during the first six months, it required 102 days of maintenance thereafter until January 2005. After November 6, 2002, Assembly Point's aircraft was also chartered to third parties for non-government missions for at least 26 days. During this time period, Richmor (rather than Assembly Point) remained on call 24/7. Draft summary sheets are attached, detailing the days for maintenance, personal use, and non-SFA charters for the relevant time period.

6

Assembly Point also neither incurred any wear and tear on its airplane for any non-use, nor incurred any additional expenses during its use other than those associated with any other general charter flights. In fact, any additional expenses were borne either by SFA or Richmor. For example, SFA paid for extra insurance and pilot costs. Richmor also waived its commission on the hours flown in certain cases where the expenses were higher than normal based on the location of the flight.

Assembly Point's Witnesses Are Not Credible

In addition, Assembly Point is seeking to recover millions of dollars based on the recollection of its representatives about alleged undocumented oral conversations that occurred up to 12 years ago. A jury will not find them credible, especially given their destruction of key evidence, inconsistencies, lack of recollection on key issues, and unfamiliarity with key documents (see e.g. Apache-Beals Corp. v International Adjusters, 59 AD2d 1032, 1033 [1977], affd 46 NY2d 888 [1979] [a party must "set forth such necessary evidentiary details as when, where or by whom the alleged oral agreement was made or the substance of the conversations" (internal quotation marks and citations omitted)]).

One of the representatives (David Gilmour), for example, testified that Richmor promised Assembly Point 50 or more hours a month from 2002 to 2005. The complaint, however, fails to allege this bargain and not one document produced during discovery references it. Incredibly, the representative (an officer and an accountant) calculated the amounts allegedly owed only in his head and communicated about the promise only verbally.

Another Assembly Point representative (Phil Morse) testified about a 2008 or 2009 in person meeting where additional promises were made, yet none of Assembly Point's other witnesses recalled any such meeting. In addition, this witness' testimony was replete with not being able to recall even the most basic facts such as his own status as an officer and director of Assembly Point.

Similarly, another Assembly Point representative (Cynthia) recalled Richmor agreeing to provide Assembly Point with 85% of a judgment, invoice, or settlement. This same witness, however, testified that she did not take notes or retain notes regarding a 2013 telephone conversation about the dispute (Cynthia Suprenant Testimony, at 155-156 ["Q Is it your testimony that you didn't save any notes that you took [in 2013] A It absolutely is, yes"; Q "Would there have been any other notes that you took other than Mahlon was nuts? A No, I don't think so, no. Q You don't recall writing anything else regarding the conversations that occurred in February or January of 2013? A I don't recall."

Despite such testimony, however, detailed notes of the 2013 telephone conversation were nonetheless provided to us shortly after the deposition (and about a year after the case had been commenced).

7

In addition, during discovery, Richmor has requested documents and information relevant to determining whether or not certain alleged oral promises and statements were made to Assembly Point, as well as documents critical to the claims and defenses at issue in this case. Nonetheless, Assembly Point has not identified what portion of its bargain it received (e.g., the number of hours flown and the revenue collected). It has also not provided any information regarding critical issues in the case, including the hours flown, the revenue received, the expenses incurred, the airplane's maintenance and the use of the airplane by Assembly Point and others from 2002 to 2005 (the relevant time period) (as this goes to Assembly Point's alleged performance of its obligations, its alleged entitlement to receive a guarantee for hours it could not fly, and damages).

In addition, Assembly Point has not provided any documents for 2002 to 2005. Rather, Assembly Point claims that it no longer has any relevant documents or information regarding critical issues in the case.

Assembly Point admittedly destroyed critical documents: it did not retain a single invoice or any other documents provided to it by Richmor from the relevant time period. Assembly Point also did not keep track, maintain, or create any written documentation regarding the hours flown each month, the revenue received, and the amounts allegedly owed to it for the subject dispute.

