EXHIBIT "F"

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

ASSEMBLY POINT AVIATION, INC.,

        Plaintiff,       **COMPLAINT AND
                    DEMAND FOR JURY
 -against-                TRIAL**

RICHMOR AVIATION, INC. and MAHLON W.  Case No. 1:13-CV-0298 (FJS/CFH)
RICHARDS,

        Defendants.

---

  Plaintiff Assembly Point Aviation, Inc. ("Plaintiff"), by and through its attorneys, Whiteman Osterman & Hanna LLP, as and for its Complaint in this matter respectfully alleges as follows:

## INTRODUCTION

  1. Plaintiff is the owner of a Gulfstream IV aircraft bearing serial number 1172, currently registered as and bearing tail number N227SV, and formerly registered and bearing tail number N85VM. Defendant Richmor Aviation, Inc. ("Richmor") was formerly Plaintiff's chartering agent for Plaintiff's aircraft. Under the parties' chartering agreement, Plaintiff is entitled to receive 85% of any revenues on charters of Plaintiff's aircraft, with Richmor retaining 15% as a commission for its services. Plaintiff otherwise paid all costs associated with owning and operating the aircraft whether for its own flights or for flights Richmor obtained as Plaintiff's chartering agent.

  2. Between May 2002 and May 2005, Richmor entered into charter agreements for Plaintiff's aircraft with a third party, SportsFlight Air, Inc. ("SFA"), which was acting as a subcontractor to a prime contractor of the United States Government.

3. Richmor and Defendant Mahlon Richards, Richmor's president and owner, subsequently sought payment from SFA for the charter of Plaintiff's aircraft to SFA.

4. Ultimately, after protracted litigation to which Plaintiff was not made a party, Defendants compromised their claims for the charter revenues owed to Plaintiff without Plaintiff's consent, or even notifying Plaintiff that it intended to settle, or had settled, with SFA.

5. In August 2012, Defendants received payment from SFA for the charter of Plaintiff's aircraft, amounting to $775,000, but did not advise Plaintiff that the funds had been received.

6. After recovering only a portion of what was owed to Plaintiff, Defendants fraudulently diverted all funds owed to Plaintiff to their own use and have refused to remit to Plaintiff all amounts that are owed.

7. In essence, Defendants chartered out Plaintiff's aircraft, received at least $775,000 for the charter of that aircraft owned by Plaintiff, concealed the fact that they received the money, and simply kept all of the funds received for the charter of the aircraft. Accordingly, as set forth below, Defendants are liable for, among other things, breach of contract, fraud, conversion, and violation of N.Y. General Business Law § 349.

## PARTIES

8. Plaintiff Assembly Point Aviation, Inc. is a Delaware corporation, with a principal place of business located in Massachusetts.

9. Upon information and belief, Defendant Richmor Aviation, Inc. ("Richmor") is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at Columbia County Airport, P.O. Box 423, 1142 Route 9H, Hudson, New York 12534.

10. Upon information and belief, Defendant Mahlon W. Richards ("Richards") is a citizen and resident of the State of New York. Richards is the president and owner of Richmor.

## JURISDICTION AND VENUE

11. This Court has jurisdiction of the subject matter of this action under 28 U.S.C. § 1332(a). Plaintiff is a corporation incorporated under the laws of the State of Delaware, having its principal place of business in the State of Massachusetts.

12. Defendant Richmor Aviation, Inc. is a corporation formed under the laws of the State of New York, having its principal place of business in the State of New York.

13. Upon information and belief, Defendant Mahlon W. Richards is a resident of the State of New York.

14. The amount in controversy in this action exceeds, exclusive of interest and costs, the sum of $75,000.

15. Venue in the Northern District of New York is based upon 28 U.S.C. § 1391(b). All Defendants reside in and the events or omissions giving rise to this action occurred in this District.

## FACTUAL BACKGROUND

16. Plaintiff is the owner of a Gulfstream IV aircraft bearing serial number 1172, currently registered as and bearing tail number N227SV, and formerly registered and bearing tail number N85VM. Plaintiff's aircraft will be hereinafter referred to as "N85VM."

17. Until February 2013, Richmor was Plaintiff's aircraft management company, and contracted to, among other things, arrange for a hangar for N85VM, maintain N85VM, and operate N85VM per Plaintiff's specifications and in accordance with applicable laws and regulations.

