UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

**ASSEMBLY POINT AVIATION, INC.,**

                               **Plaintiff,**

            v.                                1:13-CV-298
                                                            (FJS/DJS)

**RICHMOR AVIATION, INC.,**

                               **Defendant.**
_____

**APPEARANCES**                                 **OF COUNSEL**

**WHITEMAN OSTERMAN**             **JOHN J. HENRY, ESQ.**
**& HANNA LLP**                      **ROBERT S. ROSBOROUGH, IV, ESQ.**
One Commerce Plaza
Suite 1900
Albany, New York 12260
Attorneys for Plaintiff

**TABNER, RYAN & KENIRY LLP**     **WILLIAM RYAN, JR., ESQ.**
18 Corporate Woods Boulevard        **BRIAN M. QUINN, ESQ.**
Albany, New York 12211-2605
Attorneys for Defendant

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

    Plaintiff Assembly Point Aviation, Inc. brings this case against Defendant Richmor Aviation, Inc., in connection with Defendant leasing Plaintiff's aircraft. The Court issued a Memorandum-Decision and Order dated September 3, 2013, which dismissed all of Plaintiff's claims except its first cause of action for breach of contract. *See* Dkt. No. 24.

- 1 -

There are currently two motions pending before the Court.  First, Defendant has moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure or, in the alternative, for partial summary judgment.  *See generally* Dkt. 52.  Second, Plaintiff has cross-moved for summary judgment under Rule 56 of the same.  *See generally* Dkt. No. 55.

## II. BACKGROUND

**A.  The parties and the Lease**

The following facts are not in dispute.  Plaintiff owns a Gulfstream IV aircraft ("Aircraft").  *See* Dkt. No. 52-28, Aircraft Pilot and Management Services Agreement, at 3 ("Management Agreement").  David Gilmour is Plaintiff's president.  *See* Dkt. No. 52-15, Gilmour Dep., at 7:14-25. [1]  Philip Morse is Plaintiff's owner.  *See* Dkt. No. 52-2, Def.'s Statement of Material Facts, at ¶ 312.  Defendant Richmor Aviation, Inc. ("Richmor") is a provider of aircraft services that maintains, services, provides crews for, and brokers charter flights on third parties' aircraft.  *See* Dkt. No. 52-28, Management Agreement, at 2.  Mahlon Richards is Defendant's founder and president.[2]  *See* Dkt. No. 52-19, Richards Dep., at 6:20-7:11.

In January of 2001, Plaintiff and Defendant entered into an agreement whereby Defendant would procure charter flights on the Aircraft in exchange for a 15% commission of the resulting charter revenue.  *See* Dkt. No. 52-27, Aircraft Lease Agreement, at § 5.3 ("Lease")

---

[1] All further citations to the depositions in this case refer to the original transcripts' pagination. All other citations to documents on the docket refer to the page number in the top-right corner of the page which the Court's CM/ECF system generates.

[2] Although Mr. Richards was named personally in this case, the Court has dismissed all causes of action against him.  *See generally* Dkt. No. 24; *infra* Part II.D.  Accordingly, references to the singular Defendant are to Richmor Aviation, Inc.

(providing that Defendant would "remit 85% of the charter rate per hour flown" to Plaintiff).
The Lease contains the following relevant terms:

- Plaintiff was to provide the Aircraft on an "'as needed' and 'as available' basis." *See id.* at § 1.1. There is no dispute that the parties intended this term to mean that Plaintiff retained first priority to access and use the aircraft over potential charter clients. *See, e.g.,* Dkt. No. 52-19, Richards Dep., at 43:4-44:10 (agreeing that charters "would be subordinate to the owner's use" of the aircraft).
- Defendant was to "take no action to bind [Plaintiff] outside the express scope of" the Lease. *See* Dkt. No. 52-27, Lease, at §2.2(b).
- Defendant was not obligated to charter "any minimum usage of the Aircraft." *See id.* at § 2.2(c).
- Defendant was to charge a rate of "$5,100 per Flight Hour" to charter the Aircraft. *See id.* at § 2.3.
- Defendant was "responsible for all contracting with, billing, and collecting from charter customers . . . ." *See id.* at § 5.1.
- The parties agreed that no "oral . . . statements, representations, commitments, [or] promises . . . made with respect to the subject matter of this [Lease] shall be construed or relied upon by any party as the . . . inducement to engage in[] any separate agreement . . . ." *See id.* at § 12.2.
- The parties agreed that the Lease could only be amended by "an instrument in writing by the party against which the enforcement [of such amendment] is sought." *See id.* at § 12.7.