Further, despite extensive questioning of Assembly Point's representatives, relevant facts could not be discovered from their memories. Rather, they contained selective memories about the alleged statements made to them by Richmor, remembering basically the term "85%", but not recalling numerous other details, such as those regarding the hours flown, revenue received, and performance.

As such, we believe that Richmor has been severely prejudiced by Assembly Point's spoliation of documents and memories. A likely spoliation motion threatens the very existence of Assembly Point's claim.

<u>Assembly Point Ignores the Parties' Reasonable Expectations</u>

Contrary to its assertion, Assembly Point received exactly what it bargained for, namely, substantial revenue and a substantial number of hours flown. In fact, the charter revenue from 2002 to 2005 was just as high if not higher than any of the other years during the parties' relationship. In addition, contrary to Assembly Point's assertion, Richmor never had to pay Assembly Point the millions it seeks in alleged revenue. Rather, up until 2013, the invoices showed amounts due Richmor rather than Assembly Point (especially given the high expenses associated with each hour flown). Assembly Point completely ignores the parties' reasonable expectations.

Indeed, Assembly Point seeks to obtain 85% of the alleged settlement proceeds from the state court litigation. However, Richmor spent five years in state court, engaging in substantial discovery and motion practice, as well as a trial, an appeal, and

post-judgment enforcement proceedings involving numerous defendants and hundreds of paragraphs of allegations. The state court record is up to 4,000 pages or more.

Throughout the entire five year period, Assembly Point did nothing. It neither paid for the litigation costs, nor put its alleged expectations in writing. Based on these circumstances alone, Assembly Point had no basis to expect to share in any of the settlement proceeds, let alone 85% of them.

### III.   Damages (Claim for 85% of $775,000)

In any event, any damage award would have to be adjusted to reflect the following (among other things):

A.   <u>Attorney's Fees: $85,000 discount</u>.  Assembly Point's representatives testified that they agreed to pay 85% of the attorney's fees and expenses for the state court litigation. This totals a reduction of approximately $85,000.

B.   <u>Nonperformance: $400,000+ discount</u>.  In addition, despite having the burden on the issue, Assembly Point has not demonstrated its performance. For example, in June 2003 and November 2004, the subject aircraft required maintenance for 54 days, or essentially the entire period for both months. Assembly Point fails to provide any explanation as to why it believes it should recover 100 hours of flight time for these two months (or over $400,000) when it did nothing.

This is just an illustration. In fact, Assembly Point should not receive any credits for any months in which the airplane was not available for any reason for even one day. This completely destroys Assembly Point's alleged damages, even those for millions of dollars, as it cannot prove that it performed. For example, Assembly Point personally used the plane for 166 days, chartered it for 26 days, and required maintenance for another 104 days over the relevant time period.

C.   <u>Cost Avoided: $445,000</u>. Further, all the deposition witnesses agreed that the airplane incurred (non-overhead) expenses associated with flying, such as fuel and maintenance reserves, among other things, and that Assembly Point was responsible for paying them, which equated to up to $2,500 or more per flight hour. As such, any damage award would need to be reduced to account for these savings (see e.g. Restatement [Second] of Contracts § 347 ["the injured party has a right to damages based on his expectation interest as measured by (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, ... less (c) any cost or other loss that he has avoided by not having to perform."]; <u>Indu Craft, Inc. v Bank of Baroda</u>, 47 F3d 490, 495 [2d Cir 1995] [Under New York law, a successful plaintiff is entitled to damages in the "amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract."]; <u>Al-Ev Constr. Corp. v Ahern Maintenance & Supply Corp.</u>, 141 AD2d 591, 593 [2d Dept 1988] ["in computing ... damages, the trial court should have taken into consideration the cost the defendant ... avoided as a result of not having to complete [the work]"]).

9

Here, the state court determined that there were 178 unused hours on the SFA contract. Assuming a cost per flight hour of $2,500 in non-overhead expenses, Assembly Point saved at least $445,000 for not having to fly.