18. In or around January 2001, Plaintiff also entered a Non-Exclusive Aircraft Lease Agreement (the "Lease") with Richmor, under which Plaintiff agreed to lease N85VM to Richmor for the purpose of chartering N85VM to third parties on an as needed and as available basis.

19. The Lease permitted Richmor to charter N85VM to third parties at a rate of $5,100 per flight hour. Plaintiff was responsible for all costs associated with owning and operating the aircraft for flights Richmor obtained as Plaintiff's chartering agent.

20. Under the Lease, Richmor was obligated to remit to Plaintiff 85% of the charter proceeds for charters of N85VM to third parties.

21. In early 2002, Richmor brought an opportunity to Plaintiff to charter N85VM to the United States Government, through at least two intermediary companies. Under the proposal described by Richmor, N85VM was to be exclusively available for the use of the United States Government, unless Richmor first obtained permission from the Government or its intermediary to use N85VM for a different charter or for Plaintiff's own travel needs.

22. Although the proposal would make the aircraft unavailable to Plaintiff, Plaintiff recognized that it was an opportunity for significant charter revenue and, thus, authorized Richmor to enter this exclusive charter contract.

23. In June 2002, Richmor entered into a charter contract with SportsFlight Air, Inc. ("SFA"), which provided that Richmor would provide charter flight services to SFA using Plaintiff's Gulfstream IV, then registered as N85VM, for the initial six-month period from May 2002 to November 2002 (the "Charter Contract").

24.   The Charter Contract provided that SFA guaranteed that it would pay Richmor for at least 250 flight hours per month, and all hours used above the 250 hour minimum, at the rate of $4,900 per flight hour. Plaintiff approved this discount from the hourly rate in the Lease

25.   The Charter Contract also provided SFA the option to renew the contract on a monthly basis for a minimum of 50 flight hours per month following the initial six-month period.

26.   After the initial six-month charter period expired in November 2002, SFA continued to extend the Charter Contract on a monthly basis until May 2005.

27.   During this time, Richmor continued to charter N85VM to SFA, to send invoices to SFA and to receive payment for these invoices, and to receive and remit payment to Plaintiff or otherwise credit Plaintiff's account for charter revenue net of Richmor's sales commission.

28.   Because the terms of the Charter Contract were extended, Richmor or Plaintiff was also still required to obtain permission from the Government or its intermediary to use N85VM for any purpose other than charters through SFA.

29.   In return for giving up the valuable right to use N85VM when and where it pleased, for foregoing use of the aircraft for its own purposes or for ready charter to other third parties, Plaintiff continued to be entitled to receive its share of the revenues owed or obtained from SFA for the lease of N85VM under the Charter Contract.

30.   During the period that SFA was chartering N85VM for use by the United States Government, N85VM was flown in extraordinary rendition flights for the Central Intelligence Agency.

31.   As a result of the United States Government's charter of N85VM, N85VM was retrofit with special electronic equipment that was required to serve the Government's needs.

32. Due to the notoriety gained from use in the extraordinary rendition program, in or around September 2004, Plaintiff was forced to re-register N85VM as N227SV.

33. Upon information and belief, upon SFA's decision not to extend the Charter Contract further in May 2005, Richmor, without Plaintiff's knowledge, began to negotiate final payment with SFA for its commitments under the Charter Contract.

34. In or around October 2006, Richmor sent a final invoice to SFA for the total number of hours contracted for use of N85VM, less the actual hours used by SFA, less the number of hours Richmor was able to charter the aircraft to unaffiliated third parties during the period. The invoice was for $2,469,000 ($1,235,000 in charter revenue and $1,234,000 in contract interest).

35. Under the terms of the Charter Contract, SFA actually owed $2,408,840 in charter revenue, plus contract interest of one and one-half percent per month for each month that that amount remained unpaid.

36. Although the amounts owed were to be remitted to Plaintiff, Richmor did not consult with, or notify, Plaintiff of these attempts to collect the amounts owed under the Charter Contract.

37. Upon information and belief, SFA did not remit the amounts owed thereunder at that time.

38. Ultimately, in April 2007, Richmor commenced an action against SFA in New York State Supreme Court, Columbia County, to recover the amounts outstanding under the Charter Contract.

39. Notwithstanding that Plaintiff was entitled to receive the charter revenues that Richmor sought in the lawsuit against SFA, less Richmor's sales commission, Plaintiff was not named as a party to that action or even notified that it had been commenced.