The Lease incorporated by reference the parties' Management Agreement. *See* Dkt. No. 52-27, Lease, at 2 (sixth Whereas clause). The Management Agreement defines the term "Flight Hour" to mean "the time of take-off to landing (i.e., wheels up to wheels-down), as recorded time on the Aircraft hour meter, or, if nonfunctional for any reason, as indicated in the journey log entries." *See* Dkt. No. 52-28, Management Agreement, at 3. The parties do not dispute that they intended the Lease to limit Plaintiff's payment to hours that the Aircraft was actually in the air during a charter flight. When asked at his deposition, "Was [the] Lease intended to apply to only hours that were actually flown on the aircraft?", Mr. Gilmour answered, "Yes." See Dkt. No. 52-15, Gilmour Dep., at 11:21-23. Mr. Richards was similarly consistent throughout his deposition in testifying that the parties intended to limit Plaintiff's payment to hours flown. *See,*

*e.g.*, Dkt. 52-19, Richards Dep., at 37:7-11 (noting that, "for each flight hour, each hour that the aircraft was flown, . . . [Plaintiff] would receive 85 percent of the revenue for each hour flown").

**B.  SFA contract**

In early 2002, Defendant alerted Plaintiff to a new charter opportunity for the Aircraft. *See* Dkt. No. 52-15, Gilmour Dep., at 28:10-11, 29:9-24.  At a meeting that Mr. Richards, Mr. Gilmour, and Mr. Morse attended, Mr. Richards explained that he had arranged an opportunity whereby Plaintiff's aircraft could be leased to the United States government for a high volume of charter flights.  *See id.* at 28:25-29:12.  Although the parties did not discuss it at the meeting, Defendant's prospective client was Sportsflight Air., Inc. ("SFA"), a subcontractor that would in turn charter the Aircraft to the government.[3]  *See* Dkt. No. 52-19, Richards Dep., at 58:5-25. There is no dispute that this meeting took place, that the parties discussed the terms upon which Defendant subsequently chartered the Aircraft to SFA, *see generally* Dkt. No. 52-23, Def.'s Ex. "O" ("SFA contract"), or that Plaintiff generally approved of such terms.

The original duration of the SFA contract was from May 6, 2002, to November 6, 2002. *See* Dkt. No. 52-23, SFA Contract, at 2.  SFA agreed to guarantee 250 hours during this initial period.  *See id.*  SFA thereafter had the option to renew month-to-month for a minimum of fifty flight hours per month.  *See id.* at 5.  The SFA contract, while identifying the Aircraft by its registration number, does not mention Plaintiff.

Upon execution of the SFA contract, SFA was to pay Defendant a deposit of $147,000, which it apparently never paid.  *See* Dkt. No. 52-20, Richards Dep., at 79:8-14.  When asked

---

[3] For this reason, the parties interchangeably refer to Defendant's charter agreement with SFA as the "government contract."  Therefore, any such references in this Memorandum-Decision and Order refer to the SFA contract.

why he would do business with SFA after its failure to pay the deposit, Mr. Richards testified that it was because "he trusts people." *See id.* at 80:8-10.  Despite SFA's pattern of late payment, SFA and Defendant continued their relationship by continuing to perform through January of 2005.  *See infra* Background Part C.  Defendant subsequently sent SFA an invoice in the fall of 2006 for unused flight time for which SFA had guaranteed payment as part of its 50-hour monthly minimum.  *See* Dkt. No. 55-3, Pl.'s Ex. "2," at 7.  Defendant gave SFA a discount of some 305 hours to account for flights that the Aircraft was chartered to third parties and accordingly not available for SFA's use.  *See id.*  There is no dispute that Plaintiff received payment for all hours that the Aircraft actually flew.