D.      Apportionment: $437,500 discount. The judgment consisted of approximately $875,000 in damages and (according to the complaint) approximately $700,000 in interest (as of March 2011) and probably at least $875,000 by the date of the settlement. As such, the $775,000 figure from the settlement would need to be reduced by 50% to account for the fact that half of the settlement consisted of interest rather than any charter revenue.

The reductions for A-D total $1,367,500+. Subtracting Assembly Point's alleged claim for $658,750 (85% of $775,000) from this amount results in a negative value, namely more than ($708,750). Given that Assembly Point has no damages, it should not be able to recover anything in this litigation.

IV.     **Assembly Point Should Withdraw Its Complaint**

If Assembly Point does not withdraw its complaint, Richmor intends not only to seek summary judgment (in which case Assembly Point will take nothing), but also to move for sanctions based on its failure to investigate and frivolous allegations.

As explained in our recent letter to Assembly Point's counsel, the complaint neglected to mention several critical allegations that first came to light in February 2014 during the deposition of Assembly Point's President, David Gilmour, who testified that Richmor promised Assembly Point a 50 or more hour guarantee on its airplane and approximately 85% of $250,000 per month for the Government's use of the plane. This was almost a year after the commencement of this lawsuit, months after discovery exchanges, and after the time for Richmor to amend its answer had already expired.

Similarly, as a basis for the relief sought, paragraph 31 of the complaint alleges that "N85VM was retrofit with special electronic equipment that was required to serve the Government's needs." There is admittedly no evidence to support this allegation.

Further, in calculating its damages, Assembly Point asserts that (1) a certain credit was 305 hours, (2) Sportsflight had a total obligation to Richmor of 1800 hours, and (3) the arrangement lasted until May 2005. These assertions contradict the state court record, which evidence that the subject credit was much less, the total obligation from Sportsflight to Richmor was for 1550 hours, and the arrangement between Richmor and Sportsflight lasted until January 2005 (rather than May 2005) (thereby reducing both the credit and the total obligation) (see e.g. Richmor Aviation, Inc., 82 AD3d at 1426 ["We agree, however, that Supreme Court erroneously accepted [Richmor's] calculation of damages based on a 50-hour obligation for each of the 32 months between May 2002 and January 2005, for a total of 1,600 hours. Inasmuch as the initial contract clearly

10

Case 1:13-cv-00298-FJS-RFT   Document 48-8   Filed 05/20/14   Page 14 of 16

guaranteed only 250 hours for the first six months, the evidence supports an obligation by [Sportsflight] to pay for only 1,550 hours."]).

The state court record also does not support Assembly Point's assertion that Richmor flew 1,258.4 hours for Sportsflight at $4,900 per hour. Rather, the rate per hour depended on the specific Gulfstream aircraft utilized for the mission and, as explained above, several other aircraft were utilized at different rates.

In addition, Assembly Point claims that Richmor owes it over $1,000,000 for improperly crediting certain hours to Sportsflight on a 2005 and 2006 (revised) invoice. Assembly Point, however, admittedly failed to review the state court materials regarding the credit. Rather, Assembly Point merely relies upon its (1) assertion that Richmor said in 2013 that it regretted giving the credit in 2005, and (2) assumptions (rather than any actual conversations) about what it was entitled to receive. Such grounds (a comment and a mere assumption) are insufficient as a matter of law to permit any recovery, especially as Assembly Point first objected to the credit more than seven years after the credit was provided. There is no possible basis upon which Assembly Point can recover.