40. Over a year and a half later, in or around December 2008, Richards mentioned the lawsuit against SFA to Plaintiff for the first time.

41. In or around January 2009, Plaintiff's representative met with Richards to discuss the status of the litigation, among other things. At that meeting, Richards and Plaintiff's representative discussed how the proceeds collected from the lawsuit would be distributed.

42. At that time, Richards advised Plaintiff's representative that he had filed the lawsuit on Plaintiff's behalf and that the proceeds, as charter revenue, would be distributed according to the terms of the Lease with Richmor.

43. In February 2010, after a non-jury trial, New York Supreme Court, Columbia County entered a judgment in Richmor's favor in the total amount of $1,674,956.

44. Following appeal, in or about March 2011, the New York State Appellate Division, Third Department upheld the judgment issued in Richmor's favor, but modified the total amount thereof to $1,567,373, based upon a calculation error. The sole aircraft that was the subject of the litigation, and the basis upon which Richmor obtained its judgment, was Plaintiff's aircraft, N85VM.

45. Upon information and belief, in or around May 2011, Richmor commenced collection efforts against SFA to enforce the judgment, alleging that SFA had secreted assets to avoid the judgment. SFA, however, failed to respond to Richmor's requests for financial disclosures.

46. Richmor did not consult with, or even notify, Plaintiff of its legal efforts to enforce the judgment.

47. Eventually, in or around September 2011, Richards notified Plaintiff's representative that his attorneys indicated that there was some interest and willingness on the part of the SFA to discuss a settlement, and that the proposal SFA had made was for a total of $400,000 (a lump sum payment of $50,000, plus $50,000 per month for 8 months), without any collateral or security.

48. At that time, Richards and Plaintiff's representative agreed that this offer was not a reasonable or good faith offer and that it was not satisfactory, especially given that the judgment was in excess of $1.5 million at that time.

49. Upon information and belief, without consulting with or notifying Plaintiff of its efforts, Richmor took legal action to enforce the judgment from SFA, including proceedings before the New York State Supreme Court, Columbia County with respect to Richmor's allegation that SFA had secreted assets to avoid the judgment.

50. Upon information and belief, in or around March 2012, the New York Supreme Court entered an order in Richmor's favor directing SFA to either pay the judgment or produce documents and testimony disclosing all transfers of SFA's assets.

51. Richmor did not advise Plaintiff at any time that it had obtained such an order from the Court.

52. Upon information and belief, in or around July 2012, Richmor unilaterally decided to compromise its claims against SFA for less than one-half of the total amount of the unpaid judgment and far less than the monies actually owed to Plaintiff in charter revenues under the Lease.

53. Richmor did not consult with Plaintiff, or obtain Plaintiff's consent, prior to accepting less than one-half of the total amount of the unpaid judgment and far less than the monies actually owed to Plaintiff in charter revenues under the Lease.

54. Upon information and belief, in or around August 2012, Richmor's attorneys received a settlement check from SFA in the total amount of $775,000.

55. Richmor did not advise Plaintiff that it had received any monies from the litigation with SFA and did not remit any of the $775,000 settlement check to Plaintiff.

56. Richmor and Richards met with, had telephone conversations with and had several email exchanges with Plaintiff's representative on a number of operational matters relating to Plaintiff's aircraft throughout the period in which Richmor was considering accepting a settlement and after Richmor had received the settlement check from SFA. Neither Richmor nor Richards disclosed the fact that a settlement had been received.

57. On or about January 11, 2013, Plaintiff's representative met with a representative from Richmor to notify Richmor that Plaintiff had decided to cease using Richmor's aircraft management services.

58. At no time before or during this meeting did Richmor's representative inform Plaintiff's representative that it had settled the SFA litigation for less than one-half of the total judgment awarded or that it had received the $775,000 settlement check from SFA.

59. During the week of January 14, 2013, Richards called Plaintiff's representative several times with requests to reconsider Plaintiff's decision to terminate management services through Richmor, or in the alternative, to discuss aspects of the termination of the relationship, the transfer of the aircraft to another management company, and the possibility of Plaintiff contracting with Richmor for future aircraft maintenance and charter of other Richmor aircraft.

9

60. At no time during these calls did Richards inform Plaintiff's representative that Richmor had settled the SFA litigation for less than one-half of the total judgment awarded or that he had received the $775,000 settlement check from SFA.