   The parties dispute a variety of facts with respect to the SFA contract, including the critical issue in this case of whether Defendant, through Mr. Richards, promised Plaintiff payment for a minimum number of flight hours arising out of the SFA contract whether Plaintiff's Aircraft flew such hours or not.  According to Plaintiff, the parties made the following oral agreement in connection with the SFA contract.  First, Plaintiff and Defendant agreed that Plaintiff would subordinate its access priority to the Aircraft for the duration of the SFA contract. *See* Dkt. No. 52-23, SFA Contract, at 2 (providing that SFA's use of the Aircraft was to be "as required" by SFA); *see* Dkt. No. 52-20, Richards Dep., at 68:18-23 (noting that SFA was to have first priority use of the Aircraft under the SFA contract).  Second, they agreed that SFA would receive a discounted charter rate of $4,900 per hour, as opposed to the Lease's stated rate of $5,100.  *See* Dkt. No. 52-23, SFA Contract, at 5; *see also* Dkt. No. 52-20, Richards Dep., at 69:9-20.

   Plaintiff asserts that it agreed to forego certain of its rights under the Lease because Defendant represented that chartering the Aircraft to SFA would entitle Plaintiff to revenue for a

- 5 -

guaranteed minimum number of flight hours per month even if the Aircraft did not fly those hours. *See, e.g.*, Dkt. No. 52-15, Gilmour Dep., at 46:6-9 (explaining that "[i]t was 250 hours minimum [for the first six months], so whether the plane ever left the ground or not, we were to get paid 250 hours, and in exchange, we were, you know, making the plane available to the government"). Defendant contends instead that Plaintiff was to be paid for actual hours flown, as had been their customary course of dealing for years. *See* Dkt. No. 52-20, Richards Dep., at 63:6-13.[4]

## C. Litigation

When SFA failed to pay Defendant's 2006 invoice, Defendant sued SFA in New York Supreme Court, Columbia County, to recover the value of the unused flight hours. *See generally* Dkt. No. 55-4, Supreme Court Complaint ("state-court litigation"). After prevailing in a bench trial, then-Plaintiff Richmor obtained a judgment that was adjusted to $874,650; the parties subsequently settled for $775,000. *See* Dkt. No. 58-2, Def.'s Response to Pl.'s Counter Statement of Material Facts, at ¶ 52; *see also Richmor Aviation, Inc. v. Sportsflight Air, Inc.*, 82 A.D.3d 1423, 1426-27 (3d Dep't 2011).

After Defendant settled the state-court litigation with SFA, Plaintiff demanded that Defendant pay it the entire settlement amount because the settlement represented less than 85% of the total value of the unused flight time. *See* Dkt. No. 55-13, Pl.'s Ex. "12," at 2. Mr.

---

[4] In general, although Mr. Richards testified at length throughout his deposition about how his course of dealing with Plaintiff for nearly twenty years was essentially oral in nature, Defendant nonetheless denies "that the parties orally agreed to anything." *See, e.g.*, Dkt. No. 58-2, Def.'s Response to Pl.'s Counter Statement of Material Facts, at ¶ 8. In light of the fact that Mr. Richards testified in his deposition that the parties orally agreed, for example, to modify the Lease's terms for hangar rent and pilot salaries, such a statement appears inconsistent and is but one example of the general lack of clarity in the arguments supporting both parties' positions.

- 6 -

Richards testified that he considered gifting a portion of the state-court settlement to Plaintiff in light of the negative publicity Plaintiff received in connection with SFA's use of the aircraft for CIA rendition flights. *See* Dkt. No. 52-20, Richards Dep., at 118-19. According to Plaintiff, Defendant's reference to a gift was a total surprise. *See* Dkt. No. 52-16, Gilmour Dep., at 157:18-23 (recalling that "[i]t was never discussed as a gift. It was part of an arrangement we had with Mahlon [Richards]. It's always been part of the arrangement, every conversation we've had throughout with Mahlon [Richards] was 85 percent, fifty-hour minimum per month. The thought of it being a gift, it was ridiculous.").