The complaint also alleges that "[t]he sole aircraft that was the subject of the [state court] litigation, and the basis upon which Richmor obtained its judgment [against Sportsflight], was Plaintiff's aircraft, N85VM" (Federal Complaint, at Paragraph 44). Had Assembly Point reviewed the state court record on appeal prior to filing its complaint, it would have realized that Richmor flew and relied upon other aircraft as a basis upon which it obtained its judgment. In fact, this issue was discussed at length during the trial, as evidenced by the following citations from the record on appeal:

> "THE COURT:  ... you're telling me that you used different airplanes?
> THE WITNESS: Yes." (Record on Appeal, at 106.)

> "THE COURT: Now, you also flew different airplanes pursuant to what you understood this agreement to be, transporting whoever it was that you transported?
> THE WITNESS: We flew different airplanes, yes." (Record on Appeal, at 106.)

> "Q. But there were times [N85VM] was not [available for Sportsflight], and you used other aircraft; correct?
> A. We would receive permission from Sportsflight for --
> Q. The question was whether other aircraft were used.
> A. Ask me again, please.
> THE COURT: That's asked and answered." (Record on Appeal, at 98.)

> "Q. Are they all for what's been previously identified as tail number [N85VM],- or were other planes used?

11

> A. There were other planes that we have bills here for."
> (Record on Appeal, at 96.)
>
> "A. There were lots of reasons why those [other] planes were used.... There were occasions when they didn't want to use the contracted tail number, and requested us to send another airplane. There were occasions when the contracted airplane was in for maintenance, and they wanted us to do something, so we substituted an airplane." (Record on Appeal, at 96-97.)
>
> "THE COURT: Was [there ever a complaint from anyone about a] problem in any way related to the fact that you used an airplane other than this one, Gulfstream IV?
> THE WITNESS: No." (Record on Appeal, at 107.)
>
> "THE COURT: You were asking Mr. Richards about using a different airplane. I'm just trying to understand whether or not that mattered.
> ...
> THE COURT: I'm asking a question to establish that it doesn't matter." (Record on Appeal, at 108.)
>
> "THE COURT: Excuse me. Were the substituted airplanes in any way functionally different from the ones that --
> THE WITNESS: They did the same job, same size."
> (Record on Appeal, at 97.)

Further, the appellate court was fully aware of the other aircraft, relied on the invoices identifying the other aircraft, and referenced the other aircraft in its decision (see e.g. Richmor Aviation, Inc. v Sportsflight Air, Inc., 82 AD3d 1423, 1425 [3d Dept 2011] ["Richards testified that [Richmor] provided a different plane for the Government's use ... at the Government's request or when the original plane was already in use or undergoing maintenance."]).

In addition, Richmor testified that its (several) aircraft and crew remained on call 24/7, even without Assembly Point's airplane, as evidenced by Richmor's use of several other aircraft and 19 different pilots for the Sportsflight contract (see Richmor Aviation, Inc., 82 AD3d at 1425 [noting that Richmor had a ground crew and staff on call 24/7]).

For example, in June 2003 and November 2004, the subject aircraft required maintenance for 54 days, or essentially the entire period for both months. Assembly Point fails to provide any explanation as to why it believes it should recover 100 hours of flight time for these two months (or over $400,000) when it did nothing.

12

Indeed, in considering the number of days of maintenance, Assembly Point's personal use (for which Richmor did not obtain any revenue), and charters to other third parties, Richmor spent the bulk of the time on call and performing without Assembly Point's assistance (see Record on Appeal, at 106-107 ["THE COURT: [Were] you ever ... unable to fulfill the agreement; that is to say, [was there ever a time] that you couldn't get somebody to the place that they wanted to go in the time they wanted to get there? [Richards:] No, ... we completed all the missions"]).

Further, prior to this lawsuit, Assembly Point indisputably knew about the other aircraft and Richmor's obligations to be on call 24/7 and also had public access to the record on appeal. Nonetheless, Assembly Point made (and continues to make) this frivolous allegation, which contains no evidentiary support.

Very truly yours,

TABNER, RYAN AND KENIRY, LLP

Brian M. Quinn
bmq@trklaw.com

13