61. On or about January 18, 2013, approximately six months after Richmor had settled the SFA litigation and received the $775,000 settlement payment, Plaintiff first learned that the case had been settled and that payment had been received.

62. During that conversation, Richards conceded that he owed Plaintiff the settlement monies, but stated that he needed additional time to pay it.

63. At no time thereafter have Defendants remitted any of the settlement funds to Plaintiff, as they are obligated to do under the express terms of the Lease.

64. On or about February 12, 2013, Plaintiff, through its counsel, demanded that Defendants return the settlement funds owed to it within seven days.

65. Defendants failed to respond to Plaintiff's demand within the seven-day period provided, or at any time thereafter.

## AS AND FOR A FIRST CAUSE OF ACTION

66. Plaintiff repeats and realleges all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

67. Plaintiff entered into the Lease with Richmor, under which Plaintiff agreed to lease N85VM to Richmor to use for charter flights for third parties, and Richmor agreed to remit 85% of the charter rate per hour flown on N85VM to Plaintiff.

68. Between May 2002 and May 2005, Richmor chartered N85VM to SFA under the Charter Contract.

69. Richmor billed SFA for less than the amount owed to Plaintiff for the charter flights on N85VM.

70. Richmor accepted charter revenues from SFA in an amount less than one-half of those lawfully owed to Plaintiff under the Lease.

71. In August 2012, Defendants received $775,000 in charter revenues from SFA for the charter flight hours owed under the Charter Contract.

72. Richmor has breached the Lease with Plaintiff by billing SFA for less than the amount owed to Plaintiff for the charter flights on N85VM.

73. Richmor has also breached the Lease with Plaintiff by accepting charter revenues from SFA in an amount less than one-half of the total amount of the unpaid judgment and less than 20 percent of the monies lawfully owed to Plaintiff under the Lease.

74. Richmor has also breached the Lease with Plaintiff by failing and refusing to remit any monies to Plaintiff for these charter flights, as required under the Lease.

75. Plaintiff has been damaged in an amount to be determined at trial of this matter, but in no event less than $2,047,514, together with contract interest, costs and attorneys' fees.

## AS AND FOR A SECOND CAUSE OF ACTION

76. Plaintiff repeats and realleges all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

77. In discussions with Plaintiff's representative, Richards specifically represented that he had pursued the litigation against SFA to recover the charter revenues owed on behalf of Plaintiff.

78. Richards further represented that any charter revenues recovered in the litigation against SFA would be remitted to Plaintiff according to the terms of the Lease.

79. Richards knew that these representations were false.

80. Richards made these representations with the intention of inducing Plaintiff to rely on Richard's stated intention to remit any charter revenues recovered in the litigation against SFA to Plaintiff and not intervene in the litigation against SFA to protect its rights.

81. Plaintiff reasonably relied on Richards's representations and did not intervene in the litigation against SFA to protect its rights to the charter revenues.

82. Defendants compromised the claims for the monies lawfully owed to Plaintiff without consulting Plaintiff and without Plaintiff's consent.

83. Defendants concealed from Plaintiff their receipt of the charter revenues from SFA pursuant to the settlement.

84. Richards communicated directly with Plaintiff's representative on numerous occasions between August 2012 and January 2013 and failed to disclose receipt of the charter revenues from SFA pursuant to the settlement.

85. Defendants fraudulently diverted the charter revenues lawfully owed to Plaintiff and failed and refused to remit any of the charter revenues to Plaintiff.

86. As a result of Defendants' fraudulent conduct, Plaintiff has suffered damages in an amount to be determined at trial of this matter, but in no event less than $775,000, together with interest, costs and attorneys' fees.

### AS AND FOR A THIRD CAUSE OF ACTION

87. Plaintiff repeats and realleges all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

88. Under the Lease, Plaintiff is entitled to receive 85% of the charter rate per hour flown on N85VM.

89. Between May 2002 and May 2005, Richmor chartered N85VM to SFA under the Charter Contract.

90. Defendants accepted charter revenues from SFA in an amount less than one-half of those lawfully owed to Plaintiff under the Lease.

91. In August 2012, Defendants received $775,000 in charter revenues from SFA for the charter flight hours owed under the Charter Contract.

92. Defendants concealed from Plaintiff their receipt of the charter revenues from SFA pursuant to the settlement.

93. On or about February 12, 2013, Plaintiff demanded that Defendants return that charter revenues owed to Plaintiff.

94. Defendants failed and refused to respond to Plaintiff's demand for return of the charter revenues lawfully owed to Plaintiff.