When Defendant failed to remit any of the state-court settlement proceeds, Plaintiff commenced this action seeking, among other things, payment of at least "$2,047,514, together with contract interest, costs[,] and attorneys' fees." *See* Dkt. No. 1, Complaint, at ¶¶ 66-75. According to Plaintiff, this amount represents the total value of unused flight time accrued under the SFA contract. After the Court's partial grant of Defendant's motion to dismiss, *see* Dkt. No. 24, Plaintiff's single remaining cause of action is for breach of contract against Defendant Richmor Aviation, Inc.

## III. DISCUSSION[5]

### A. Summary judgment legal standard

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) (quotation omitted). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

---

[5] As a preliminary matter, the Court denies Plaintiff's motion to strike Defendant's Statement of Material Facts. Although this Court's local rules require that a statement of material facts be "accurate and complete," *see* L.R. 7.1(a)(3), Defendant's papers in particular are replete with legal argument that should have been restricted to its memorandum of law. Thus, the Court disregards Defendant's statements of material fact and affidavits to the extent that they improperly advance legal arguments. *See* L.R. 7.1(a)(2), (a)(3) (providing that affidavits "must not contain legal arguments"). Moreover, to the extent that Defendant urges the Court to deny Plaintiff's cross-motion for summary judgment on the ground that Plaintiff failed to file a supporting affidavit, the Court declines to do so because Plaintiff's counsel filed an attorney declaration with the cross-motion. *See* Dkt. No. 55-1, John Henry Dec. This is sufficient to satisfy Local Rule 7.1(a)(3).

Additionally, the Court concludes that any findings it made in its Memorandum-Decision and Order ruling on Defendant's motion to dismiss are non-binding in connection with the present motions for summary judgment. *Cf. Nobel Ins. Co. v. City of N.Y.*, No. 00-CV-1328 (KMK), 2006 WL 2848121, *4 (S.D.N.Y. Sept. 29, 2006) (noting that, because "'a ruling in favor of a plaintiff on a motion to dismiss does not address the merits of a case, such ruling will not preclude a subsequent ruling in favor of a defendant on the same issue on a motion for summary judgment following discovery '" (quotation and other citations omitted)).

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *See Anderson*, 477 U.S. at 250 n.4. If the moving party meets this initial burden, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *See Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553. The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *Anderson*, 477 U.S. at 250 (instructing that summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict" (quotation omitted)).

**B. Plain meaning of the term "flight hour" under the Lease**[6]

New York law governs the Lease in this case. *See* Dkt. No. 52-27, Lease, at § 12.10. Under New York law, "'[t]he elements of a cause of action for breach of contract are (1) formation of a contract between plaintiff and defendant; (2) performance by plaintiff; (3) defendant's failure to perform; and (4) resulting damage.'" *Research Found. of State Univ. of N.Y. v. Nektar Therapeutics*, No. 09-CV-1292, 2013 WL 2145652, *5 (N.D.N.Y. May 15, 2013) (quotation omitted). In this case, it is undisputed that the Lease is a contract between Plaintiff and Defendant. Additionally, there is no genuine dispute that Plaintiff performed.[7] However, the parties dispute whether Defendant breached and to what extent Plaintiff suffered damages.

---

[6] Before addressing the merits of Plaintiff's claim, the Court finds that Plaintiff's request to invoke the doctrine of judicial estoppel here is misplaced.

> [I]n evaluating whether to apply the doctrine of judicial estoppel, courts generally look for the existence of three factors: (1) that a party's new position is "clearly inconsistent" with its earlier position, (2) that the party seeking to assert this new position previously persuaded a court to accept its earlier position, and (3) that the party "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

*Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012) (quotation omitted). In this case, although Defendant successfully argued in the state-court litigation that SFA owed it money in connection with "the charter of [Plaintiff's] Aircraft," *see Richmor Aviation, Inc.*, 82 A.D.3d at 1423, there was no issue as to Plaintiff's entitlement to payment for such hours. Neither was there any issue concerning the Lease between Plaintiff and Defendant. Accordingly, Plaintiff's argument that "without [Plaintiff's Aircraft, Defendant] could not have received any funds from SFA" is oblique; although perhaps true on its face, it avoids the central question of whether the Lease entitles Plaintiff to the payment it seeks here. Accordingly, the Court finds that Plaintiff's judicial estoppel argument is without merit.