95. Upon information and belief, Defendants are currently unlawfully detaining Plaintiff's charter revenues, which are Plaintiff's property, and/or improperly interfering with Plaintiff's right to the charter revenues.

96. As a result of Defendants' conversion of the charter revenues lawfully owed to Plaintiff, Plaintiff has suffered damages in an amount to be determined at trial of this matter, but in no event less than $775,000, together with interest, costs and attorneys' fees.

## AS AND FOR A FOURTH CAUSE OF ACTION

97. Plaintiff repeats and realleges all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

98. New York General Business Law § 349 provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

99. Defendants engaged in an act or practice that was deceptive or misleading in a material way when they represented to Plaintiff that they were pursuing the litigation against SFA on Plaintiff's behalf and that any charter revenues recovered in the litigation against SFA would be remitted to Plaintiff according to the terms of the Lease.

100. Defendants also engaged in an act or practice that was deceptive or misleading in a material way when they billed SFA for less than the amount owed to Plaintiff for the charter flights on N85VM and accepted charter revenues from SFA in an amount less than one-half of those lawfully owed to Plaintiff.

101. These deceptive business practice was aimed at members of the public generally, namely, Plaintiff and Defendants' other clients, which reasonably rely on Defendants to serve as charter agent for their aircraft.

102. Defendants' deceptive acts or practices are a violation of New York General Business Law § 349.

103. As a result of Defendants' deceptive acts or practices, Plaintiff has suffered damages in an amount to be determined at trial of this matter, but in no event less than $2,047,514, together with contract interest, costs and attorneys' fees.

104. As a result of the foregoing materially deceptive acts or practices of Defendants, Plaintiff under New York General Business Law § 349 is entitled to recover from Defendants treble damages up to one thousand dollars ($1,000) and its reasonable attorneys' fees.

## AS AND FOR A FIFTH CAUSE OF ACTION

105. Plaintiff repeats and realleges all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

106. Upon information and belief, as a result of agreeing to pursue the litigation against SFA on Plaintiff's behalf, Defendants were in a confidential or fiduciary relationship with Plaintiff to recover the charter revenues lawfully owed to Plaintiff.

107. In connection with that confidential or fiduciary relationship, Defendants unequivocally promised to remit to Plaintiff the charter revenues recovered from SFA in the litigation.

108. Plaintiff reasonably relied on this unambiguous promise to remit the charter revenues recovered in the litigation and did not intervene in the litigation against SFA to protect its rights to the charter revenues.

109. In August 2012, Defendants received $775,000 in charter revenues from SFA for the charter flight hours owed under the Charter Contract.

110. Defendants have failed to remit any charter revenues to Plaintiff, have concealed from Plaintiff the receipt of charter revenues from SFA pursuant to the settlement, and have failed to discharge their duties to Plaintiff.

111. In failing and refusing to remit any charter revenues to Plaintiff, Defendants have unlawfully detained and have been unjustly enriched at Plaintiff's expense by the total amount of charter revenues owed to Plaintiff.

112. Therefore, Plaintiff is entitled to imposition of a constructive trust over the charter revenues that Defendants were obligated to remit to Plaintiff.

WHEREFORE, Plaintiff Assembly Point Aviation, Inc. respectfully requests that this Court enter a judgment against Defendants Richmor Aviation, Inc. and Mahlon W. Richards: (1) awarding Plaintiff damages in an amount to be determined at the trial of this matter, but in no event less than $2,047,514, together with contract interest, costs and attorneys' fees, (2) imposing a constructive trust over the charter revenues that Defendants were obligated to remit to Plaintiff; (3) awarding Plaintiff treble damages up to $1,000.00 and the costs, disbursements, and attorneys' fees incurred in connection with this action; and (4) awarding Plaintiff such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. Pro. 38, Plaintiff demands a jury on all issues so triable.

Dated: March 15, 2013  
       Albany, New York

WHITEMAN OSTERMAN & HANNA LLP

By: */s/ John J. Henry*  
_____  
John J. Henry, Esq. (501744)  
Robert S. Rosborough IV, Esq. (516667)  
Attorneys for Plaintiff  
One Commerce Plaza  
Albany, New York 12260  
(518) 487-7600

w:\21200\21266\plead\complaint (final).docx