[7] Although Defendant purports to dispute whether Plaintiff performed its obligations under the Lease, *see* Dkt. 58-1, Def.'s Reply, at 15, it supports this argument by pointing to its prior argument that Plaintiff did not perform 24/7 standby operations under the SFA contract and that, accordingly, Plaintiff is not entitled to payment under the SFA contract. *See* Dkt. No. 52-3, Def.'s Mem., at 15. This argument, although suggesting that Plaintiff is not a proper third-party beneficiary of the SFA contract, does not challenge Plaintiff's performance under the terms of the Lease. Accordingly, the Court finds that there is no genuine dispute with respect to

(continued . . . )

If a contract's language is clear and unambiguous, the court, as a matter of law, enforces the provisions in accordance with their plain and ordinary meaning. *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004). In other words, where "'a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence.'" *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) (quotation omitted).

"Contracts must be read as a whole, and if possible, courts must interpret them to effect the general purpose of the contract." *Id.* (citing *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358, 763 N.Y.S.2d 525, 794 N.E.2d 667 (2003)). "'It is also important to read the document as a whole to ensure that excessive emphasis is not placed upon particular words or phrases.'" *Id.* (quoting *South Road Assocs., LLC v. Int'l Bus. Machs. Corp.*, 4 N.Y.3d 272, 277, 793 N.Y.S.2d 835, 826 N.E.2d 806 (2005)). Thus, where, as here, neither side contends that the contract terms in question present any ambiguity but instead argue for competing interpretations of what consequences flow from those terms, the court may resolve the issue as a matter of law. *See id.*

In this case, on the one hand, Plaintiff argues that the Lease, when read as a whole, entitles it to 85% of all charter revenues generated in connection with the Aircraft. On the other, Defendant argues that the Lease requires it to remit 85% of revenues only for hours flown. The Lease incorporates the Management Agreement's definition of flight hour as "the time from take-off to landing." By its plain meaning, this definition suggests that the term "flight hour" in the Lease refers only to time the Aircraft was in flight. Accordingly, the Court finds as a matter

---

(. . . continued)
Plaintiff's performance of its obligations under the Lease. Furthermore, to the extent that the parties dispute whether Plaintiff is a third-party beneficiary of the SFA contract, these arguments are irrelevant because neither side in this case seeks to enforce the SFA contract.

of law that, at the time they executed the Lease, the parties intended the term "flight hour" to refer only to time the Aircraft was in flight.

## C.  Modification of the Lease

It is undisputed in this case that Plaintiff seeks to recover only those revenues attributable to SFA *unused* flight time—hours for which SFA guaranteed payment but never flew.  Thus, in light of the Court's finding that the parties originally intended the Lease's "flight hour" term to include only the time actually flown, Plaintiff may prevail on its breach-of-contract claim only by showing that Plaintiff and Defendant orally modified the terms of the Lease such that Plaintiff agreed to forego certain of its rights under the Lease in consideration for a minimum guarantee of charter revenue arising out of the SFA contract regardless of whether the Aircraft flew those hours or not.

Under New York law, a contract that expressly prohibits oral modification generally cannot be changed "unless such executory agreement is in writing and signed by the party against whom enforcement . . . is sought . . . ."  N.Y. Gen. Oblig. Law § 15–301(1).  However, the parties may waive a no-oral modification clause, and an oral modification "may be enforced even in the absence of a writing if either party has partially performed under the terms of that oral agreement."  *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 121 (2d Cir. 1998) (citing *Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 343, 366 N.E.2d 1279, 1283, 397 N.Y.S.2d 922, 926 (1977)).

In order to waive a no-oral modification clause by partial performance, the parties' conduct "'must not otherwise be compatible with the agreement as written.'"  *Aircraft Servs. Resales LLC v. Oceanic Capital Co. Ltd.*, 586 F. App'x 761, 763 (2d Cir. 2014) (quoting [*Rose*,

42 N.Y.2d] at 343-44, 397 N.Y.S.2d 922, 366 N.E.2d 1279); *see also John Street Leasehold LLC v. F.D.I.C.*, 196 F.3d 379, 382 (2d Cir. 1999) (providing that, "even where it is provided that modifications must be in writing and signed, New York will enforce oral modifications in two circumstances—where there has been (1) partial performance or (2) reliance—but only where the subsequent performance or reliance is 'unequivocally referable to the modification.'" (quotation omitted)). To be "unequivocally referable," the parties' conduct must be "'unintelligible or at least extraordinary, explainable only with reference to the oral agreement.'" *Merrill Lynch*, 155 F.3d at 122 (quoting *Anostario v. Vicinanzo*, 59 N.Y.2d 662, 664, 450 N.E.2d 215, 216, 463 N.Y.2d 409, 410 (1983)). If a party's conduct can be reasonably explained by reasons other than an oral modification, then the conduct is "equivocal" and the prohibition on oral modifications prevails. *See id*. (citation omitted). The question of waiver in this context is one of fact that may properly be put to a jury where a reasonable jury could conclude that the conduct of the parties was inconsistent with their original agreement as written. *See, e.g.*, *Gun Hill Rd. Serv. Station, Inc. v. ExxonMobil Oil Corp.*, No. 08 Civ. 7956(PKC), 2013 WL 395096, *5 (S.D.N.Y. Feb. 1, 2013).

In this case, there appears to be a genuine issue of material fact as to whether the parties' course of conduct can be explained only in reference to an oral modification of the Lease. As Plaintiff points out, there is evidence tending to show that it agreed to forego certain of its rights under the Lease in exchange for benefits arising out of SFA's agreement with Defendant. In particular, Mr. Gilmour testified at his deposition that Plaintiff agreed to forego its access priority to the aircraft and further agreed to a discounted hourly rate in consideration for a minimum of 250 hours for the first six months of the SFA transaction, with the option of 50 hours per month thereafter. *See* Dkt. No. 52-15, Gilmour Dep., at 32-36; *see also* Dkt. Nos. 52-

19, 52-20, Richards Dep., at 60, 67-69 (discussing oral conversations in which the parties agreed to a discounted rate and Plaintiff consented to allowing the Aircraft to be available to SFA 24/7 in exchange for "large blocks" of charter time).

Put another way, a reasonable jury could find that several features of the parties' conduct as it relates to the SFA charter are incompatible with the terms of the written Lease. First of these is Plaintiff subordinating its use priority to SFA. *Compare* Dkt. No. 52-27, Lease, at §§ 1.1, 2.2(b) (identifying the Aircraft as available for charter "as available") *with* Dkt. No. 52-23, SFA Contract, at 2 (identifying the Aircraft as available for use "as required" by SFA). Second is the provision for a minimum number of hours per month. *Compare* Dkt. No. 52-27, Lease, at § 2.2(c) (providing that "[n]othing contained [in this Lease] shall obligate [Defendant] to any minimum usage of the Aircraft"). These facts, viewed together, would be sufficient to support a reasonable factfinder's conclusion that that the parties' conduct is "explainable only by reference to the oral agreement." *Merrill Lynch*, 155 F.3d at 122.

D.  **Account-stated defense**

"'An account stated is an agreement between parties to an account based upon prior transactions between them with respect to the correctness of the account items and balance due.'" *Seacon Corp. v. Cellect, LLC*, No. 6:06-CV-1022, 2009 WL 2495949, *4 (N.D.N.Y. Aug. 12, 2009) (quotation omitted). "An agreement as to the amount due is implied where an invoice is received and kept without objection made within a reasonable time." I*d.* (citations omitted). Accordingly, "[t]he failure to object raises a presumption of correctness which may be rebutted by proof of any circumstances tending to a contrary inference[.]" *James Talcott, Inc. v. U.S. Tel. Co.*, 52 A.D.2d 197, 200 (1st Dep't 1976) (citation omitted).

However, a claim or defense based upon the account stated doctrine "fails where there has not been an account rendered," or where there is a dispute as to whether the account is accurate. *Seacon Corp.*, 2009 WL 2495949, at *4.; *see also Seneca Pipe & Paving Co., Inc. v. S. Seneca Cent. Sch. Dist.*, 83 A.D.3d 1540, 1542 (4th Dep't 2011) (finding that a plaintiff failed to prove its accounts-stated claim where the defendant "asked for a break-down" of what was due and refused to pay part of an invoice). Furthermore, an "[a]ccount stated, even when pleaded as a defense or proved on the trial, is not conclusive as a settlement, if mistake or other equitable considerations are shown to impeach it." *Hopwood Plays, Inc. v. Kemper*, 263 N.Y. 380, 385 (1934) (citations omitted).

In this case, the parties attached Defendant's monthly invoices to Plaintiff for the time period at issue, generally from May of 2002 to January of 2005. *See generally* Dkt. Nos. 52-29, 59-30. Generally, the invoices detailed monthly charter revenues together with monthly expenses for the Aircraft, culminating in a statement of an amount due to either Plaintiff or Defendant depending upon whether revenues or expenses were greater. It is undisputed that the invoices do not mention the revenue in controversy here, namely, SFA's unused flight time.[8] The parties disagree as to the effect of these invoices on Plaintiff's claim. According to Plaintiff, it delayed in billing Defendant for the unused hours and further refrained from advising Defendant of an ongoing breach of the Lease because "it's not the way we typically communicated with Mahlon [Richards]." *See* Dkt. No. 52-16, Gilmour Dep., at 120:14-15, 157: 7-8.

---

[8] However, the invoices' line items for revenue refer to attachments which are not included in the exhibits. *See generally* Dkt. No. 52-29, Def.'s Ex. "T." Thus, it is not possible from the exhibits to determine what particular items comprised Defendant's statement of the Aircraft's revenue in any given month.

Although Plaintiff's failure to object raises a presumption that the invoices were correct, the record may reasonably be read as showing that they were incomplete. This raises equitable considerations as to whether the parties knew that Defendant owed Plaintiff a further amount than stated in the invoices—for the SFA unused flight time—and that their agreement was for Defendant to pass such revenue on to Plaintiff "when [Defendant] got paid." *See* Dkt. No. 52-15, Gilmour Dep., at 19-22 (noting that, beginning in or around 2002, Plaintiff and Defendant had conversations about how many minimum hours Plaintiff was due in light of the fact that the invoices were inconsistent with respect to revenue from month to month), 75-79 (relating that "I could see [from the invoices] that we weren't getting our charter revenue . . . so I was asking Mahlon [Richards], and he was saying that he hadn't been paid by [SFA] yet, and he would pay us when he got paid by them").

Viewed in light of the parties' pattern of oral dealing, including frequent status conversations about all facets of their business relationship, these conversations could reasonably be viewed as showing that the parties knew and acknowledged that the invoices were not a complete statement of all amounts owing between them. *See, e.g.*, *id.* at 120 (responding to the question of why Plaintiff did not bill Defendant by saying, "It's not the nature of the relationship we've had for years . . . .").[9] Accordingly, the Court finds that there are genuine issues of material fact regarding Defendant's account-stated defense.

---

[9] Moreover, Defendant's accountant testified that he did not record the unused flight time because it was a "claim that [hadn't] been adjudicated," and thus not "realized or realizable." *See* Dkt. No. 55-15, Valachovic Dep., at 45:21-46:7. Also, Plaintiff has represented that it uses the cash basis accounting method, "which provides for the recording of receipts and expenses only when received or incurred." *See* Dkt. No. 55-18, Pl.'s Mem., at 27; Dkt. No. 55-15, Valachovic Dep., at 50 (noting that cash basis method is "an accepted accounting method" whereby "nothing is recorded until cash is received or disbursed"). This testimony further supports a reasonable explanation of why the unused SFA hours appeared neither in the parties' books nor in their monthly invoices. Thus, a reasonable factfinder could conclude that it would

## IV. CONCLUSION

Having reviewed the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for summary judgment, *see* Dkt. No. 52, is **DENIED**; and the Court further

**ORDERS** that Plaintiff's cross-motion for summary judgment, *see* Dkt. No. 55, is **DENIED**; and the Court further

**ORDERS** that trial counsel shall participate in a telephone conference on April 4, 2016, at 11:00 a.m. to schedule a trial in this matter. The Court will provide counsel with the dial-in instructions prior to the conference.

**IT IS SO ORDERED.**

Dated: March 14, 2016
        Syracuse, New York

_____
Frederick J. Scullin, Jr.
Senior United States District Judge

---

not be inconsistent for the parties to be discussing an amount that Defendant owed Plaintiff, to be collected from SFA, when such amount was not recorded or otherwise accounted for.